```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION

 3   UNITED STATES OF AMERICA ) Docket No. A 08-CR-92(1) SS
                              )
 4   vs.                      ) Austin, Texas
                              )
 5   ARTHUR LONGORIA          ) August 11, 2008

 6
                    TRANSCRIPT OF TRIAL ON THE MERITS
 7                 BEFORE THE HONORABLE SAM SPARKS
                           Volume 1 of 2
 8

 9   APPEARANCES:

10   For the United States:      Ms. Rrachelle R. Douglas
                                 Mr. Grant Sparks
11                               Assistant U.S. Attorneys
                                 816 Congress Avenue, Suite 1000
12                               Austin, Texas 78701

13

14   For the Defendant:         Mr. Stephen M. Orr
                                 Orr & Olavson
15                               804 Rio Grande Street
                                 Austin, Texas 78701
16

17

18   Court Reporter:            Ms. Lily Iva Reznik, RPR, CRR
                                 200 W. 8th Street
19                               Austin, Texas 78701
                                 (512)916-5564
20

21

22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

1                          **I N D E X**

2                                                              Page

3    Jury Voir Dire                                            12

4    Government's Opening Statements                           72

5    Defendant's Opening Statements                            76

6                          Direct    Cross    Redirect   Recross
     Witnesses:

7

8    Jonathan D. Lee         80        91        105       106

9    Robbie M. Volk         107       120

10   Stephen L. Schafer     124

11   Brian Crissman         131       139

12   Anthony C. Nelson      140

13   Armando A. Balderama   149       156

14   David Berryhill        158       166

15   Douglas A. Skolaut     168       174

16   Daniel L. Jones        180       189

17   Belinda D. Olivo       195

18

19   Proceedings Adjourned                                    198

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2                                        Offered    Admitted

 3    Government's

 4    #2                                    154        154

 5    #3                                    173        173

 6    #4                                    155        155

 7    #5                                    169        169

 8    #6                                    117        117

 9    #6A                                   118        119

10    #7                                    133        133

11    #14                                   142        142

12    #15                                   142        142

13    #23 through 27                        142        142

14    #31                                   119        119

15    #31A                                  138        138

16    #32                                   138        138

17

18    Defendant's

19    (None.)

20

21

22

23

24

25
```

10:54:11  1          THE CLERK:  The Court calls Case No. A 08-CR-92, United

10:54:11  2  States of America vs. Longoria.

10:54:11  3          MS. DOUGLAS:  Good morning, your Honor.  Rrachelle

10:54:11  4  Douglas on behalf of the United States.

10:54:11  5          THE COURT:  Ms. Douglas.

10:54:11  6          MR. ORR:  Steve Orr and David Crawford for Mr.

10:54:11  7  Longoria, your Honor.  Your Honor, Mr. Crawford is not yet

10:54:11  8  licensed in federal court, but he's just going to assist me here.

10:54:11  9          THE COURT:  Welcome.

10:54:11  10          MR. ORR:  I need some help.  Well, the Court knows

10:54:11  11  that.

10:54:11  12          THE COURT:  I don't know that that's necessary, but all

10:54:11  13  you have to do is file a motion pro hac vice and I'll be glad to

10:54:11  14  let him in.  But I'll let him in orally.

10:54:11  15          MR. ORR:  Thank you, your Honor.

10:54:11  16          THE COURT:  Because of --

10:54:11  17          MR. ORR:  He's studying to take the exam, Judge.

10:54:11  18          THE COURT:  I hope he -- let me look at your tie, sir.

10:54:11  19  He can give you help, Mr. Orr.

10:54:11  20          All right.  We've replaced one of your jurors.  But I

10:54:11  21  don't know which one.  And of course, under the computer, they'll

10:54:11  22  just move another one on the panel, but we had a juror this

10:54:11  23  morning that was distressed.  She's going to the doctor today to

10:54:11  24  find out if she has cancer.  And I have a good illustration today

10:54:11  25  of how well we're doing in our paperless docket.  I have one set

10:54:11  1  of government's proposed voir dire.  I have two sets of the

10:54:11  2  defendant's proposed voir dire.  I've got a copy of the

10:54:11  3  defendant's motion in limine and memorandum of law.  I have the

10:54:11  4  government's two responses to that motion.  I have the

10:54:11  5  government's two responses to the 404(b) motion.  I have two

10:54:11  6  motions -- two responses to the motion for disclosure of all

10:54:11  7  evidence.  The only thing I can assume is that who's ever filing

10:54:11  8  the pleadings is making errors, and so, you re-file again and, of

10:54:11  9  course, then, we get another pleading.  I have one set of the

10:54:11  10  government's jury instructions.  No jury instructions from the

10:54:11  11  defendant; is that correct, Mr. Orr?

10:54:11  12        MR. ORR:  That would be correct, your Honor.  I just

10:54:11  13  assumed that probably your Honor would know the correct charge.

10:54:11  14  I have a charge in the last gun case I did upstairs in Judge

10:54:11  15  Yeakel's court.

10:54:11  16        THE COURT:  The only thing I require is if you wish to

10:54:11  17  have a special charge --

10:54:11  18        MR. ORR:  I don't know of any.

10:54:11  19        THE COURT:  And I have two more government's responses

10:54:11  20  to the motion for disclosure of all evidence, three more, four

10:54:11  21  more.  Two more copies of the government's response to 404(b).

10:54:11  22  They must be very concerned about 404(b).  They have four

10:54:11  23  separate responses, all of which are identical, by the way, but

10:54:11  24  it takes me a long time to find out that they're identical.  So I

10:54:11  25  would appreciate a little bit more accurately filed stuff.

10:54:11  1          All right.  Well, we have the motion in limine, so I'll

10:54:11  2   hear from the government.

10:54:11  3          MR. ORR:  Your Honor, Mr. Longoria is charged with one

10:54:11  4   count of possession by a felon of a firearm with a .380 pistol,

10:54:11  5   and at the house there's counterfeit money, there's drugs all

10:54:11  6   over the place, I think, as well as a sawed-off shotgun.  I think

10:54:11  7   that none of this stuff needs to be admitted to prove up the

10:54:11  8   possession of a firearm.

10:54:11  9          THE COURT:  How about the police scanner and body

10:54:11  10  armor?

10:54:11  11         MR. ORR:  Oh, yeah.  None of that either, your Honor.

10:54:11  12  Well, there's so many people at the house, Judge.  I mean there's

10:54:11  13  three or four different people there, and not all the people live

10:54:11  14  there were there.  I mean this can all belong to someone else

10:54:11  15  other than Mr. Longoria.  And so, to err against Mr. Longoria --

10:54:11  16  unless they can trace it to Mr. Longoria and affirmatively link

10:54:11  17  him to the drugs, the body armor, and all that stuff, I think

10:54:11  18  it's highly -- it's prejudicial.

10:54:11  19         THE COURT:  I can't tell.  I'll ask counsel in a

10:54:11  20  minute.  But it appears that the gun was in the bedroom under a

10:54:11  21  bed, defendant's bed; that the body armor and scanner were in the

10:54:11  22  bedroom.  I don't know exactly where the drugs were.  But let's

10:54:11  23  find out from the government.

10:54:11  24         MR. ORR:  Yes, your Honor.

10:54:11  25         MR. SPARKS:  Yes.  Judge, each of those three items,

| | | |
|---|---|---|
| 10:54:11 | 1 | the scanner, the body armor and then, the drugs that we've listed |
| 10:54:11 | 2 | in the 404(b) motion -- there were other drugs found elsewhere in |
| 10:54:11 | 3 | the home, but the ones listed in the response to the motion were |
| 10:54:11 | 4 | all found in about a ten-foot radius from the bed, at the most, |
| 10:54:11 | 5 | probably closer to an arm's length or from between myself and Ms. |
| 10:54:11 | 6 | Sims. |
| 10:54:11 | 7 | THE COURT:  The marihuana cigarettes, the cocaine and |
| 10:54:11 | 8 | the top dresser drawer, cocaine in the false Pepsi can, heroin in |
| 10:54:12 | 9 | the false Pepsi can, and methamphetamine in the false Pepsi can |
| 10:54:12 | 10 | in the refrigerator. |
| 10:54:12 | 11 | MR. SPARKS:  That's correct, Judge.  And the |
| 10:54:12 | 12 | refrigerator, just so the Court has a frame of reference, it was |
| 10:54:12 | 13 | a small, little bedroom type of refrigerator that was basically, |
| 10:54:12 | 14 | roughly, arm's length from the bed where the handgun was found. |
| 10:54:12 | 15 | So our position is that the -- the guns, the scanner, the body |
| 10:54:12 | 16 | armor, the shotgun, everything, is inextricably intertwined with |
| 10:54:12 | 17 | that possession of handgun.  And if I failed to mention the |
| 10:54:12 | 18 | scanner, as well.  And it's necessary to complete the story of |
| 10:54:12 | 19 | the crime. |
| 10:54:12 | 20 | THE COURT:  Well, then, why didn't the government |
| 10:54:12 | 21 | charge him appropriately? |
| 10:54:12 | 22 | MR. SPARKS:  Well, we could have charged some pretty |
| 10:54:12 | 23 | small amounts of drugs. |
| 10:54:12 | 24 | THE COURT:  You just want to get it in for prejudice |
| 10:54:12 | 25 | then. |

10:54:12  1          MR. SPARKS:  Well, I don't think it's unduly

10:54:12  2  prejudicial --

10:54:12  3          THE COURT:  This is certainly extrinsic.  The gun can

10:54:12  4  come out of a drug charge, but I've never seen a case where they

10:54:12  5  say drugs can come out of a gun charge.  So we're looking at

10:54:12  6  straight 404(b), and the government doesn't want to charge that,

10:54:12  7  I don't see where it's admissible.  The drugs, I don't see.

10:54:12  8  We've got Mr. Longoria and I assume there's a Mrs. Longoria in

10:54:12  9  the bedroom.

10:54:12  10          Now, the scanner and the body armor, there's not much

10:54:12  11  reason to have body armor unless there's a relationship to a gun.

10:54:12  12  So that's a closer question.  But they're clearly prejudicial.

10:54:12  13  And in this case, it appears to me from reading Judge Yeakel's

10:54:12  14  order on suppression that you have the gun under the defendant's

10:54:12  15  bed, the defendant in a statement to law enforcement officers,

10:54:12  16  after receiving Miranda warnings a second time, advises that he

10:54:12  17  handled the gun, and that he wouldn't be surprised his

10:54:12  18  fingerprints were on it.  Were his fingerprints on it?

10:54:12  19          MR. SPARKS:  No, they were not, Judge.

10:54:12  20          THE COURT:  Well, I didn't think so.

10:54:12  21          MR. SPARKS:  Well, I would say this.  Prints were not

10:54:12  22  able to be pulled off.  No latent prints of any kind were able to

10:54:12  23  be pulled off the firearm.

10:54:12  24          THE COURT:  I've never seen prints on a gun, actually,

10:54:12  25  but it was a good question to ask.  So you've got the defendant's

10:54:12  1    own testimony that he handled it; that means he possessed it.

10:54:12  2    And the gun is under his bed.  What else does the government

10:54:12  3    want?

10:54:12  4             MR. SPARKS:  Well, Judge --

10:54:12  5             THE COURT:  Why else would it not be prejudicial to the

10:54:12  6    point that it would override probative value?

10:54:12  7             MR. SPARKS:  I guess the government's position and I've

10:54:12  8    sort of -- I don't know how else to phrase this.  I respectfully

10:54:12  9    disagree with the drugs being extrinsic.  Everything there was

10:54:12  10   res gestae.  The offense was -- my position is that it is --

10:54:12  11   well, it's intrinsic.  It's part of the whole commission of the

10:54:12  12   crime, the presence of the drugs, the presence of the scanner,

10:54:12  13   presence of the body armor.

10:54:12  14            Our position is that just because we could prove the

10:54:12  15   case without the body armor and the scanner, or that we don't

10:54:12  16   need it by virtue of his confession, doesn't mean that we think

10:54:12  17   it's relevant and intrinsic to the crime.  It's a matter of

10:54:12  18   weight in our position, not whether or not necessarily we need

10:54:12  19   it.

10:54:12  20            THE COURT:  Well, the Fifth Circuit doesn't seem to

10:54:12  21   agree with you.  United States vs. Ridlehuber,

10:54:12  22   R-I-D-L-E-H-U-B-E-R, they reversed Judge Smith by holding that

10:54:12  23   this was not intrinsic but extrinsic; that is, that drugs do not

10:54:12  24   come -- in this particular case was a methamphetamine lab, which

10:54:12  25   was the reason for the search warrant, as drugs were the reason

10:54:12  1  for the search warrant here.  And the Fifth Circuit held that it

10:54:12  2  was -- that a gun charge could well be intrinsic in a dope case

10:54:12  3  but not the opposite; so therefore, it's just a pure evaluation

10:54:12  4  of whether the probative value outweighs the prejudice.

10:54:12  5       And as I understand it, and you correct me if I'm wrong

10:54:12  6  because I didn't hear the motion to suppress, but you have the

10:54:12  7  gun under the defendant's bed and an admission to law enforcement

10:54:12  8  officers that he knew it was there and he handled it.  Is that

10:54:12  9  right?

10:54:12  10      MR. SPARKS:  That is correct, Judge.

10:54:12  11      THE COURT:  All right.  Now, if on cross-examination

10:54:12  12  the door is opened with regard to body armor, with regard to

10:54:12  13  scanner, or any inference, for example, that somebody else placed

10:54:12  14  the gun there, or he just touched it as he reached for his

10:54:12  15  pillow, or anything like that, or anybody else had the gun, then

10:54:12  16  approach, and I may, then, think that the evidence is more

10:54:12  17  probative than prejudicial.

10:54:12  18      But right now, it appears -- particularly the drugs.

10:54:12  19  The scanner could be anything.  But the body armor is certainly

10:54:12  20  closely related to the firearm.  But at the present time, I'll

10:54:12  21  sustain the motion in limine which requires the government to

10:54:12  22  approach the bench before they go into anything other than the

10:54:12  23  gun at this time.

10:54:12  24      MR. SPARKS:  And just for clarification, the shotgun,

10:54:12  25  I'm assuming by your comments -- or I'm not going to assume

10:54:12  1  anything, actually, Judge.  Could I get clarification on the

10:54:12  2  shotgun?

10:54:12  3           THE COURT:  The shotgun's in another room, isn't it?

10:54:12  4           MR. SPARKS:  No.  It's in the safe in the bedroom,

10:54:12  5  which was also -- it was on top of the refrigerator within arm's

10:54:12  6  length, inside the safe --

10:54:12  7           THE COURT:  And the defendant gave you the --

10:54:12  8           MR. SPARKS:  Combination, yes, your Honor.

10:54:12  9           MR. ORR:  Well, we think the evidence actually is he

10:54:12  10  gave the combination to another safe.  There's the gun safe and

10:54:12  11  there's another safe.  So we -- the offense report isn't clear,

10:54:12  12  but we believe that based on all the evidence that he didn't give

10:54:12  13  the combination to the gun safe.

10:54:12  14           MR. SPARKS:  But shotgun -- the combination that he

10:54:12  15  gave opened the safe that had the shotgun in it, your Honor.

10:54:12  16           MR. ORR:  I'm saying I don't think that's right.  Well,

10:54:12  17  I don't know.  Who knows what I know.  What difference does it

10:54:12  18  matter what I think?

10:54:12  19           THE COURT:  Well, let's find out, satisfy Mr. Orr.

10:54:12  20  Let's find out when you put the officer on that Mr. Longoria gave

10:54:12  21  the combination to the safe wherein you found the shotgun.

10:54:12  22           MR. SPARKS:  Understood.

10:54:12  23           THE COURT:  All right.

10:54:12  24           MR. SPARKS:  Thank you, your Honor.

10:54:12  25           THE COURT:  All right.  Anything else before we select

10:54:12  1    the jury?

10:54:12  2            MR. SPARKS:  Housekeeping question.  We have a witness

10:54:12  3    that didn't bring a jacket -- a jacket.  He's got a coat and a

10:54:12  4    dress shirt on.  What's the Court's --

10:54:12  5            THE COURT:  I'll have counsel up here, please.

10:54:12  6            (At the bench, on the record.)

10:54:12  7            THE COURT:  All right.  On the stipulations, the chief

10:54:12  8    stipulation, but is the stipulation to be placed in evidence, the

10:54:12  9    stipulation of facts you're going to place it in evidence in the

10:54:12  10   charge?

10:54:12  11           MS. DOUGLAS:  No, your Honor.  Just the whole chief

10:54:12  12   stipulation as to the one felony.  Yes, sir.

10:54:12  13           MR. ORR:  The standard ol' chief thing.  I asked her

10:54:12  14   about that.

10:54:12  15           THE COURT:  I was going to say.

10:54:12  16           MR. ORR:  No.  It doesn't say that.  But I said that.

10:54:12  17   I should have said it last week but --

10:54:12  18           THE COURT:  Okay.  So you're going to -- on reading the

10:54:12  19   indictment and you stipulated he has eight felony convictions?

10:54:12  20           MS. DOUGLAS:  Yes, sir.

10:54:12  21           THE COURT:  That will be in the charge.

10:54:12  22           MR. ORR:  Thank you, your Honor.

10:54:12  23   JURY VOIR DIRE

10:54:12  24           (Jury panel present.)

10:54:12  25           THE COURT:  Well, welcome to the United States District

10:54:12  1  Court, members of the jury panel.  Many of you are from outside

10:54:12  2  of Travis County?  If you'll raise your hand.  How many of you

10:54:12  3  were surprised to get our invitation?  The Austin Division of the

10:54:12  4  Western District of Texas comprises 16 counties, just like the

10:54:12  5  congressional district, or like the old congressional district,

10:54:12  6  and the law requires us to draw proportionate to the population,

10:54:12  7  which is a population that is registered to vote, the same number

10:54:12  8  throughout.  So I can have people as far as Junction.  Anybody

10:54:12  9  from Junction here today -- on one side, all the way to Brenham

10:54:12 10  on the other.  Anybody from Brenham?  No ice cream today.

10:54:12 11          And the federal court recommends that a jury panel be

10:54:12 12  held for six months.  In Austin, we have the privilege of having

10:54:12 13  a lot of people in the Travis, Williamson County and Hays County,

10:54:12 14  so you're only on for two months, which I regret because some of

10:54:12 15  you won't get to serve on a jury.  But the Western District is

10:54:12 16  also the second largest geographic district in the nation.  The

10:54:12 17  largest is the one district in Alaska, but our district runs from

10:54:12 18  here to Waco, to Midland, Odessa to El Paso, back down through

10:54:12 19  Del Rio, San Antonio, encircling Pecos.  And the folks in the

10:54:12 20  Pecos Division, which has a very high docket in number, and

10:54:12 21  Midland and Del Rio will serve every for year, virtually

10:54:12 22  everybody that lives in that district.  And the Pecos and in Del

10:54:12 23  Rio, the jurors can drive easily 200 miles a day to jury service.

10:54:12 24          And while anybody on the jury in Austin has the option

10:54:12 25  of staying here, most of the folks have responsibilities in

10:54:12  1   ranches, and that type of thing, where they have to get back.  So

10:54:12  2   that's my way of telling you you've got it easy.  And let me give

10:54:12  3   you a little reminder of our history.

10:54:12  4          As you probably remember from school, jury trials in

10:54:13  5   criminal cases and then, civil cases became a formality under the

10:54:13  6   Magna Carta.  People were rising up against total authority of

10:54:13  7   kings, and that was one of the provisions there.  But the

10:54:13  8   important part to the United States was that -- and I'm reading a

10:54:13  9   book right now, one of the new best sellers called the Mayflower,

10:54:13  10  which is -- it's one of those books you can read about 28 pages a

10:54:13  11  day and put it down and read it 28 pages the next day, a hard

10:54:13  12  read, but it's a hard story, too.  And the people that came over

10:54:13  13  and settled in Plymouth but from then on, because they came

10:54:13  14  primarily from Europe, they were used to jury trials that result

10:54:13  15  from the Magna Carta.

10:54:13  16         And in 1772, when King George had imposed a lot of

10:54:13  17  taxes, he realized, all of a sudden, that he was losing all of

10:54:13  18  the lawsuits in the states or the colonies, and the reason for

10:54:13  19  that was at that time the juries not only found facts, they were

10:54:13  20  allowed to find the law.  So, as you probably remember, in 1772,

10:54:13  21  he outlawed and prohibited jury trials in the colonies, which

10:54:13  22  means that all civil and all criminal cases were determined by

10:54:13  23  judges who were appointed by the crown.  So in 1776 and 1777,

10:54:13  24  after the war, as you know, we got the Sixth and Seventh

10:54:13  25  Amendments to the Constitution.  Nine of the 13 colonies refused

10:54:13  1  to ratify the Constitution until it was represented that a Bill

10:54:13  2  of Rights would issue and we would have jury trials in the United

10:54:13  3  States for civil and criminal cases.

10:54:13  4          Now, why do I remind you of that?  The reason for it is

10:54:13  5  this is the only time that each of you who served on a jury will

10:54:13  6  be active in your government.  You have to run for an office for

10:54:13  7  the legislature.  And the executive, you've got to be appointed

10:54:13  8  if you're not elected president or governor.  But all issues in

10:54:13  9  all civil cases and all criminal cases in our country, which is

10:54:13  10  the only country in the world, is to be determined by its

10:54:13  11  citizenry, not judges.  They didn't want old, tired, fat,

10:54:13  12  gray-headed judges, like me, determining everything that they

10:54:13  13  have.  It was a distrust of judges in 1778 and a distrust of

10:54:13  14  government.  The people then wanted their own people in the

10:54:13  15  neighborhoods to find the facts in criminal and civil trials, and

10:54:13  16  that has continued today.

10:54:13  17          So while we have a staff that's going to accommodate

10:54:13  18  you best we can, we want you to be down here when you can serve.

10:54:13  19  When you can't serve, you can call in and we will arrange it.

10:54:13  20          Judge Nowlin is selecting a jury today.  Judge Yeakel

10:54:13  21  is in his third or fourth week in a case, and we will be

10:54:13  22  selecting from your number one jury, unfortunately, just one.  It

10:54:13  23  will be a criminal case, but you'll be through this week.  You

10:54:13  24  should be through Thursday, at the latest.  So that's where we

10:54:13  25  are.  Each of you have been qualified to be a juror in the United

10:54:13  1  States District Court.  We're going to go through what we call

10:54:13  2  the voir dire examination so that we can find from your number

10:54:13  3  people who can serve on this jury and be objective jurors.

10:54:13  4        Now, the definition of objective juror is very simple:

10:54:13  5  It's one who will under oath say, I will listen to the evidence

10:54:13  6  in a trial of this case.  I will follow the instructions given to

10:54:13  7  me by the Judge on the law, and I will answer any questions of

10:54:13  8  fact asked of me solely from what I hear in the trial with my

10:54:13  9  fellow jurors.  In a criminal case, the factual findings are a

10:54:13  10 finding of not guilty or guilty.  In a civil case, there are

10:54:13  11 questions that are usually answered "Yes" or "No," but they will

10:54:13  12 be factual issues.

10:54:13  13       So you're about to start serious business here.  I know

10:54:13  14 that there's not any of you who would rather not be someplace

10:54:13  15 else, but have a little patience with it because this is your

10:54:13  16 responsibility and your authority.  And I hope you can keep that

10:54:13  17 in mind.

10:54:13  18       Now, this is a criminal case and criminal cases in the

10:54:13  19 federal court are handled by the United States Attorney's Office.

10:54:13  20 And the assistant United States attorney is Rrachelle Douglas.

10:54:13  21 Ms. Douglas, if you would stand and introduce, please, everyone

10:54:13  22 in the courtroom that's associated with the prosecution.

10:54:13  23       MS. DOUGLAS:  Yes, your Honor.

10:54:13  24       Good morning, my name is Rrachelle Douglas.  Grant

10:54:13  25 Sparks will be assisting me with the trial.  He works at the

10:54:14  1  United States Attorney's Office, as well.  Doug Skolaut is the

10:54:14  2  detective with the Austin Police Department.  He's the case agent

10:54:14  3  on this case.  He'll be in the courtroom throughout the entire

10:54:14  4  trial.  Thank you, your Honor.

10:54:14  5      THE COURT:  Now, does anybody on the panel know Ms.

10:54:14  6  Douglas or Mr. Sparks?  Does anybody know anybody that's

10:54:14  7  associated with the United States Attorney's Office?

10:54:14  8      Now, my name is Sam Sparks.  I cannot grow a little

10:54:14  9  goatee, like he's got over there, and we're not related.  And I

10:54:14  10  have to say that every time, but we are not related.

10:54:14  11      The defendant in the case is Mr. Arthur Longoria.  Mr.

10:54:14  12  Longoria, if you would stand, please.  He's represented by Mr.

10:54:14  13  Orr.  Mr. Orr, if you would introduce your crew.

10:54:14  14      MR. ORR:  I'm Steve Orr and this is our young

10:54:14  15  associate, David Crawford.

10:54:14  16      THE COURT:  Okay.  Anybody know Mr. Longoria, or Mr.

10:54:14  17  Orr, or his associate?  Yes, ma'am.  If you'd just stand up and

10:54:14  18  tell me first your name and number.

10:54:14  19      THE JUROR:  Allison Abascal-Roemer, Juror No. 246.  I'm

10:54:14  20  not sure if I know Rrachelle.  And, I'm sorry, your last name?

10:54:14  21      THE COURT:  Douglas.

10:54:14  22      THE JUROR:  Her name sounds familiar.  I work with

10:54:14  23  Child Protective Services out of Kerrville, and I worked a case

10:54:14  24  with a doctor in Kerrville who was prosecuted.

10:54:14  25      MS. DOUGLAS:  We know each other from any child abuse

10:54:14  1  experience, your Honor.

10:54:14  2       THE COURT:  All right.  The fact -- hold on one second.

10:54:14  3  The fact that you know Ms. Douglas through some sort of

10:54:14  4  professional relationship, I assume this case had to do with your

10:54:14  5  employment?

10:54:14  6       THE JUROR:  Correct.

10:54:14  7       THE COURT:  Would that influence you, one way or the

10:54:14  8  other, pro-Ms. Douglas or anti-Ms. Douglas; or can you tell me

10:54:14  9  and these parties under oath that you could listen to the

10:54:14  10 evidence, make up your mind only on the evidence?

10:54:14  11      THE JUROR:  Yes.  I could listen to the evidence.

10:54:14  12      THE COURT:  Okay.  All right.  Thank you.  Yes, ma'am.

10:54:14  13      THE JUROR:  My name is Ana Martinez.  I'm Juror 195.

10:54:14  14 And I don't know whether I should say this, but my husband is a

10:54:14  15 retired U.S. attorney.

10:54:14  16      THE COURT:  Well, I think probably the people would

10:54:14  17 like to know that.  Where?

10:54:14  18      THE JUROR:  His name is Carlos Martinez and he worked

10:54:14  19 in Laredo, Texas.

10:54:14  20      THE COURT:  That's in the Southern District.

10:54:14  21      THE JUROR:  This is the Southern District.

10:54:14  22      THE COURT:  And when did --

10:54:14  23      THE JUROR:  And he was supervisor there in Laredo.  He

10:54:14  24 was disability retirement in '91.

10:54:14  25      THE COURT:  All right.  But I still need to ask you the

10:54:14  1    question, and I'll ask a lot of questions today.  I'm not shy.

10:54:14  2    But those experiences and all of those conversations that you've

10:54:14  3    had and have with your husband --

10:54:14  4              THE JUROR:  Uh-huh.

10:54:14  5              THE COURT:  -- can you represent to these parties that

10:54:14  6    you can listen to the evidence and make up your mind in this case

10:54:14  7    and not be influenced by all of those associations and

10:54:14  8    experiences with your husband?

10:54:14  9              THE JUROR:  Yes, sir.

10:54:14  10             THE COURT:  All right.  Thank you.

10:54:14  11             Now, I've already indicated that we will be through by

10:54:14  12   Thursday.  As I've told you, some of our trials can last months,

10:54:14  13   actually, in federal court.  This one will not last but till

10:54:14  14   Thursday.  Is there anybody on the panel who has such an

10:54:14  15   important obligation, going to the doctor, taking somebody in

10:54:14  16   your family to the doctor?  I've excused some person already,

10:54:14  17   this morning, who had a major medical problem.  Anybody who

10:54:14  18   cannot work those three or four days this week?  Yes, ma'am.  If

10:54:14  19   you'd stand up.

10:54:14  20             THE JUROR:  Margarita Asi, Juror 223.  I'm a pre-k

10:54:14  21   teacher, and this is the beginning of pre-k registration, this

10:54:14  22   week, from Monday to Friday.  It's pre-k registration for us.

10:54:14  23             THE COURT:  Okay.  And on registration, could they have

10:54:14  24   somebody else at the school that could register?

10:54:14  25             THE JUROR:  But we need to give tests to the students

10:54:14  1    who come.

10:54:14  2          THE COURT:  Okay.  All right.  Now, this is a good --

10:54:14  3    I'm not trying to pick on you.  This is a good example.  If you

10:54:14  4    would have just called and talked with the clerk, they would have

10:54:14  5    arranged for you to come at a time when you weren't this busy.

10:54:14  6    But I've got a lot of people here, so I'll excuse you.  Now, the

10:54:14  7    rest of you, don't start thinking about that.  But I'm going to

10:54:14  8    ask you, ma'am, if you'll follow Mr. Hall.  Mr. Hall runs the

10:54:14  9    courtroom and he'll direct you.  But it's Monday.  As a matter of

10:54:14  10   fact, I'll go ahead and excuse you.  Go register them.  Test

10:54:14  11   them.

10:54:14  12         THE JUROR:  Thank you very much.

10:54:14  13         THE COURT:  Yeah.  Yes, ma'am.

10:54:14  14         MS. HUNT:  Juror 196, Mario Villanueva, will be

10:54:14  15   replacing Juror 223, Margarita Asi.

10:54:15  16         THE COURT:  Are you okay for this week, sir?

10:54:15  17         THE JUROR:  Yes, I am, sir.

10:54:15  18         THE COURT:  Good.  Have a seat.  Anybody else have a

10:54:15  19   problem this week?  Yes, sir.

10:54:15  20         THE JUROR:  I'm not certain, but I have already paid

10:54:15  21   for a vacation plans.

10:54:15  22         THE COURT:  That's a -- a good excuse.  If I ever get a

10:54:15  23   vacation, I want to go myself.  But you just needed to call.

10:54:15  24   When does your vacation start?

10:54:15  25         THE JUROR:  It starts Thursday.

10:54:15  1          THE COURT:  This Thursday?

10:54:15  2          THE JUROR:  Uh-huh.

10:54:15  3          THE COURT:  I'll probably be through with you, but

10:54:15  4   we're not going to take a chance.  I'm going to excuse you.  And

10:54:15  5   your name and number?

10:54:15  6          THE JUROR:  210, Albert Jones.

10:54:15  7          THE COURT:  We'll get you after you get back, nice and

10:54:15  8   fresh.

10:54:15  9          MS. HUNT:  Juror 185, George Peterman, will be

10:54:15  10  replacing Juror 210, Albert Jones.

10:54:15  11         THE COURT:  Mr. Peterman, you all right for this week,

10:54:15  12  sir?

10:54:15  13         THE JUROR:  Yes, sir.

10:54:15  14         THE COURT:  Good answer.  A little slow but good

10:54:15  15  answer.  Anybody else?  Okay.  Right now, you're safe.  Yeah,

10:54:15  16  just kind of be invisible.

10:54:15  17         Now, in just a second, I'm going to have the United

10:54:15  18  States attorney read to you the indictment in the case.  But

10:54:15  19  first, let's talk about an indictment.  You know an indictment

10:54:15  20  comes from a grand jury, and a grand jury is a body of persons

10:54:15  21  under the Constitution that make a determination whether a trial

10:54:15  22  should be held and that's all.  When I get an indictment, it's a

10:54:15  23  pleading; it tells me what the case is about, it tells Mr.

10:54:15  24  Longoria and his lawyer what the case is about; importantly, it

10:54:15  25  also tells us what the case is not about.

10:54:15  1    There's specific charges in an indictment.  So the

10:54:15  2  indictment is not evidence at all of any wrongdoing; it is a

10:54:15  3  charge so that you will know what the case is about.  The

10:54:15  4  evidence will come later, and I'll instruct you later on, and the

10:54:15  5  indictment is simply no evidence.  And a lot of people think if

10:54:15  6  you've got an indictment, that means that you did something

10:54:15  7  wrong.  There have been thousands and thousands of people who

10:54:15  8  have been indicted and had no criminal charges on it, just an

10:54:15  9  indictment that tells you the charge.

10:54:15  10   Now, is there anybody here that does not understand and

10:54:15  11  thinks that just because somebody got indicted, that means that

10:54:15  12  they must have done something wrong?  I take it each of you

10:54:15  13  understand it's just a pleading.

10:54:15  14   All right.  You may read the indictment.

10:54:15  15   MS. DOUGLAS:  United States of America vs. Arthur

10:54:15  16  Longoria, the grand jury charges in a one-count indictment, on or

10:54:15  17  about December 4th, year 2007, in the Western District of Texas,

10:54:15  18  the defendant, Arthur Longoria, who having been convicted of a

10:54:15  19  crime punishable by imprisonment for a term exceeding one year,

10:54:15  20  did knowingly possess in and affecting commerce, a firearm:

10:54:15  21  to-wit, a Hi-Point, Model CF380, .380 caliber, semiauto pistol,

10:54:15  22  Serial No. P870065, which had been shipped and transported in

10:54:15  23  interstate and foreign commerce, in violation of Title 18, United

10:54:15  24  States Code, Section 922(g)(1).  And there's a signature on

10:54:15  25  behalf of the foreperson of the grand jury.

10:54:15  1          THE COURT:  All right.  So that's what this case is

10:54:15  2  about.  It's about the government alleges that Mr. Longoria had

10:54:15  3  in his possession a firearm, and he had previously been convicted

10:54:15  4  of a felony.

10:54:15  5          Now, is there anybody on the panel, because of those

10:54:15  6  allegations, something in your past that you don't feel that you

10:54:15  7  could be an objective juror, that is, to listen to the evidence

10:54:15  8  and make up your mind wholly upon the evidence?  Is there anybody

10:54:15  9  on the panel who thinks you may know anything about this case?

10:54:15  10         If counsel will get ready with the witness list,

10:54:15  11  please.  If you would -- I'm going to have the lawyers read the

10:54:15  12  names of people who may testify.  All of these people probably

10:54:15  13  won't testify, but if you think you might know any of them,

10:54:15  14  simply raise your hand and we'll find out.

10:54:15  15         MS. DOUGLAS:  Robbie Volk with the Austin Police

10:54:15  16  Department, Samuel Sanchez with the Austin Police Department,

10:54:15  17  Stephen Schafer with the Austin Police Department, Jesse Vasquez

10:54:15  18  with the Austin Police Department, Brian Crissman with the Austin

10:54:15  19  Police Department, Anthony Nelson with the Austin Police

10:54:15  20  Department, David Berryhill with the Austin Police Department,

10:54:15  21  Colleen Waters with the Austin Police Department, Howard Staha

10:54:15  22  with the Austin Police Department, Daniel Jones with the Bureau

10:54:15  23  of Alcohol, Tobacco and Firearms, ATF, Jonathan David Lee, Allen

10:54:15  24  Owens with the Travis County Sheriff's Office, and Douglas

10:54:15  25  Skolaut with the Austin Police Department.  And these are the

10:54:15   1   witnesses, your Honor.

10:54:15   2           THE COURT:  All right.  Anybody think you might know

10:54:15   3   any of those folks?  If so, please raise your hand.

10:54:15   4           Mr. Orr, you want to add to that list, sir?

10:54:15   5           MR. ORR:  Yes, sir.  Belinda Olivo and Sophia Martinez.

10:54:15   6           THE COURT:  Anybody think you may know either of those

10:54:15   7   two ladies?  All right.

10:54:15   8           Now, let's remind ourselves of a little bit about the

10:54:15   9   Constitution.  We all know that anybody charged with a crime in

10:54:15  10   this country is presumed to be innocent, and all that person has

10:54:15  11   to do is plead not guilty, which Mr. Longoria has done, and that

10:54:15  12   requires the government to produce evidence to back up their

10:54:15  13   charges.  So each juror must presume at this point in time that

10:54:15  14   Mr. Longoria is innocent, and if you can't make that presumption,

10:54:15  15   I need to know it now.

10:54:15  16           What that means, in practical terms, is that you will

10:54:15  17   listen to the evidence, and if you are not convinced from the

10:54:15  18   evidence introduced by the government in trial beyond a

10:54:15  19   reasonable doubt that Mr. Longoria is guilty, you must vote not

10:54:15  20   guilty because of the presumption of innocence.

10:54:15  21           Now, is there anyone who cannot make that commitment to

10:54:15  22   me, that is, you will require the government to present evidence,

10:54:15  23   and if you're not convinced beyond a reasonable doubt of Mr.

10:54:15  24   Longoria's guilt, you will vote not guilty?  Is there anybody who

10:54:15  25   can't make that commitment?

```
10:54:15   1            Now, it also means that Mr. Longoria through his
10:54:15   2   lawyers are not required to produce anything.  When they're
10:54:15   3   charged with a crime, you have to show up, but you do not need to
10:54:15   4   produce any evidence at all, including your own.  Everybody knows
10:54:15   5   about the Fifth Amendment.  And the Fifth Amendment is an
10:54:15   6   important constitutional right, but it has nothing to do with the
10:54:15   7   law.  The law is that the government has the burden of producing
10:54:15   8   evidence, the defendant does not.  Some people think that if I
10:54:15   9   were charged with a crime, I'd want to testify.  That's because
10:54:15  10   they've never been charged with a crime.  Usually the lawyer
10:54:15  11   makes the decision if somebody's going to testify or not.
10:54:15  12            So is there anybody that doesn't understand that
10:54:15  13   principle?  Let me rephrase it this way:  Is there anybody who
10:54:15  14   thinks if Mr. Longoria does not testify, that that means he did
10:54:15  15   something wrong?  Anybody think that?  All right.  Does everybody
10:54:15  16   understand that Mr. Orr and Mr. Longoria are not obligated to
10:54:15  17   present any evidence whatsoever?
10:54:15  18            Now, we're going to start with Ms. Torgrimson.  The
10:54:15  19   computer -- by the way, the computer selects all of you.  All of
10:54:15  20   your names go in there in the computer.  I don't know how it
10:54:15  21   works.  I don't want to know how it works.  All I know is the
10:54:15  22   people who get selected are the children and grandchildren of the
10:54:15  23   people that used to win the cakewalks at the fair.  I want you to
10:54:15  24   stand up, in just a minute, and tell us a little bit about
10:54:15  25   yourself.
```

10:54:15  1          Let me tell you right now, sort of like this:  My name

10:54:15  2  is Sam Sparks.  I was born here in Austin in 1939, went through

10:54:15  3  the Austin schools.  Went to the University of Texas, where 52

10:54:15  4  years ago I was trying to -- well, I was swimming through the

10:54:15  5  university, and I was trying to break 54 seconds in the 100

10:54:15  6  meters.  And last night, I saw a guy swim 46 seconds, and I

10:54:15  7  applauded him, I'm glad we won.  I turned off the TV and cursed

10:54:15  8  him.

10:54:15  9          I'm married, I have six children.  Thank God they're

10:54:15  10  all gone.  We have seven grandchildren.  And I've held this job

10:54:15  11  for 17 years.  I was a lawyer for 28, 29 years before then.  My

10:54:15  12  wife's a school teacher.  She won't teach anymore.  She's at

10:54:15  13  home.  That type of thing.  So have at it.

10:54:15  14          THE JUROR:  My name is Carol Torgrimson.  I was born in

10:54:15  15  Dallas, and I grew up there.  Went to college in Boston with my

10:54:15  16  professional career in California.  Returned to Texas, seven

10:54:15  17  years ago, to retire to family.  And, of course, Austin is the

10:54:15  18  only place in Texas that I want to be, so here I am.  I'm

10:54:15  19  married.  I have two stepdaughters.  I have two grandchildren.

10:54:15  20  They live in Scotland, which makes it very difficult for me.  I

10:54:15  21  was admitted to law school in 1968.  I didn't go.  Decision right

10:54:15  22  now I regret.  Haven't regretted it until the last seven years,

10:54:15  23  but now I regret it.

10:54:15  24          THE COURT:  You can go back now.

10:54:15  25          THE JUROR:  I've actually considered talking about it,

10:54:15  1   but I'm not sure that the LSAT still holds after 40 years.

10:54:15  2          THE COURT:  I didn't even have to take one.

10:54:15  3          THE JUROR:  I'm full-time volunteer.

10:54:15  4          THE COURT:  What was your career in California?

10:54:15  5          THE JUROR:  I was in the computer business, CalTech

10:54:16  6   marketing, and then, I retired from that, and I did community

10:54:16  7   work.  I started a community newspaper which I published for many

10:54:16  8   years.  And I've been doing volunteer work about 20 years now,

10:54:16  9   full-time.

10:54:16  10         THE COURT:  All right.  Thank you.  Mr. Pate.

10:54:16  11         THE JUROR:  My name is Scot Pate.  I was born in

10:54:16  12  Lubbock, Texas in 1958.  Raised on a cotton farm and continued

10:54:16  13  family business for 22 years.  Farming kind of went south after

10:54:16  14  about ten years of droughts and low prices, commodity prices, and

10:54:16  15  I wanted to get out of the cotton business, gone into the water

10:54:16  16  business.  I work for the Brazos River Authority, state agency.

10:54:16  17  We produce wholesale water.  I'm married, I've got two children

10:54:16  18  of my own.  My wife has three children.  Not our first marriages.

10:54:16  19  Got children living anywhere from my son in Denmark to the

10:54:16  20  Dallas/Fort Worth area, and they're all gone, which is nice.  And

10:54:16  21  that's pretty much my life.

10:54:16  22         THE COURT:  My grandmother on a farm in Alvarado used

10:54:16  23  to make my brother and I pick cotton when we did things bad, and

10:54:16  24  we had to fill out the sack on it.

10:54:16  25         THE JUROR:  We just had to go chop cotton.

```
10:54:16   1          THE COURT:  Well, I tell you what, it kept my mouth
10:54:16   2   clean.  Next.  Thank you.
10:54:16   3          THE JUROR:  My name is Tracy Watson.  Born in Orlando,
10:54:16   4   Florida, 1944.  I was an Air Force brat, so I lived around the
10:54:16   5   country in different places.  Went to the University of Texas
10:54:16   6   here.  I have an undergraduate in architectural studies,
10:54:16   7   graduated.  I worked in city of Austin for a number of years in
10:54:16   8   urban planning.  And then, I got what I call nine years off for
10:54:16   9   good behavior when I went to Portland, Oregon -- or Orlando,
10:54:16  10   Florida and came back and worked for the city of Austin until my
10:54:16  11   retirement in 2002.  Since my retirement, I do resolution
10:54:16  12   mediation on land use and public policy issues.  And I have a
10:54:16  13   fairly successful tennis racket restringing business.  Got one
10:54:16  14   child, 26 years old, autistic, but he's on his own right now and
10:54:16  15   doing very well, and I'm very pleased about that.
10:54:16  16          THE COURT:  Thank you.
10:54:16  17          THE JUROR:  My name is Darla Atkins.  I was born in
10:54:16  18   Wyandotte, Michigan, raised in Blue Ridge, Georgia.  I've been
10:54:16  19   here since January '78.  I've been doing construction, air
10:54:16  20   conditioning and plumbing till about four years ago.  And now,
10:54:16  21   I'm been doing a new career in retail.
10:54:16  22          THE COURT:  Okay.  Thank you.
10:54:16  23          THE JUROR:  And I am Ingrid Kruse from Fredericksburg,
10:54:16  24   Texas.  I was born in Germany, became a citizen when I was in the
10:54:16  25   sixth grade, and I got married.  Well, I went to business college
```

10:54:16   1   in Austin, and then, I got married.  We have two sons.  My

10:54:16   2   youngest son is with the police department in Kyle.  My oldest

10:54:16   3   son lives in the Copeland area and with -- worked with

10:54:16   4   electricity.  We keep our granddaughter -- oldest granddaughter

10:54:16   5   every summer.  She is now nine so she's with my husband.  And we

10:54:16   6   just picked up an exchange student from Pakistan Saturday, so

10:54:16   7   she's stuck with my husband until I get home.  And I work for the

10:54:16   8   216th Judicial District Probation Department in Gillespie County.

10:54:16   9   The main office is in Kerrville.

10:54:16   10           THE COURT:  And what do you do with the probation?

10:54:16   11           THE JUROR:  Administrative assistant.

10:54:16   12           THE COURT:  Thank you.  Ma'am.

10:54:16   13           THE JUROR:  Hi, I'm Megan Moore.  I'm a speech

10:54:16   14   pathologist up in Leander.  I work for the city, so I probably

10:54:16   15   work with your son.  I don't really have so much very exciting

10:54:16   16   about me.  My mom's a teacher.  My dad works in radio.  That's

10:54:16   17   about it.

10:54:16   18           THE COURT:  Where did you grow up?

10:54:16   19           THE JUROR:  I grew up here.

10:54:16   20           THE COURT:  In Austin.

10:54:16   21           THE JUROR:  Yeah, since I was six.

10:54:16   22           THE COURT:  You can't have it better than that.

10:54:16   23           THE JUROR:  I can't.  I went to school at Texas Tech

10:54:16   24   and got my master's in Dallas.  That's about it.

10:54:16   25           THE COURT:  Okay.  Thank you, ma'am.  Yes, ma'am.

10:54:16  1          THE JUROR:  I'm Barbara Stephenson, and I was born and

10:54:16  2   raised in Philadelphia, Pennsylvania.  My first marriage was up

10:54:16  3   in New Jersey.  I had two daughters, and the one daughter is

10:54:16  4   still living in New Jersey, other one lives in Virginia.  My

10:54:16  5   mother is still alive and well, and drives a car and goes to the

10:54:16  6   Jersey shore every summer.  And my first husband passed away.

10:54:16  7   Well -- I'm sorry, back up.

10:54:16  8          I went to school in Philadelphia, graduated from Temple

10:54:16  9   University Hospital.  It was not a four-year program at the time,

10:54:16  10  so I'm only the three-year program RN.  But I worked for 40 years

10:54:17  11  and most of my time spent in critical care, and last, say, ten

10:54:17  12  years was in urology.  I worked for a very prominent physician in

10:54:17  13  Philadelphia.  And my husband -- my first husband passed away,

10:54:17  14  and I was a widow for about 11 years.  And then, I met my second

10:54:17  15  husband, which I knew for a few years, and that was the reason I

10:54:17  16  moved down to Texas.  I came down here in January of 2002, did a

10:54:17  17  big move, helped my family, and I also retired from nursing at

10:54:17  18  that time.  And we did get married and we just celebrated our

10:54:17  19  fifth anniversary.

10:54:17  20          THE COURT:  Well, good.  Congratulations.

10:54:17  21          THE JUROR:  Thank you.

10:54:17  22          THE JUROR:  My name is George Peterman.  I was born and

10:54:17  23  raised in a small town near Beaumont, Texas, down southeast

10:54:17  24  Texas.  I left college to -- founded a company and did that for

10:54:17  25  about eight, nine years.  After that, I left, moved up to Austin,

10:54:17   1   here to Austin to be with my now wife.  I'm a technology

10:54:17   2   consultant by trade, however, I was recently hired by University

10:54:17   3   of Texas aquatics as one of their scuba instructors.  So that

10:54:17   4   will be starting in the next couple of weeks.  That's it.

10:54:17   5            THE COURT:  What business did you have for a while?

10:54:17   6            THE JUROR:  It was internet service provider, one of

10:54:17   7   the very first in 1994.

10:54:17   8            THE COURT:  All right, sir.  Thank you.

10:54:17   9            THE JUROR:  My name is Scott Gribble.  I was born in

10:54:17  10   1962 in Temple, Texas.  I grew up in San Antonio.  Went to

10:54:17  11   college in San Marcos the early '80s.  I graduated with

10:54:17  12   bachelor's degree in '86.  Worked there for about eight years in

10:54:17  13   electronics and manufacturing.  My degree plan was in

10:54:17  14   manufacturing electronics so that was -- I now work up in Round

10:54:17  15   Rock.  We make gasoline dispensers.  I do computer programming

10:54:17  16   there.  I'm a product configuration specialist, tieing back in

10:54:17  17   with the degree plan.  Anyway, my wife and I have been together

10:54:17  18   for 15 years.  We have no children.  We do have a bratty dog

10:54:17  19   who's 15 years old, also.  And we enjoy hiking and the outdoors

10:54:17  20   and live in Bastrop.

10:54:17  21            THE COURT:  All right.  Thank you.

10:54:17  22            THE JUROR:  Hi, Rodney James.  I was born in

10:54:17  23   Independence, Kansas, back in 1960; 48 years old.  Lived there

10:54:17  24   for two months, then moved to Dallas with my parents.  Raised

10:54:17  25   there till about '92 and then, moved to Austin.  Been in Austin

| | | |
|---|---|---|
| 10:54:17 | 1 | since then.  Went to college at University of Texas at Dallas.  I |
| 10:54:17 | 2 | worked for IBM and been there about 25 years in software sales. |
| 10:54:17 | 3 | Married a couple of years ago, two kids, acquired through the |
| 10:54:17 | 4 | marriage.  Love them very much.  And now, we recently closed on a |
| 10:54:17 | 5 | new home, and my wife is home and unpacking boxes and dealing |
| 10:54:17 | 6 | with contractors. |
| 10:54:17 | 7 | THE COURT:  And trying to figure out how you arranged |
| 10:54:17 | 8 | that. |
| 10:54:17 | 9 | THE JUROR:  Next week would have been bad, as well. |
| 10:54:17 | 10 | THE COURT:  All right.  Thank you, sir.  Yes, ma'am. |
| 10:54:17 | 11 | THE JUROR:  My name is Cynthia Landenberger.  I was |
| 10:54:17 | 12 | born and raised in Midland, Texas.  Moved all over Texas but |
| 10:54:17 | 13 | always in Texas.  I married my husband 15 years ago, acquired |
| 10:54:17 | 14 | three sons.  He's given me ten grand-kids.  I know I look too |
| 10:54:17 | 15 | young for that.  And I'm a medical biller and coder in Marble |
| 10:54:17 | 16 | Falls, Texas, have been with this company for five years, live a |
| 10:54:17 | 17 | pretty good life.  That's about it. |
| 10:54:17 | 18 | THE COURT:  Thank you.  Yes, sir. |
| 10:54:17 | 19 | THE JUROR:  My name is Brian Olson.  I was born in Los |
| 10:54:17 | 20 | Angeles, and luckily, my parents moved us down here when I was |
| 10:54:17 | 21 | young.  So we moved down here since '82.  I lived in about this |
| 10:54:17 | 22 | area since then.  Married, ten years, two kids.  Worked at |
| 10:54:17 | 23 | Freescale the last 14 years.  And -- |
| 10:54:17 | 24 | THE COURT:  What do you do at Freescale? |
| 10:54:17 | 25 | THE JUROR:  Manufacturing, wear the suits. |

| | | |
|---|---|---|
| 10:54:17 | 1 | THE COURT:  Okay. |
| 10:54:17 | 2 | THE JUROR:  That's about it. |
| 10:54:17 | 3 | THE COURT:  Thanks. |
| 10:54:17 | 4 | THE JUROR:  My name is Aaron Riethmayer.  I was born |

10:54:17  5  and raised in Taylor, Texas, born in '69.  And I'm a county

10:54:17  6  manager by trade.  I have two sons, one four years old and one

10:54:17  7  six years old.  And I've lived in and out of the Austin area all

10:54:17  8  my life.

10:54:17  9  　　　　　THE COURT:  All right, sir.  Thank you.

10:54:17  10  　　　　　THE JUROR:  Michael Bowers.  I was born in 1969.  I was

10:54:17  11  born and raised in Lexington, Kentucky.  Went to the University

10:54:17  12  of Kentucky.  My background is in information technology and

10:54:17  13  technology consulting.  I moved to the Austin area in 2000.  I am

10:54:18  14  married, and I lived with my wife in Georgetown now.

10:54:18  15  　　　　　THE COURT:  Thank you, sir.

10:54:18  16  　　　　　THE JUROR:  My name is Ana Martinez.  I was raised and

10:54:18  17  born in Laredo, Texas in 1948.  I got married in '71.  I have an

10:54:18  18  undergraduate degree in education.  Two children, both doing very

10:54:18  19  well, good citizens.  Moved to Austin in '92 because of my

10:54:18  20  husband's health.  He needed a heart transplant, so he's still

10:54:18  21  alive, doing well.  I went back to -- I have a master's degree,

10:54:18  22  an MBA.  Went back to my teaching and I'm teaching first grade,

10:54:18  23  but I spend more time now to help my husband if he needs anything

10:54:18  24  and he's doing fine.  Everybody's doing okay.

10:54:18  25  　　　　　THE COURT:  Well, good.  Thank you, ma'am.

| | | |
|---|---|---|
| 10:54:18 | 1 | THE JUROR: My name is Cindy Berry, and I was born in |
| 10:54:18 | 2 | Cali, Colombia in 1965. My father was from Texas. My mother was |
| 10:54:18 | 3 | from Colombia. And I graduated from University of Texas with a |
| 10:54:18 | 4 | liberal arts degree. But now, I'm a project manager at Dell. |
| 10:54:18 | 5 | I've been in a relationship for nine years and I have three dogs. |
| 10:54:18 | 6 | And that's about it. |
| 10:54:18 | 7 | THE COURT: All right. Thank you. You may get the |
| 10:54:18 | 8 | award being the further-est away. Third row. |
| 10:54:18 | 9 | THE JUROR: My name is David Owens. I grew up in |
| 10:54:18 | 10 | Houston, moved to Austin '73 to come to the University of Texas. |
| 10:54:18 | 11 | Never left. I've been married 26 years. I have three grown |
| 10:54:18 | 12 | sons, seven wild grand-kids. Played on the same softball team in |
| 10:54:18 | 13 | the city of Austin league for 35 years. |
| 10:54:18 | 14 | THE COURT: Well, at least they haven't cut you. |
| 10:54:18 | 15 | THE JUROR: My name is Mario Villanueva. I am married, |
| 10:54:18 | 16 | just turned 58. I've been married 34 years. I've got three |
| 10:54:18 | 17 | children. I'm from south Texas, Eagle Pass. I first came to |
| 10:54:18 | 18 | Austin 1968 to attend the University of Texas, where I got a |
| 10:54:18 | 19 | bachelor's degree from University of Texas. After I graduated, I |
| 10:54:18 | 20 | moved to California, where I worked in the high-tech industry for |
| 10:54:18 | 21 | about nine years, then came back and worked for IBM for about 18 |
| 10:54:18 | 22 | years until they decided to shut us down. And current -- and I |
| 10:54:18 | 23 | went to work for the state for a couple of years, then switched |
| 10:54:18 | 24 | over to -- I am currently employed at the Internal Revenue |
| 10:54:18 | 25 | Service as a tax examiner. |

10:54:18  1          THE COURT:  You folks, be nice to us.

10:54:18  2          THE JUROR:  That will be it.

10:54:18  3          THE COURT:  Thank you very much.

10:54:18  4          THE JUROR:  My name is Ron Green.  I was born and

10:54:18  5  raised in Houston.  I went to University of Texas, got a degree

10:54:18  6  in computer science.  I'm married, got three young children.  And

10:54:18  7  I work for a local of software company.

10:54:18  8          THE JUROR:  My name is Julie Johnson.  I was born in

10:54:18  9  1978 in Pueblo, Colorado, which is a very small town, and went to

10:54:18  10  school at West Texas A & M University, and came here between

10:54:18  11  Lubbock and Amarillo, got my bachelor's degree in marketing,

10:54:18  12  moved here in '03, worked a few jobs.  And I work for Grande

10:54:18  13  Communications as inside sales rep.  And I'm getting married in

10:54:18  14  October.

10:54:18  15          THE COURT:  Good.  Next.

10:54:18  16          THE JUROR:  I'm John Inman.  Lived in Texas all my

10:54:18  17  life, Fort Worth, Lubbock, Austin.  I have a bachelor's degree

10:54:18  18  from Texas Western in sociology and religion.  I work for Texas

10:54:18  19  Department of Human Services.  I'm retired.  Part-time work.  I'm

10:54:18  20  married.  I have one son.  My wife teaches.

10:54:18  21          THE COURT:  Thank you.

10:54:18  22          THE JUROR:  My name is Arlene Franklin.  I was born and

10:54:18  23  raised in Virginia.  I moved here in 1980 and been working for

10:54:18  24  the same company ever since then.  We're a sand/gravel company.

10:54:18  25  Been married since 1986.  No children but do have a spoiled dog.

10:54:18  1          THE COURT:  Thank you.  Ma'am.

10:54:18  2          THE JUROR:  Lisa Perry.  I was born in California, but

10:54:18  3  I've lived in Texas all but six weeks of my life.  Graduated from

10:54:18  4  Concordia Lutheran College.  I'm self-employed, do furniture

10:54:18  5  restoration.  I have a 14-year-old son going into high school.

10:54:18  6  Pray for me.  My husband works for Hewlett Packard.  That's about

10:54:18  7  it.

10:54:18  8          THE COURT:  Thank you.  Ma'am.

10:54:18  9          THE JUROR:  My name is Angela Luedecke.  I was born and

10:54:18  10  raised in western Kansas.  Moved to Austin area in 2001.  I'm

10:54:18  11  married.  I live in Leander now.  No kids, just spoiled pets.

10:54:18  12  And a legal secretary to a judge at the court of appeals.

10:54:18  13          THE COURT:  The first question the lawyers are going to

10:54:18  14  ask me is what judge?

10:54:18  15          THE JUROR:  Cathy Cochran.

10:54:18  16          THE COURT:  All right.  Thank you.  All right.

10:54:18  17          THE JUROR:  Paul Branson.  Born and raised in El Paso,

10:54:18  18  Texas.  I graduated from Texas Tech with a degree in finance.

10:54:18  19  I'm a professional real estate broker.  Married with two small

10:54:18  20  sons, ages one and five.

10:54:18  21          THE COURT:  All right.  Thank you.  Does your wife work

10:54:18  22  outside the house?

10:54:18  23          THE JUROR:  Yes, sir.

10:54:18  24          THE COURT:  What does she do?

10:54:18  25          THE JUROR:  She is a real estate agent and also works

10:54:18   1    for a real estate developing company as a property manager.

10:54:18   2           THE COURT:  Thank you.  Yes, ma'am.

10:54:18   3           THE JUROR:  Hi, Connie Bull.  I was born in Harlingen

10:54:18   4    in '64.  And, of course, I didn't pick cotton.  We got to jump in

10:54:18   5    the trailers that they say pack the cotton.  Anyway, raised in

10:54:18   6    Corpus Christi.  I got married at 19, been together 25 years,

10:54:18   7    recently divorced, and just started working at Freescale.

10:54:18   8           THE COURT:  So we've got picker, a chopper and a

10:54:18   9    packer.

10:54:18  10           THE JUROR:  And a spoiled, spoiled puppy.

10:54:18  11           THE COURT:  Next, please.

10:54:18  12           THE JUROR:  Good morning.  My name is Carla Saegert.  I

10:54:18  13    was born and raised here in Austin.  I am not going to tell you

10:54:18  14    the year.  You can't make me.  I've been with the state of Texas

10:54:18  15    with different agencies for 26 years.  I'm currently with the

10:54:18  16    Department of Agriculture.  My husband works for the Department

10:54:18  17    of Public Safety.

10:54:18  18           THE COURT:  What does he do for DPS?

10:54:18  19           THE JUROR:  He works all in the fleet vehicles.

10:54:18  20           THE COURT:  Okay.  Thank you, ma'am.  Yes, ma'am.

10:54:18  21           THE JUROR:  Morning.  My name is Susan Gorishek.  I was

10:54:18  22    born in 1968, here in Austin, Texas.  Never left, never will.

10:54:18  23    Graduated from Johnston High School, which is no longer Johnston

10:54:18  24    anymore.  Received a cosmetology license the same year I

10:54:18  25    graduated.  Married when I was 22, had my first kid when I was

10:54:18  1    23.  She's 16, got her driver's license in May.  And I have a

10:54:18  2    14-year-old.  They both attend Bowie High in the marching band.

10:54:18  3    So they're very busy.  They've been busy.  They're busy this

10:54:18  4    week.  So it's our responsibility to get the 14-year-old back and

10:54:18  5    forth two, three -- they have practices all this week.  So I hope

10:54:18  6    she's responsible when I'm not there.  And my husband works for

10:54:18  7    AMD, and he travels constantly with them and he's out of town

10:54:18  8    this week.  So it's really up to her to be responsible if I'm

10:54:18  9    picked this week.  And I also have two spoiled dogs, also, plus

10:54:18  10   kids.  Thank you.

10:54:18  11            THE COURT:  Thank you, ma'am.  Next, please.

10:54:18  12            THE JUROR:  Allison Abascal-Roemer.  I was born in

10:54:18  13   1976.  Born in San Antonio, grew up in Eagle Pass.  My mom was a

10:54:18  14   teacher.  My dad was a district attorney, still a district judge,

10:54:18  15   so I saw the good and bad of what they did.  Went into Child

10:54:18  16   Protective Services, was a legal worker, then legal supervisor.

10:54:18  17   Now I'm a family-based supervisor, better for my family.  I am

10:54:18  18   married to a police sergeant in Fredericksburg, and we have a

10:54:18  19   three-year-old daughter.

10:54:18  20            THE COURT:  And your dad's name?

10:54:18  21            THE JUROR:  Amado Abascal.

10:54:18  22            THE COURT:  Okay.  Thank you, ma'am.

10:54:18  23            THE JUROR:  Jennifer Juday.  Born here in Texas, mostly

10:54:18  24   grew up in Houston.  I've also lived a little bit in Florida,

10:54:18  25   several years in Colorado, and Alabama and Arkansas, and I ended

10:54:18    1    up back here.  Got a degree from Rice and another degree from

10:54:18    2    University of Texas.  And worked from home, worked for Baxter

10:54:18    3    Healthcare.  And also have a three-year-old at home.  So my

10:54:18    4    husband's home with the three-year-old today and it's just --

10:54:18    5    it's his birthday today, so it's a big day for me.  I have a

10:54:18    6    couple of cats.  Don't know if there's anything else more

10:54:18    7    interesting.  Thanks.

10:54:18    8              THE COURT:  Okay.  Yes, sir.

10:54:18    9              THE JUROR:  My name is Harol Stegman, Jr.  I was born

10:54:18   10    here in Austin, 1955.  Went to schools in the Eanes School

10:54:18   11    District.  I attended a two-year technical school up in Dallas,

10:54:18   12    came back to Austin.  Worked for IBM for 25 years, where I was

10:54:18   13    laid off for two.  Retrained.  The five-year program is

10:54:18   14    electronic -- electrician.  And I am married and have two

10:54:18   15    daughters and two step-kids.

10:54:18   16              THE COURT:  All right.  Thank you, sir.

10:54:18   17              THE JUROR:  My name is Richard Miller.  I was born in

10:54:18   18    Chicago.  I grew up in Maryland and Indiana.  I lived in Houston

10:54:18   19    for 20 years.  I was a travel agent.  Decided Houston was not a

10:54:18   20    nice place to live anymore, so six years ago, we moved here.  I

10:54:19   21    live out towards Dripping Springs.  And now, I work for the IRS

10:54:19   22    in underreporting.

10:54:19   23              THE COURT:  Is that why you're on the back row?

10:54:19   24              Okay.  For those of you over here, right now, your

10:54:19   25    numbers are too high to get on the selection, so just -- so

10:54:19  1   that's the reason we're going to stop there.

10:54:19  2         Now, the next question I ask is -- it sounds like such

10:54:19  3   an innocuous question, but it's actually a very important

10:54:19  4   question, and that is, is there anyone who can't commit right now

10:54:19  5   to follow the legal instructions that I give?  I've never had a

10:54:19  6   bunch of people shout "No."  But it is important.  While you

10:54:19  7   have, those of you selected to be jurors in this case, the

10:54:19  8   exclusive authority to determine the facts, you do not have the

10:54:19  9   authority to determine the law.  And after I hear the evidence, I

10:54:19  10  write out legal instructions.  I'm required to read them to you,

10:54:19  11  but I also give them to you in writing, and I expect the jury, as

10:54:19  12  do the parties expect the jury, will follow those legal

10:54:19  13  instructions.  If you can't commit to follow the legal

10:54:19  14  instructions given, please let me know now.

10:54:19  15        Now, how many people on the front row have been victims

10:54:19  16  of a crime?  Okay.  We'll start -- ma'am, let me tell you, you

10:54:19  17  think that I can see you, but I really -- I know you're out

10:54:19  18  there.  So raise your hand and we'll start with you.  Just tell

10:54:19  19  me about how long ago and what was it.

10:54:19  20        THE JUROR:  Most recently, I was a victim of identity

10:54:19  21  theft in 2003.  I was -- and I've been a victim of a home theft

10:54:19  22  but breaking and entering in 1972.

10:54:19  23        THE COURT:  All right.  Now, I should say, too, anybody

10:54:19  24  -- you know, these old walls have heard everything.  But if

10:54:19  25  anybody wishes to approach the bench, all you have to do is say,

10:54:19  1  "I'd like to approach the bench," and you come up here, and I've

10:54:19  2  got a little, teeny microphone right here that I'm sure the CIA

10:54:19  3  manufactured, and then, the court reporter has something in her

10:54:19  4  ear so we can hear it.  The lawyers have to hear it, but we can

10:54:19  5  hear it in confidence.  Otherwise, just answer as you proceed.

10:54:19  6  Now, who's next?  Yes, sir.

10:54:19  7          THE JUROR:  Also, about same time in 2002, 2003,

10:54:19  8  identity theft, somebody put a forwarding mail thing into the

10:54:19  9  post office, and I lost a lot of my mail for quite a while.  I

10:54:19  10  also had at least one small burglary in the garage, some tools.

10:54:19  11          THE COURT:  Okay.  And we need your name and number.

10:54:19  12          THE JUROR:  I'm sorry.  Tracy Watson, 256.

10:54:19  13          THE COURT:  All right.  Next?

10:54:19  14          THE JUROR:  192, Darla Atkins.  Burglary and they set

10:54:19  15  the house on fire.

10:54:19  16          THE COURT:  About how long ago?

10:54:19  17          THE JUROR:  That was '97.

10:54:19  18          THE COURT:  And was there ever any trial about it?

10:54:19  19          THE JUROR:  No.  There was a mediation between the

10:54:19  20  juveniles and the court.

10:54:19  21          THE JUROR:  Ingrid Kruse, 221.  Our home was

10:54:19  22  burglarized about nine years ago.  We still have the individual

10:54:19  23  on the ten-year probation.  He gets off in December.

10:54:19  24          THE COURT:  Did you go to court on that?

10:54:19  25          THE JUROR:  Yes, we did.

10:54:19  1          THE COURT:  All right.  Anybody else?

10:54:19  2          THE JUROR:  Megan Moore.  I think my number is 216, I

10:54:19  3  think.  I was involved in a car crash with a drunk driver.

10:54:19  4          THE COURT:  Okay.  Yes, ma'am.

10:54:19  5          THE JUROR:  Barbara Stephenson, Juror 175.  It was back

10:54:19  6  in 1977, something like that.  My husband had come home, the

10:54:19  7  house was burglarized, and the person was still in the home, shot

10:54:19  8  at him, but they never caught him and never went to trial.

10:54:19  9          THE COURT:  Okay.  Yes.  All right.  Second row?

10:54:19  10  Anybody victims of a crime?  Yes, sir.

10:54:19  11          THE JUROR:  Rodney James, 189.  It was a check that was

10:54:19  12  mailed to us from Pedernales Electric, and it got taken out of

10:54:19  13  the mail, or never made it in the mail, but it was forged and no

10:54:19  14  charges were ever pressed.  We were able to get our money back.

10:54:19  15  And then, just minor burglaries, a couple of them throughout the

10:54:19  16  years.

10:54:19  17          THE COURT:  When was the last one?  More than two years

10:54:19  18  ago?

10:54:19  19          THE JUROR:  Yes.

10:54:19  20          THE COURT:  Okay, sir.  Thank you.  Yes, sir.

10:54:19  21          THE JUROR:  Aaron Reithmayer, 259.  My cousin in the

10:54:19  22  'mid-80s was murdered on a track field after she had been stalked

10:54:19  23  for two years.  And my cousin was also my neighbor.

10:54:19  24          THE COURT:  Was there a trial on that?

10:54:19  25          THE JUROR:  There was a trial and he's still -- I think

10:54:20    1    he got, like, 99 years and comes up on probation every once in a

10:54:20    2    while.

10:54:20    3              THE COURT:  Did you participate in the trial as a

10:54:20    4    witness?

10:54:20    5              THE JUROR:  No.

10:54:20    6              THE COURT:  All right.  Anybody else on the second row?

10:54:20    7    How about the third row?  Yes, sir.

10:54:20    8              THE JUROR:  Scott Gribble, No. 173.  Just in the --

10:54:20    9    back in the '80s, a lot of break-ins into my car in San Antonio

10:54:20   10    and articles stolen.

10:54:20   11              THE COURT:  That happened in San Antonio.

10:54:20   12              THE JUROR:  I didn't want to be dishonest by not

10:54:20   13    mentioning it.

10:54:20   14              THE COURT:  Okay.  Third row?

10:54:20   15              THE JUROR:  Dave Owens, 178.  I had my house broken

10:54:20   16    into.

10:54:20   17              THE COURT:  About how long ago?

10:54:20   18              THE JUROR:  Twenty years ago.

10:54:20   19              THE COURT:  Okay.  Rest on the third row?  How about

10:54:20   20    the fourth row?

10:54:20   21              THE JUROR:  Paul Branson, 164.  Victim of theft, number

10:54:20   22    of years ago, for my car broken into.

10:54:20   23              THE COURT:  Yes, ma'am.

10:54:20   24              THE JUROR:  Carla Saegert, Juror No. 145.  Theft, auto

10:54:20   25    theft.  They got in the our garage, took some tools.  It was over

| | | |
|---|---|---|
| 10:54:20 | 1 | two years ago. |
| 10:54:20 | 2 | THE COURT: Okay. Thank you, ma'am. Yes. |
| 10:54:20 | 3 | THE JUROR: Allison Abascal-Roemer, 246. Back when I |
| 10:54:20 | 4 | was in college, someone tried to take me out of my car. |
| 10:54:20 | 5 | THE COURT: Okay. Yes, ma'am. |
| 10:54:20 | 6 | THE JUROR: Jennifer Juday, 118. In college, got |
| 10:54:20 | 7 | burglar-ed. Got -- had someone follow me and try to get me in |
| 10:54:20 | 8 | their car, and had someone do an indecent exposure thing. But |
| 10:54:20 | 9 | that's all been a long time. |
| 10:54:20 | 10 | THE COURT: All right. Yes, sir. |
| 10:54:20 | 11 | THE JUROR: Richard Miller, 201. When I lived in |
| 10:54:20 | 12 | Austin, we had our cars broken into several times and stolen once |
| 10:54:20 | 13 | or twice. That's all. |
| 10:54:20 | 14 | THE COURT: All right. Those of you that have had the |
| 10:54:20 | 15 | experiences of having your house broken in, or having to go to |
| 10:54:20 | 16 | trial, or any of those things that have to do with being the |
| 10:54:20 | 17 | victim of a crime, is there anybody who can't make the commitment |
| 10:54:20 | 18 | to the parties in this lawsuit that you can put those experiences |
| 10:54:20 | 19 | in the closet, close the door, don't let it influence you, and |
| 10:54:20 | 20 | you will make your determination solely on the evidence that you |
| 10:54:20 | 21 | hear in this trial? If you can't make that commitment, please |
| 10:54:20 | 22 | raise your hand. |
| 10:54:20 | 23 | All right. Now, I need to ask you about the flip side. |
| 10:54:20 | 24 | And the flip side is, anybody on the panel, you, any member of |
| 10:54:20 | 25 | your family, that is, your spouse, your children, your |

10:54:20   1   grandchildren, ever been arrested for a crime?  As I say, we've

10:54:20   2   heard everything.  The best one I remember is a lady said that

10:54:20   3   her 80-something-year-old mother was arrested up here at the

10:54:20   4   nuclear plant, protesting against hurting the bluebonnets.

10:54:20   5          As I say, I have six children, five of them were boys.

10:54:20   6   I have had the privilege of going to jail and picking them up on

10:54:20   7   occasions, that type of thing.  Also had federal judges throw me

10:54:20   8   in jail, if you want to know the truth.  Four different ones,

10:54:20   9   four different times.  But that was a long time ago, when I was

10:54:20  10   young and spirited.  But I need to know that type of thing.  Yes,

10:54:20  11   ma'am.

10:54:20  12          THE JUROR:  Do DWIs count?

10:54:20  13          THE COURT:  Yes, ma'am.

10:54:20  14          THE JUROR:  DWIs, '84.  1984.

10:54:20  15          THE JUROR:  I have been to jail.  Sorry.

10:54:20  16          THE COURT:  That's all right.

10:54:20  17          THE JUROR:  Just --

10:54:20  18          THE COURT:  How long ago?

10:54:20  19          THE JUROR:  It was a long time.  I was 20 -- so seven,

10:54:20  20   eight years ago.

10:54:20  21          THE COURT:  Okay.

10:54:20  22          THE JUROR:  Presenting false identification.

10:54:20  23          THE COURT:  Okay.  Yes.

10:54:20  24          THE JUROR:  Probably 2002.

10:54:20  25          THE COURT:  We need names and number.

10:54:20    1              THE JUROR:  George Peterman, 185.  Public intoxication

10:54:20    2    in 2002.

10:54:20    3              THE COURT:  Okay.  Anybody else on the front row?  Yes,

10:54:20    4    sir.

10:54:20    5              THE JUROR:  Scot Pate, 236.  You said family members,

10:54:20    6    also?

10:54:20    7              THE COURT:  Yes, sir, I did.

10:54:20    8              THE JUROR:  Got a -- my wife has her oldest daughter,

10:54:20    9    we've got the privilege of learning all about meth.  She's gone

10:54:20   10    to jail with -- was put on -- she was awaiting trial for that

10:54:20   11    one.  She was caught again at 3:00 in the morning, the school

10:54:20   12    parking lot, and at that point, she received 20 years and she's

10:54:20   13    still in the prison.

10:54:20   14              THE COURT:  Okay.

10:54:20   15              THE JUROR:  Ingrid Kruse, 221.  I have six brothers,

10:54:20   16    two sisters, and out of that some of my brothers do have an

10:54:20   17    extensive history with meth and drugs and alcohol.  So I don't

10:54:20   18    know.

10:54:20   19              THE COURT:  That's all right.  Did you participate in

10:54:20   20    any trial of any of your brothers?

10:54:20   21              THE JUROR:  No.

10:54:20   22              THE COURT:  Okay.  Anybody on the second row?  Yes,

10:54:20   23    sir.

10:54:20   24              THE JUROR:  Carol Torgrimson, 143.  I had a stepson --

10:54:21   25    this was during a previous marriage -- who at the age of 12 was

10:54:21  1  arrested for burglary and spent years in the juvenile system in

10:54:21  2  California.  So I had extensive experience with the juvenile

10:54:21  3  court system there.

10:54:21  4            THE COURT:  Okay.  What the lawyers need to know.

10:54:21  5  Let's start with the second row now.  Anybody?  Yes, sir.

10:54:21  6            THE JUROR:  Okay.  It's been more than 20 years.  When

10:54:21  7  I was a teenager, theft under $5.  Tried to steal a cassette tape

10:54:21  8  from an Albertsons.  Tried to syphon some gas one time.  I guess

10:54:21  9  that would probably be a felony now.

10:54:21  10            THE COURT:  Any other major crime?

10:54:21  11            THE JUROR:  We tried to steal some pool furniture back

10:54:21  12  in --

10:54:21  13            THE COURT:  Let's bring it up in the last ten years.

10:54:21  14  Got any trouble?

10:54:21  15            THE JUROR:  No, sir.

10:54:21  16            THE COURT:  Sit down.  Yes.

10:54:21  17            THE JUROR:  Rodney James, 189.  It was when I was 16.

10:54:21  18  You want to hear about it?

10:54:21  19            THE COURT:  No.  Did you go to jail?

10:54:21  20            THE JUROR:  Detention.

10:54:21  21            THE COURT:  And you got out?

10:54:21  22            THE JUROR:  Yeah.  I was in there for a while.

10:54:21  23            THE COURT:  Okay.  All right.  That's all.  Anybody

10:54:21  24  else on the second row?  Yes, ma'am.

10:54:21  25            THE JUROR:  How far back?  I was arrested for

10:54:21   1   methamphetamines, got probation, got off early.  My husband's

10:54:21   2   been in prison.  He did all his parole.  We're both clean and

10:54:21   3   sober for many years.  I have two children in the federal system

10:54:21   4   right now.  And you live and you learn.  Nothing recent.

10:54:21   5            THE COURT:  Okay.  Thank you, ma'am.  Next.

10:54:21   6            THE JUROR:  Brian Olson, 159.  Twelve years ago, I was

10:54:21   7   arrested and thrown in jail for PI.

10:54:21   8            THE COURT:  Okay.  Anybody else on the second row?

10:54:21   9   Third row?  Yes, ma'am.

10:54:21  10            THE JUROR:  Arlene Franklin, 184.  My husband was

10:54:21  11   arrested for DWI, back in the early '80s.

10:54:21  12            THE COURT:  All right.  Thank you.  Yes.

10:54:21  13            THE JUROR:  Your Honor, my son was involved in a school

10:54:21  14   fight.

10:54:21  15            THE COURT:  Name and number?

10:54:21  16            THE JUROR:  I think it's 33 now.  Mario Villanueva.  My

10:54:21  17   son was involved in a high school fight about 15 years ago.

10:54:21  18            THE COURT:  Oh, okay.  Thank you.  Anybody else on that

10:54:21  19   row?  How about the last row?  Okay.  Start with you, ma'am.

10:54:21  20            THE JUROR:  Carla Saegert, Juror 145.  My

10:54:21  21   sister-in-law, two years in federal prison for theft.

10:54:21  22            THE COURT:  Okay.  About how long ago?

10:54:21  23            THE JUROR:  She's been out for about three years now.

10:54:21  24            THE COURT:  Okay.  Thank you.  Next.

10:54:21  25            THE JUROR:  Susan Gorishek, Juror 154.  My daughter was

10:54:21  1   not arrested, but last year, the 14-year-old was given a truancy,

10:54:21  2   went to juvenile court and served eight hours of community

10:54:21  3   service.

10:54:21  4            THE COURT:  Okay.  The one that's driving now?

10:54:21  5            THE JUROR:  Now she's supposed to be -- my 16-year-old

10:54:21  6   is responsible for her so that's why she --

10:54:21  7            THE JUROR:  Allison Abascal, Juror 246.  My father had

10:54:21  8   an indictment and was -- had a suspension but then, reinstated.

10:54:21  9   Was never arrested.

10:54:21  10           THE COURT:  Okay.  What was that for?

10:54:21  11           THE JUROR:  It had to do here in Travis County.  It was

10:54:21  12  something with Kickapoo and a lot of press on it, having to do

10:54:21  13  with campaign funds and whether he claimed them all.

10:54:21  14           THE COURT:  Okay.

10:54:21  15           THE JUROR:  Jennifer Juday.  Criminal mischief,

10:54:21  16  arrested in college for $1 parking fee.

10:54:21  17           THE COURT:  You ought to meet this big criminal over

10:54:21  18  here.

10:54:21  19           THE JUROR:  My mom worked for Greenpeace.  She was a

10:54:21  20  research scientist, but she may have had encounters.  I mean I

10:54:21  21  know she was a witness and she was a victim of crime, and she may

10:54:21  22  have had -- been arrested at some point.  And my grandfather had

10:54:21  23  run-ins with the IRS, and he may have been arrested.  I don't

10:54:21  24  know.

10:54:21  25           THE COURT:  Okay.  Anybody else need to answer that

10:54:21  1  question?

10:54:21  2          Now, I think we've got one or two, but let me ask you:

10:54:21  3  How many of you have had the wonderful experience of going to law

10:54:21  4  school?  Not wanting to go to law school but going to law school,

10:54:21  5  if you'll raise your hand.

10:54:21  6          Many people who I have seen in jury selection come and

10:54:21  7  believe that because a person is in law enforcement, that person,

10:54:21  8  for that reason alone, has more credibility than anybody else.

10:54:21  9  The law indicates and establishes that a juror must size up the

10:54:21 10  credibility of every witness equally.  And, of course, there's

10:54:21 11  always the determination the jury has to make as to what you

10:54:21 12  believe is credible testimony and what you believe is not

10:54:21 13  credible testimony.  But is there anybody on the panel right now

10:54:21 14  who thinks just because a person is in law enforcement, that that

10:54:21 15  testimony is more important for that fact alone than any other

10:54:21 16  witness who would testify?

10:54:21 17          Now, we've had a lot of people who already indicated

10:54:21 18  that they or some member of their family is in law enforcement.

10:54:21 19  I'm going to exclude you from answering again.  But if you have

10:54:21 20  not answered it, is there anybody on the panel who you or some

10:54:21 21  member of your immediate family is in law enforcement?

10:54:21 22          THE JUROR:  Megan Moore, 216.  My uncle is in federal

10:54:21 23  narcotics.

10:54:21 24          THE COURT:  And whereabouts?

10:54:21 25          THE JUROR:  He works in Dallas now.  He's worked all

10:54:21  1    over for DEA.

10:54:21  2            THE COURT:  Thank you.  Yes, ma'am.

10:54:21  3            THE JUROR:  Ingrid Kruse, 221.  My son is a sergeant

10:54:21  4    with the Kyle Police Department.

10:54:21  5            THE COURT:  All right.  Thank you.

10:54:21  6            THE JUROR:  Juror No. 233.  My son's a police officer

10:54:21  7    in Dallas, Texas.

10:54:21  8            THE COURT:  In College Station?

10:54:21  9            THE JUROR:  No.  Dallas, Texas.

10:54:21  10           THE COURT:  In Dallas.  I was going to say, College

10:54:21  11   Station needs them.  Yes.

10:54:21  12           THE JUROR:  Carla Saegert, Juror 145.  I have a

10:54:21  13   brother-in-law who is on the police department in Austin.

10:54:21  14           THE COURT:  And his name?

10:54:21  15           THE JUROR:  His name is Trey Morgan.

10:54:21  16           THE COURT:  Okay.  Anybody else?  Yes, ma'am.

10:54:21  17           THE JUROR:  Allison Abascal-Roemer, Juror 246.  My

10:54:21  18   husband's a police sergeant.

10:54:21  19           THE COURT:  Where?

10:54:21  20           THE JUROR:  Fredericksburg, Texas.  Okay.  Yes, ma'am.

10:54:21  21           THE JUROR:  Connie Bull, 161.  My nephew is with the

10:54:21  22   police department in Cibolo.

10:54:21  23           THE COURT:  Anybody else need to answer that?  All

10:54:21  24   right.  Those of you who have been or have family -- friends or

10:54:21  25   family members or friends who are in law enforcement, is there

10:54:21  1  anybody who can't make the commitment, because of that

10:54:21  2  relationship, that you will listen to the evidence and make up

10:54:21  3  your mind in this trial solely on what you hear and not be

10:54:21  4  influenced by those contacts that you have in law enforcement?

10:54:21  5  If you can't make that commitment, please raise your hand.

10:54:21  6        Now, I need to know, those of you who have had

10:54:21  7  litigation experience, that is, filed a lawsuit, have a lawsuit

10:54:21  8  filed against you, or testified in a lawsuit where you were

10:54:21  9  questioned by lawyers, or gave what we call a deposition before a

10:54:21  10  court reporter where you were questioned by lawyers -- I'm not

10:54:21  11  interested in divorce or child custody of any nature, any other

10:54:21  12  litigation.  Anybody on the front row have that?  Yes, sir, Mr.

10:54:21  13  Watson.

10:54:21  14        THE JUROR:  My position with the city.  I was deposed

10:54:21  15  many times on land use development issues.  And I was city

10:54:21  16  representative and was questioned in a trial, Barton Creek

10:54:21  17  properties against the city.

10:54:21  18        THE COURT:  Any litigation experience outside of your

10:54:21  19  professional?

10:54:21  20        THE JUROR:  No, sir.

10:54:21  21        THE COURT:  All right, sir.  Anybody else on the front

10:54:21  22  row?  Yes, ma'am.

10:54:21  23        THE JUROR:  Yes.  It was back -- sorry, Barbara

10:54:21  24  Stephenson, 175.  I had to write a deposition for a medical

10:54:21  25  problem that occurred at the hospital, and it was not in front of

| | | |
|---|---|---|
| 10:54:21 | 1 | any lawyers or anything.  They just -- the director and directors |
| 10:54:21 | 2 | of nursing. |
| 10:54:21 | 3 | THE COURT:  Just making a business note. |
| 10:54:21 | 4 | THE JUROR:  Yes. |
| 10:54:21 | 5 | THE COURT:  Did you have to testify later? |
| 10:54:21 | 6 | THE JUROR:  No.  They never called me to testify. |
| 10:54:21 | 7 | THE COURT:  All right. |
| 10:54:21 | 8 | THE JUROR:  They just -- yes. |
| 10:54:21 | 9 | THE COURT:  Back in Philadelphia? |
| 10:54:21 | 10 | THE JUROR:  Yes. |
| 10:54:21 | 11 | THE JUROR:  George Peterman, 185.  Couple of small |
| 10:54:21 | 12 | lawsuits having to do with my company, mainly against suppliers |
| 10:54:21 | 13 | or their suppliers. |
| 10:54:21 | 14 | THE COURT:  Is that when you were in -- |
| 10:54:21 | 15 | THE JUROR:  When I had my company. |
| 10:54:21 | 16 | THE COURT:  Okay.  All right.  Anybody on the second |
| 10:54:21 | 17 | row, litigation experience?  Yes, sir. |
| 10:54:21 | 18 | THE JUROR:  Been sued a couple of times over land |
| 10:54:21 | 19 | disputes.  The first one was over parcel of land that's co-owned |
| 10:54:21 | 20 | by a neighbor of mine and myself.  Second one was over some land |
| 10:54:21 | 21 | easement, egress easement with 17 plaintiffs versus myself. |
| 10:54:21 | 22 | THE COURT:  Did either of those go to trial? |
| 10:54:21 | 23 | THE JUROR:  No. |
| 10:54:21 | 24 | THE COURT:  They were all settled?  Has it been a |
| 10:54:21 | 25 | couple of years? |

10:54:21  1              THE JUROR:  The last one just kind of fizzled out, but

10:54:21  2    it lasted since '97.  Lasted almost eight years.

10:54:21  3              THE COURT:  Okay.  Yes, ma'am.

10:54:21  4              THE JUROR:  Anna Martinez, 195.  Small courts.  I was

10:54:21  5    remodeling my house and I had difficulty with the designer, and

10:54:21  6    we did go to court and settled it.

10:54:21  7              THE COURT:  Third row.  And the fourth row?  Yes.

10:54:21  8              THE JUROR:  Paul Branson, 164.  I was sued, a great

10:54:21  9    number of years ago, over a traffic accident.  I was involved in

10:54:21  10   a contract dispute.  And I was also involved in a real estate

10:54:21  11   transaction.

10:54:21  12             THE COURT:  Did any of them go to court with a trial?

10:54:21  13             THE JUROR:  None of them have gone to trials.

10:54:22  14             THE COURT:  All right.  Any of them still pending?

10:54:22  15             THE JUROR:  The contract or -- excuse me.  The real

10:54:22  16   estate case is still pending against the estate of my father, but

10:54:22  17   I was dropped as a defendant.

10:54:22  18             THE COURT:  Okay.  Yes, sir.

10:54:22  19             THE JUROR:  I'm sorry.  Rodney James, 189.  The second

10:54:22  20   one did go to court as a summary judgment.

10:54:22  21             THE COURT:  Okay.  Thank you.  Yes, ma'am.

10:54:22  22             THE JUROR:  Connie Bull, 161.  In 2006, we were in a

10:54:22  23   car accident.  My husband was charged with criminal negligence

10:54:22  24   homicide, and all the charges were dropped.

10:54:22  25             THE COURT:  Okay.  Thank you, ma'am.

10:54:22  1              THE JUROR:  I'm sorry, but in the contract dispute

10:54:22  2  there was a judgment.

10:54:22  3              THE COURT:  Name and number.

10:54:22  4              THE JUROR:  Paul Branson, 164.

10:54:22  5              THE COURT:  Ata boy, Mr. Branson.  Yes.

10:54:22  6              THE JUROR:  Allison Abascal-Roemer, Juror 246.  During

10:54:22  7  my employment, I've been on jury trials for CPS, criminal trials.

10:54:22  8              THE COURT:  I'm going to exclude you on -- you work

10:54:22  9  with the children?

10:54:22 10              THE JUROR:  Yes.  So I get called on criminal for CPS.

10:54:22 11              THE COURT:  Have you had any litigation experience that

10:54:22 12  didn't have to do with your employment?

10:54:22 13              THE JUROR:  No.

10:54:22 14              THE COURT:  Okay.  Thank you.  Anybody else?

10:54:22 15              All right.  Those of you that have had the experience

10:54:22 16  of litigation, or being a witness, or giving a written statement

10:54:22 17  for potential claim, is there anybody who can't put that

10:54:22 18  experience aside and not let it influence you in this case?  If

10:54:22 19  so, let me see your hand.

10:54:22 20              Now, is there anybody on the panel who knew anybody

10:54:22 21  else on this side of the room on the panel before you came here

10:54:22 22  today?  Yes, sir.

10:54:22 23              THE JUROR:  Dave Owens, No. 178.  I work with Mr.

10:54:22 24  Miller back there.

10:54:22 25              THE COURT:  Mr. Miller, do you admit you know him?

10:54:22  1              THE JUROR:  Yes, I admit I know him.

10:54:22  2              THE COURT:  All right.  Let me ask you this:  Do you

10:54:22  3  visit in each other's homes?  Or is it just a professional

10:54:22  4  relationship?

10:54:22  5              THE JUROR:  Just a professional relationship.

10:54:22  6              THE COURT:  And if you both ended up on a jury, would

10:54:22  7  one follow the other, like a lamb, or would you make up your own

10:54:22  8  decision?

10:54:22  9              THE JUROR:  I would make up my own.

10:54:22  10             THE COURT:  Is that right?

10:54:22  11             THE JUROR:  Yes.  That's right.

10:54:22  12             THE COURT:  Anybody on this panel think you know

10:54:22  13  anybody that works in the federal courthouse?  Works for my

10:54:22  14  staff, for Judge Yeakel's staff, or Judge Pitman's staff, or

10:54:22  15  Judge Austin's staff, or the clerk, or the probation department?

10:54:22  16             Now, we're almost through.  Anybody on the front row

10:54:22  17  have had any serious disputes with the federal government?

10:54:22  18  Serious disputes with EEOC, or immigration, or any of the

10:54:22  19  government agencies, Internal Revenue Service, where you had a

10:54:22  20  severe problem?  Anybody on the front row?  How about the second

10:54:22  21  row?  The third row?  And the last row?

10:54:22  22             THE JUROR:  Paul Branson, 164.  The IRS has sued my

10:54:22  23  immediate family a number of times.

10:54:22  24             THE COURT:  All right.  Is any of them pending now?

10:54:22  25             THE JUROR:  No, sir.

10:54:22  1              THE COURT:  Okay.  That experience, I'm sure, has been

10:54:22  2    enlightening.  Would it influence you in any way, Mr. Branson, if

10:54:22  3    you're to be a juror on this case?

10:54:22  4              THE JUROR:  No, sir.

10:54:22  5              THE COURT:  Okay.  Thank you.  I'll have the lawyers up

10:54:22  6    here, please.

10:54:22  7              (At the bench, on the record.)

10:54:22  8              THE COURT:  I think I've covered everything.  Any

10:54:22  9    additional questions from the government?

10:54:22  10             MS. DOUGLAS:  No, your Honor.

10:54:22  11             THE COURT:  How about the defendant?

10:54:22  12             MR. ORR:  No, your Honor.  That was fine.  I appreciate

10:54:22  13    it.

10:54:22  14             THE COURT:  All right.  Y'all may have a seat.

10:54:22  15             All right.  Members of the jury panel, I'm going to let

10:54:22  16    you go for 15 minutes.  Please come back.  We're short of

10:54:22  17    marshals.  We're running them.  For those of you who like to

10:54:22  18    smoke, it's kind of like high school.  You have to go out in the

10:54:22  19    front.  The security officers will show you.  Otherwise, you can

10:54:22  20    look at our beautiful hall or see the pretty trees.  Don't go too

10:54:22  21    far out.  We've got so many condos now that we have more dogs

10:54:22  22    that walk across that yard than people.  So those of you that

10:54:22  23    love dogs, you stay on the sidewalk.

10:54:22  24             Don't talk about this case.  Talk about anything else

10:54:22  25    you want, don't talk about the case.  Please look where you are,

10:54:22    1    I want you in the same seats.  As you come back, you folks over

10:54:22    2    in the left-hand side of the room, don't run off, come back, but

10:54:22    3    you can sit anywhere you wish.  And we're in recess for 15

10:54:22    4    minutes.

10:54:22    5                (In chambers.)

10:54:22    6                THE COURT:  Okay.  Ms. Douglas, if you would state the

10:54:22    7    challenges of the government, please.

10:54:22    8                MS. DOUGLAS:  Cynthia Landenberger, Juror No. 156,

10:54:23    9    Angela Leudecke, Juror No. 141, Scot Pate, Juror No. 236, Rodney

10:54:23    10   James, Juror 189, Mario Villanueva, Juror No. 18, Paul Branson,

10:54:23    11   Juror No. 25.

10:54:23    12               THE COURT:  Any objections, exceptions, or Batson

10:54:23    13   challenges to any of the United States attorney's peremptories?

10:54:23    14               MR. ORR:  No, your Honor.

10:54:23    15               THE COURT:  All right.  The Court finds no basis for a

10:54:23    16   Batson challenge.

10:54:23    17               Mr. Orr, if you'd state the defendant's please.

10:54:23    18               MR. ORR:  You'll find this interesting.  Tracy Watson,

10:54:23    19   No. 3, Ingrid Kruse, No. 5, Megan Moore, No. 6, Barbara

10:54:23    20   Stephenson, No. 7, Ana Martinez, 15, Mario Villanueva, No. 18,

10:54:23    21   Arlene Franklin, No. 22, Angela Leudecke, No. 24, and Connie

10:54:23    22   Bull, No. 26, Susan Gorishek, No. 28.

10:54:23    23               THE COURT:  Any objections, exceptions, or Batson

10:54:23    24   challenges to any of the peremptories of the defendant?

10:54:23    25               MS. DOUGLAS:  No, your Honor.

10:54:23  1          THE COURT:  The Court finds no basis for a Batson

10:54:23  2  challenge.

10:54:23  3          Ms. Sims, if you'll read to us the names of those

10:54:23  4  chosen.

10:54:23  5          THE CLERK:  Juror No. 143, Carol Torgrimson, Juror No.

10:54:23  6  185, George Peterman, Juror No. 173, Scott --

10:54:23  7          THE COURT:  Wait a minute.  Peterman, what number is

10:54:23  8  that?  He took the place on somebody else?

10:54:23  9          THE CLERK:  Did I miss Juror No. 192, Darla Atkins?

10:54:23  10  Juror No. 185, George Peterman, Juror No. 173, Scott Gribble,

10:54:23  11  Juror No. 159, Brian Olson, Juror No. 259, Aaron Riethmayer,

10:54:23  12  Juror No. 260, Michael Bowers, Juror No. 258, Cindy Berry, Juror

10:54:23  13  No. 178, David Owens, Juror No. 177, Ronald Green, Juror No. 270,

10:54:23  14  Julie Johnson, Juror No. 205, John Inman, Juror No. 149, Jennifer

10:54:23  15  Juday, and Juror No. 268, Harol Stegman.

10:54:23  16          THE COURT:  Okay.  Is the jury satisfactory with the

10:54:23  17  prosecution?

10:54:23  18          MS. DOUGLAS:  Yes, your Honor.

10:54:23  19          THE COURT:  Satisfactory with the defense?

10:54:23  20          MR. ORR:  Yes, your Honor.

10:54:23  21          THE COURT:  All right.  We will go in and select the

10:54:23  22  jury.  And then, I'll excuse the panel and we'll have opening

10:54:23  23  statements.

10:54:23  24          (Jury panel present.)

10:54:23  25          THE COURT:  Members of the jury, if your name is read,

10:54:23  1    please just stand at your seat.

10:54:23  2         THE CLERK:  Juror No. 143, Carol Torgrimson, Juror No.

10:54:23  3    192, Darla Atkins, Juror No. 185, George Peterman, Juror No. 173,

10:54:23  4    Scott Gribble, Juror No. 159, Brian Olson, Juror No. 259, Aaron

10:54:23  5    Riethmayer, Juror No. 260, Michael Bowers, Juror No. 258, Cindy

10:54:23  6    Berry, Juror No. 178, David Owens, Juror No. 177, Ronald Green,

10:54:23  7    Juror No. 270, Julie Johnson, Juror No. 205, John Inman, Juror

10:54:23  8    No. 149, Jennifer Juday, Juror No. 268, Harol Stegman.

10:54:23  9         THE COURT:  Okay.  Ladies and gentlemen, you're the

10:54:23  10   jury.  I'm going to put you in Mr. Hall's custody.  If you'll get

10:54:23  11   your personal things and follow him.  He'll show you the jury

10:54:23  12   room and where we come and go.  In just a few minutes, we'll

10:54:23  13   start the trial.

10:54:23  14        COURT SECURITY OFFICER:  Those jurors selected, please

10:54:23  15   follow me.

10:54:23  16        THE COURT:  I feel like the Michelin cartoon:  I don't

10:54:23  17   want to let you go.  The reason for it is that the number one

10:54:23  18   expense in federal courts are the juries, so you're expensive.

10:54:23  19   And generally we select several juries out of each panel.  But in

10:54:23  20   this particular case, because one judge is still going on in a

10:54:23  21   multi-week case, Judge Nowlin had a different jury panel, we only

10:54:23  22   had -- well, it turned out we only had one.  We had several cases

10:54:23  23   it looked like we were going to have Thursday, and that's why

10:54:23  24   it's so important for you, the next time you get a notice, to

10:54:23  25   please call because on Friday afternoons, about 4:00, we'll

10:54:23  1  change the numbers and try to cut some.  And, of course, if you

10:54:23  2  have a legitimate and big concern, call and Monica will take care

10:54:23  3  of it.  That's what she does up here.  If she's not talking to a

10:54:23  4  juror, I think she's asleep, so call her and make sure that you

10:54:24  5  get the information.

10:54:24  6        And don't think that you wasted your time.  The Western

10:54:24  7  District of Texas has more cases filed in it than any other

10:54:24  8  district in the United States with one exception and that's

10:54:24  9  southern Texas.  We vie for the number one position each time

10:54:24  10  because, of course, we have a lot of the border and we have a lot

10:54:24  11  of immigration cases, which as a general rule don't come all the

10:54:24  12  way to Austin; they're handled in Del Rio, El Paso, Laredo and

10:54:24  13  Brownsville and McAllen, primarily.  But that doesn't change the

10:54:24  14  fact that we're busy.

10:54:24  15        In '91, when I came to help Judge Nowlin here, he had

10:54:24  16  over 1,600 civil cases.  I took half, he took half, and we worked

10:54:24  17  pretty hard for five years to get current.  We've been current

10:54:24  18  ever since, which means that we try cases within a year they're

10:54:24  19  filed, with the exception of patents cases, which takes 16 months

10:54:24  20  usually to get up.  But I can't do it without the jurors coming

10:54:24  21  in.  And the lawyers know the jurors are going to come in.  The

10:54:24  22  lawyers know the cases go to trial, and so, we move the docket.

10:54:24  23  And we have a very heavy docket.

10:54:24  24        I hope to see you again, but if not, remember when you

10:54:24  25  get that notice that we need you.  Again, remember this really is

10:54:24  1  the only time you'll be actively involved in your own government.

10:54:24  2  And you're the judges of the facts, and lots of people have

10:54:24  3  fought and died for that right to keep judges from making all of

10:54:24  4  the decisions, allowing the citizenry to do so.  It's an

10:54:24  5  important right.  Y'all are all excused, although you're welcome

10:54:24  6  to stay and watch the trial if you wish.

10:58:47  7          (Jury panel exits.)

10:58:47  8          MR. ORR:  May we say something on the record, your

10:58:48  9  Honor?

10:58:48  10          THE COURT:  Anything you say will be on the record.

10:58:50  11          MR. ORR:  Yes, sir, of course.  Well, unless Lily takes

10:58:53  12  a break.

10:58:56  13          THE COURT:  Proceed, Mr. Orr.

10:58:58  14          MR. ORR:  I think there's going to be some testimony

10:59:00  15  from the government's first witness, Mr. Lee, that he sold a .380

10:59:03  16  -- I mean a .410 shotgun to Mr. Longoria.  That's what's in his

10:59:08  17  statement.  So I'm assuming he's going to say the same thing on

10:59:11  18  the stand.

10:59:11  19          THE COURT:  Sold it to Mr. Longoria?

10:59:12  20          MR. ORR:  Sold them to Mr. Longoria.  Well, when they

10:59:14  21  searched the house, they found a shotgun, but it's a 12-gauge.

10:59:17  22  The police on his statement ask him, well, was the shotgun you

10:59:21  23  sold to Mr. Longoria -- was it sawed off when you sold it?  Oh,

10:59:24  24  no, it wasn't tampered with, it was brand-new, all that kind of

10:59:26  25  stuff.

| | | |
|---|---|---|
| 10:59:26 | 1 | So my question -- my point is this.  With the Court's |
| 10:59:30 | 2 | ruling on the shotgun, I wanted to ask the officers and did -- |
| 10:59:32 | 3 | and you didn't find a .410 shotgun in the house, did you?  And |
| 10:59:35 | 4 | the answer to which is no.  Not no, but we did find a 12-gauge. |
| 10:59:39 | 5 | I just don't want to open the door by proving there was no .410 |
| 10:59:42 | 6 | there. |
| 10:59:44 | 7 | THE COURT:  Who is the gentleman, a civilian who sold |
| 10:59:47 | 8 | it? |
| 10:59:48 | 9 | MR. SPARKS:  Yes, your Honor. |
| 10:59:49 | 10 | THE COURT:  Who might know the difference and may not |
| 10:59:52 | 11 | know the difference. |
| 10:59:53 | 12 | MR. ORR:  Yes, sir.  He's talked about a .410 and |
| 10:59:55 | 13 | described it as a break-apart .410. |
| 10:59:57 | 14 | THE COURT:  Well, I can't -- let's put it this way.  I |
| 11:00:03 | 15 | don't give legal advice anymore because I don't get paid enough |
| 11:00:06 | 16 | for it.  But you ask him if he didn't find the shotgun, I would |
| 11:00:15 | 17 | certainly allow him to ask, did you find. |
| 11:00:18 | 18 | MR. ORR:  No. |
| 11:00:19 | 19 | THE COURT:  I understand you're talking about different |
| 11:00:20 | 20 | shotguns, but the inference being no shotgun was there is enough |
| 11:00:24 | 21 | to -- well, what did you find?  That's the door that you're |
| 11:00:28 | 22 | opening. |
| 11:00:30 | 23 | MR. ORR:  Well -- |
| 11:00:31 | 24 | THE COURT:  But that's -- |
| 11:00:33 | 25 | MR. ORR:  -- I was just thinking -- |

11:00:34  1          THE COURT:  -- this is just conversation.  I don't know

11:00:36  2  what the evidence is going to be.

11:00:37  3          MR. ORR:  I'm moving in way of limine that they not be

11:00:40  4  able to bring in the information about the shotgun in response.

11:00:42  5          THE COURT:  Well, we're not going to try question by

11:00:44  6  question.  But if you ask them, you didn't find, then that opens

11:00:49  7  the door as to what they did find.

11:00:50  8          MR. ORR:  This may be some awfully short

11:00:52  9  cross-examination.

11:00:54  10          THE COURT:  It may be.

11:00:56  11          MR. ORR:  If I can manage to do that.

11:00:58  12          THE COURT:  I found many times that's what a defense

11:01:00  13  lawyer had to do, because I had to do it, which means I had to

11:01:03  14  run outside and ask all my questions to a tree to get it out and

11:01:08  15  then, go back and try the lawsuit.  All right.

11:01:14  16          MR. ORR:  Yes, sir.

11:01:26  17          THE COURT:  All right.  We're going to start.  Looks

11:01:28  18  like things are under control.

11:02:24  19          (Jury present.)

11:03:22  20          THE COURT:  Members of the jury, as we open court every

11:03:29  21  morning, and as we open court every afternoon, after the noon

11:03:34  22  break, I will ask you three questions:  Have you permitted

11:03:38  23  anybody to talk to you about this case?  Have you talked to

11:03:41  24  anybody about the case?  Have you learned anything at all about

11:03:45  25  the case, outside of the presence of each other and this

| 11:03:49 | 1 | courtroom?  And as long as you can say "No" under oath to those |
| 11:03:54 | 2 | questions, we're going to be best friends. |
| 11:03:57 | 3 | But sometimes that's a difficult thing because when you |
| 11:04:02 | 4 | get home tonight, your friends or family are going to say, you |
| 11:04:06 | 5 | got on a jury, what kind of a jury is it?  What kind of case is |
| 11:04:09 | 6 | it?  And you're going to have to say, which is true, you know, |
| 11:04:12 | 7 | you read about that crazy Judge Sparks down there, that federal |
| 11:04:17 | 8 | judge that throws people in jail, which, unfortunately, sometimes |
| 11:04:20 | 9 | we have to do, he said I couldn't talk about the case.  I would |
| 11:04:25 | 10 | be disqualified as a juror, and I've got to answer him under oath |
| 11:04:30 | 11 | in the morning.  But he says come Thursday, I can bore you to |
| 11:04:35 | 12 | death by telling you everything about the case. |
| 11:04:38 | 13 | Let me tell you that the reason for that is when you go |
| 11:04:42 | 14 | home and you talk with a friend our family, it's possible that |
| 11:04:46 | 15 | someone can say something that would influence you that the other |
| 11:04:50 | 16 | jurors have not heard.  If you're talking even on the street |
| 11:04:54 | 17 | corner, you might be influenced, and the others are not.  That's |
| 11:04:57 | 18 | why our whole system, right now, of trial is to have the jury |
| 11:05:02 | 19 | hear everything together, deliberate where they speak and you |
| 11:05:09 | 20 | hear everything in the deliberation, because in the federal court |
| 11:05:13 | 21 | the jury must be unanimous.  As I've indicated to you, you will |
| 11:05:19 | 22 | be requested to find whether or not the government has |
| 11:05:22 | 23 | established guilt in this case beyond a reasonable doubt.  If you |
| 11:05:27 | 24 | individually do not find that, you must vote not guilty.  And any |
| 11:05:34 | 25 | verdict needs to be unanimous.  In other words, no person can be |

11:05:38  1  found guilty without all 12 of the jurors who are deliberating,

11:05:42  2  voting that they find beyond a reasonable doubt of the

11:05:47  3  defendant's guilt.

11:05:51  4        Now, each of you have been qualified to be jurors in

11:05:56  5  this case, which means that you have committed yourself under

11:06:01  6  oath to sit back, listen to the evidence.  I'm not going to let

11:06:07  7  you take any notes because, if you'll remember, when you were in

11:06:09  8  school and you were taking notes, all of a sudden, you forgot to

11:06:12  9  listen for just an important thing.  We found out in the 1950s,

11:06:18  10 monitoring juries all over the country that -- the American Bar

11:06:21  11 Association that a jury of six or more people in a trial that

11:06:25  12 lasts no longer than two weeks remembers virtually everything,

11:06:29  13 not only the evidence but who comes into the courtroom, what

11:06:32  14 people wear, what people say.  And so, collectively, you will be

11:06:37  15 able to recall all of the evidence.  Plus at the end of all of

11:06:41  16 the evidence, the lawyers will give you their rendition of what

11:06:45  17 they believe the evidence means, and then, you will have all of

11:06:49  18 that with you.

11:06:53  19       So if you'll listen to my questions and answer them

11:06:56  20 orally.  Have you talked to anybody about this case?

11:07:01  21       JURORS:  No.

11:07:03  22       THE COURT:  Awfully weak.  Have you allowed anybody to

11:07:07  23 talk to you about the case?

11:07:09  24       JURORS:  No.

11:07:10  25       THE COURT:  Much better.  And have you learned anything

11:07:12   1  at all about the case, outside the presence of each other and

11:07:16   2  this courtroom?

11:07:18   3            JURORS:  No.

11:07:18   4            THE COURT:  All right.  Show negative responses to all

11:07:21   5  questions by all jurors.  And if you'll stand and be sworn,

11:07:23   6  please.

11:07:24   7            THE CLERK:  You, and each of you, solemnly swear or

11:07:29   8  affirm that in the case of United States of America vs. Arthur

11:07:33   9  Longoria, that you will a true verdict rendering according to the

11:07:37  10  law and the evidence, so help you God?

11:07:40  11            (Affirmative response given.)

11:07:42  12            THE COURT:  You may be seated.

11:07:44  13            Now, with the taking of that oath, members of the jury,

11:07:46  14  you become judges, judges of the facts in this case.  You have

11:07:50  15  under the Constitution the exclusive authority to determine the

11:07:54  16  facts in this case.  It's a criminal case, so you'll be

11:07:57  17  determining whether the defendant is not guilty or guilty.  I

11:08:07  18  will decide the questions of law and give you the legal

11:08:09  19  instructions, as I've already told you.  It also will be my job

11:08:14  20  to determine what evidence that you should consider and,

11:08:18  21  occasionally, what evidence that you should not consider in

11:08:21  22  rendering a verdict.  And I'll go into that in a minute.

11:08:25  23            But nothing I say to the lawyers, or to you, or to my

11:08:30  24  staff, occasionally -- because we have a lot of litigation going

11:08:36  25  on and I happen to be an older judge, I have judges contacting me

11:08:41  1  all the time, and I'll turn on this machine that I've learned to

11:08:47  2  hate, and I might be looking over here and seeing what other

11:08:51  3  problems that I might have outside of Austin.  But what I say and

11:08:57  4  do is not to be interpreted by you in any way as to who should

11:09:03  5  prevail in this case.  That's your job.  That's the job of the

11:09:06  6  jury to determine the facts, and you'll do that based on the

11:09:10  7  evidence.

11:09:11  8          So what is the evidence?  The evidence is the sworn

11:09:14  9  answers to questions the lawyers pose.  Not the questions of what

11:09:19  10  the lawyers say, not the statements that the lawyers are allowed

11:09:23  11  to make at opening statement and closing statement, but the sworn

11:09:28  12  answers to questions from the witnesses who have sworn to tell

11:09:31  13  the truth.  Evidence can also be documents, pictures.  I don't

11:09:35  14  know what we'll have, but I expect we'll have some sort of

11:09:38  15  documentary evidence.  Listen to all the oral testimony together,

11:09:43  16  you will get it all.  All of the documentary evidence will be

11:09:46  17  presented to you during your deliberations and you'll have it.

11:09:52  18          What the lawyers say is not evidence, not binding on

11:09:55  19  you in any way, shape or form.  You have the right to believe

11:10:02  20  everything a witness says, nothing that a witness says, or parts

11:10:06  21  of what a witness may say.  You have that exclusive authority.

11:10:10  22  You have the authority to listen to the lawyers, and I emphasize

11:10:16  23  I think it's important to listen to the lawyers because they're

11:10:18  24  the only ones, sitting in this courtroom right now, who know what

11:10:22  25  the evidence is going to be.

11:10:25  1    But remember this:  The lawyers are advocates.  The

11:10:29  2    assistant United States attorney's position is to bring in the

11:10:33  3    best evidence to try to convict the defendant.  Mr. Orr's

11:10:37  4    position is to try to show you from the evidence that you should

11:10:41  5    not convict.  They have a point of view.  So remember that when

11:10:46  6    they make their statements to you before and after the

11:10:49  7    presentation of the evidence.  But listen to them because their

11:10:53  8    statements can assist you in understanding their contentions so

11:10:57  9    that you can evaluate the evidence yourself.

11:11:03  10   Now, the lawyers are going to make objections in this

11:11:05  11   case.  This is not going to be like a television.  I'll have to

11:11:08  12   admit, I have never seen any of the television programs other

11:11:12  13   than, incidentally, Law And Order.  I think it's on every channel

11:11:18  14   every day, and occasionally, I flip one and watch it.  But I've

11:11:21  15   not seen any of the others.  But my kids and wife have told me

11:11:25  16   about it or asked me about questions.  It's not like that.  The

11:11:31  17   lawyers are obligated to me under their oath to make objections

11:11:36  18   when they do not believe there's evidence that you should

11:11:39  19   consider, and I will make a ruling.

11:11:47  20   If I grant the objection, you won't hear the evidence.

11:11:50  21   Don't try to guess what it was.  Don't try to figure it out.  I

11:11:54  22   don't want you to consider it.  If I overrule it, don't think

11:11:57  23   it's any more important than anything else.  Sometimes I may turn

11:12:03  24   to you and I may say:  Now, members of the jury, I'm going to

11:12:06  25   allow you to consider this evidence for this purpose but not for

11:12:11  1  that purpose.  And I've had my children say before, how does a

11:12:18  2  juror forget what they've just heard in evidence?  And I say,

11:12:22  3  well, you don't have to forget it, but you have to follow the

11:12:25  4  legal instructions.  You don't use evidence that I limit if that

11:12:30  5  comes up to another issue.  And if you have any questions, just

11:12:36  6  raise your hand and make sure that I give you an instruction that

11:12:38  7  you understand.

11:12:42  8         Now, of course, I've got a court reporter.  She takes

11:12:45  9  down everything.  She's very good.  But there's not a transcript

11:12:49  10 prepared for you.  A transcript is prepared for the appellate

11:12:53  11 court if there's an appeal, and it's prepared at a later date.

11:12:58  12 So when you get through, don't in your deliberations say, we want

11:13:03  13 the transcript of the trial because I have to write you a note,

11:13:08  14 don't you remember what I told you on Monday?  Listen to the

11:13:13  15 evidence and you will remember everything that you need.  You've

11:13:17  16 got good lawyers in this case, and they will present the case

11:13:21  17 fine.

11:13:22  18        Don't do any investigation.  Don't try to learn

11:13:28  19 anything.  We've got a great library just two blocks down here.

11:13:31  20 If you have time, you ought to go over and look at it, but don't

11:13:34  21 look up anything on the law.  You'll have plenty of evidence and

11:13:38  22 plenty of legal instructions to decide this case from the

11:13:42  23 courthouse.

11:13:44  24        From time to time, I may bring the lawyers up to have a

11:13:48  25 bench conference.  Don't worry about what we are talking about.

11:13:52    1    Play like it's like baseball when the catcher and the pitcher go

11:13:56    2    out there and talk.  We'll be quick.  The reason that we're doing

11:14:01    3    it, though, is so you don't have to stand up, go to the jury room

11:14:05    4    and then, come right back out.  Although, occasionally, if I see

11:14:09    5    anybody nodding off, I might let you have a little exercise and

11:14:11    6    do that.  But the truth of the matter is, it's for your

11:14:14    7    convenience.  Please be patient on that.

11:14:17    8              Anybody want to invoke the rule?

11:14:24    9              MR. ORR:  Yes, your Honor.

11:14:24    10              THE COURT:  Okay.  The rule is invoked in virtually all

11:14:29    11    cases: that means the witnesses will testify without hearing each

11:14:32    12    other's testimony and without discussing with each other what the

11:14:36    13    testimony will be.  And I will instruct the lawyers to instruct

11:14:39    14    their witnesses to abide by the ruling.

11:14:42    15              Now, we're going to start in just a second with opening

11:14:45    16    statements.  Again, they're not evidence.  They're to tell you

11:14:48    17    kind of a preview of what the evidence will be so when the first

11:14:51    18    witness is called, the testimony will make sense to you.  Then,

11:14:57    19    the prosecution that has the burden of convincing each of you

11:15:00    20    beyond a reasonable doubt of guilt from the evidence, they will

11:15:03    21    call their witnesses, and they will ask the questions first.

11:15:08    22    Then the defense will be allowed to ask questions, and the

11:15:12    23    prosecution will close up the witnesses, and we go to next

11:15:18    24    witness until we're through.  And at that time if the defendant

11:15:20    25    decides to call any witnesses, the process is just reversed.  And

11:15:25  1    then, we will end up with all of the evidence.

11:15:30  2         I'll have to take a little time to prepare a charge,

11:15:35  3    which is the legal instructions.  The lawyers get the right to

11:15:38  4    review it, make comment, object to it if they wish, and then, we

11:15:45  5    bring you back in the courtroom.  I will read you the charge.

11:15:50  6    The lawyers will be able to, then, argue the evidence and the

11:15:53  7    charge, and then, and only then, will you start deliberating.

11:15:57  8         So when you go to lunch, if any of you go to lunch with

11:16:00  9    each other, again, don't talk about the case, talk about anything

11:16:03  10   else you wish.  Don't talk about this case until I tell you to,

11:16:06  11   after you've heard all of the evidence.  Don't make up your mind

11:16:09  12   early.  Keep an open mind.  Listen to all of the evidence until

11:16:13  13   the evidence has been presented.

11:16:15  14        The government may make their opening statement.

11:16:19  15        MR. SPARKS:  Judge, did you want me to reread the

11:16:22  16   indictment?

11:16:22  17        THE COURT:  The indictment's been read.  Just make an

11:16:27  18   opening statement.

11:16:29  19   GOVERNMENT'S OPENING STATEMENTS

11:16:32  20        MS. DOUGLAS:  Good morning, ladies and gentlemen.  What

11:16:35  21   I'm going to do at this point is give you an overview of what I

11:16:39  22   believe the evidence is going to be from the government, the

11:16:43  23   witnesses that I'm going to call, and what I expect them to come

11:16:46  24   in and testify about.  This case is a simple case in the

11:16:49  25   government's opinion.  It's a case about your actions, the

11:16:54    1    consequences of your actions, and acceptance of the

11:16:57    2    responsibility for your actions.

11:17:00    3          First off, I'll remind you that Arthur Longoria is

11:17:04    4    charged as being a convicted felon in possession of a firearm.

11:17:08    5    And the Court will give this to you later, but there's been a

11:17:11    6    stipulation that he is, in fact, a convicted felon.  I bring that

11:17:16    7    up at this point because I'll talk about consequences.

11:17:20    8          Arthur Longoria made choices in his life that brought

11:17:23    9    him to the status of being a convicted felon.  Once you become a

11:17:26   10    convicted felon, the consequence of that action is that you no

11:17:29   11    longer are able to possess firearms, and that's why we're here

11:17:32   12    today.  You're going to hear from witnesses who have known Mr.

11:17:38   13    Longoria for a couple of years.  The first witness that you're

11:17:40   14    going to hear from is Jonathan Lee.  He's 23 years old right now.

11:17:45   15    He's lived here, off and on, in Austin for about two to three

11:17:49   16    years, and true enough, there's an age difference between himself

11:17:54   17    as well as Mr. Longoria, but it's a friendship that evolved over

11:17:58   18    time and they've hung out together, mainly at Mr. Longoria's

11:18:02   19    home.

11:18:03   20          Jonathan's going to tell you he's made some poor

11:18:05   21    choices in his life, and one of them is he's not a good financial

11:18:09   22    manager, as a lot of times, younger citizens are not.  And he's

11:18:13   23    going to tell you that he'll buy weapons, and then, at the end of

11:18:16   24    the month, he has more month left over than he has money left

11:18:20   25    over, and he needs something to supplement in order to be able to

11:18:23  1  pay the rent, to be able to eat.  So he's going to tell you that

11:18:26  2  he purchased some firearms, and he got into, yet, another

11:18:29  3  position where he needed money for rent and he needed money for

11:18:32  4  food.

11:18:33  5       He's going to tell you that he called Arthur Longoria,

11:18:36  6  the defendant, and say, look I've got a couple of firearms, could

11:18:39  7  you buy them and help me out?  I need some money.  I need money

11:18:43  8  to pay rent, I need money for food.  And he's going to tell you

11:18:48  9  Arthur Longoria agreed.  Jonathan is going to tell you he went

11:18:51  10  over to the house he had been at many times, over at Howellwood

11:18:55  11  Way, which is located here at Austin, Travis County, Texas.  He's

11:18:59  12  going to tell you on that day, they didn't have a price because

11:19:03  13  they had already discussed it.  And as I said, they'd been

11:19:06  14  friends for a few years.  He walked in with two firearms, left

11:19:09  15  them there.  Arthur Longoria handed him his money and he left.

11:19:12  16  He doesn't care what Mr. Longoria does with those firearms after

11:19:17  17  that.  They weren't his anymore once he sold them to him for

11:19:19  18  money for rent and for food.

11:19:23  19       You're next going to hear from detectives with the

11:19:27  20  Austin Police Department.  They're going to tell you that they

11:19:28  21  received information and they investigated the information

11:19:31  22  regarding the house off of Howellwood Way, Mr. Longoria's

11:19:35  23  residence.  They're going to tell you that they sought and

11:19:38  24  received a search warrant for that residence.  They're going to

11:19:42  25  tell you about the day they went and executed the search warrant

11:19:45  1   off of Howellwood Way.  And they're going to tell you about that

11:19:49  2   morning when they got there, there were five people in the

11:19:52  3   residence; and they're going to tell you how they secured the

11:19:54  4   residence and the process that they took in searching the

11:19:57  5   residence and speaking with the people who were in the home.

11:19:59  6          The person of interest here is obviously Arthur

11:20:02  7   Longoria.  They're going to tell you about him being Mirandized

11:20:05  8   at that time.  They're going to tell you about some of the things

11:20:08  9   he said.  They're going to tell you about the item that they

11:20:10  10  found, which is why we're here.  They're going to tell you about

11:20:14  11  a Hi-Point pistol that was found in Arthur Longoria's bedroom,

11:20:19  12  and they're going to tell you about the location of it.  So be

11:20:22  13  listening for that as far as where this firearm was found in the

11:20:25  14  bedroom.

11:20:28  15         You're going to hear from a Bureau of Alcohol, Tobacco

11:20:31  16  and Firearms agent.  And you're also going to hear from a

11:20:34  17  ballistics examiner, a firearms examiner with the Austin Police

11:20:38  18  Department.  And you may think, why are we hearing from them?

11:20:41  19  But that's the government's burden.  I have to prove to you that

11:20:43  20  the item that's found is a firearm, so you have to have someone

11:20:47  21  to come in and indicate that this is a firearm that's capable of

11:20:51  22  functioning as a firearm.  So you may be saying, well, that's

11:20:55  23  obvious, but I have to prove that to you.

11:20:57  24         I also have to prove that the firearm was not

11:20:59  25  manufactured here in the state of Texas, and that's the

11:21:01  1  responsibility of the agent with ATF to come in and establish to

11:21:05  2  you the research that he's done and be able to tell you where

11:21:08  3  that firearm was manufactured.

11:21:09  4        And one of the biggest pieces of evidence I believe

11:21:12  5  you're going to see and hear is going to be the statement that

11:21:16  6  Arthur Longoria gave.  It's been videotaped.  He was Mirandized.

11:21:20  7  So you're going to see that.  You'll get the opportunity to see

11:21:22  8  what his version of why he's in possession of this firearm is,

11:21:27  9  and I believe after you listen to his own words, there's not

11:21:30  10  going to be any doubt in your mind that he was, in fact, in

11:21:33  11  possession of this firearm.  And you could certainly see him

11:21:36  12  attempting to shirk his responsibility, but that's what I'm going

11:21:40  13  to ask you at the end of all of this.  He's taken actions,

11:21:44  14  there's consequences, and I'm going to ask you, at the end of it,

11:21:46  15  to find him responsible and find him guilty of being a felon in

11:21:50  16  possession of a firearm.  Thank you.

11:21:54  17        THE COURT:  Mr. Orr.

11:21:56  18  DEFENDANT'S OPENING STATEMENTS

11:21:58  19        MR. ORR:  May it please the Court.

11:21:59  20        Ladies and gentlemen of the jury, prosecution, this

11:22:01  21  trial isn't going to take very long, a day or two maybe.  Maybe

11:22:04  22  three.  You're going to hear several witnesses, some from the

11:22:07  23  prosecution and probably some from the defense, although, as the

11:22:10  24  Judge told you, the defendant has no obligation to bring in

11:22:13  25  witnesses.  We may in this case bring in the witnesses that I

11:22:17  1  mentioned to you in voir dire.  We'll see how the government's

11:22:20  2  case goes.  It may be that we rest after the government's case is

11:22:23  3  concluded and we've heard their witnesses.

11:22:25  4       Sometimes the government doesn't prove their case with

11:22:29  5  their witnesses, and there's no point in the defense putting on a

11:22:31  6  case.  But what you need to look at in this case is the

11:22:35  7  credibility of the witnesses.  And you get to look at the

11:22:38  8  credibility primarily of Jonathan Lee.  Now, Mr. Lee as she told

11:22:41  9  you, is a 23-year-old, young man who buys and sells firearms.

11:22:45  10 And what apparently Mr. Lee has told Ms. Douglas is that, well,

11:22:49  11 I'll buy some guns, and then, I'll run out of money at the end of

11:22:51  12 the month, and I'll have to sell those guns.  He just happens to

11:22:55  13 be buying guns and just happens to need some money.  That's his

11:22:58  14 version.

11:22:59  15      I think a more reasonable deduction when you listen to

11:23:02  16 him and you hear all the witnesses and you hear -- if we bring in

11:23:06  17 -- we have to put on witnesses and we bring in Ms. Olivo, I think

11:23:10  18 what you're going to hear is that it's a regular business.  Mr.

11:23:13  19 Lee buys and sells guns.  He goes to the gun shows, and he sells

11:23:17  20 guns to people on the street.

11:23:20  21      Now, what you're going to hear from him say, I believe,

11:23:23  22 is that he's going to claim that he sold a gun to Arthur

11:23:31  23 Longoria.  And I think he's going to say it was for the use of

11:23:35  24 Loretta Garcia, who is now Mrs. Longoria.  And what he's going to

11:23:41  25 say is that I sold them to Arthur.  I sold these -- to the guy I

| | |
|---|---|
| 11:23:47 | 1 |
| 11:23:52 | 2 |
| 11:23:57 | 3 |
| 11:24:02 | 4 |
| 11:24:08 | 5 |
| 11:24:13 | 6 |
| 11:24:16 | 7 |
| 11:24:19 | 8 |
| 11:24:22 | 9 |
| 11:24:27 | 10 |
| 11:24:33 | 11 |
| 11:24:37 | 12 |
| 11:24:43 | 13 |
| 11:24:48 | 14 |
| 11:24:52 | 15 |
| 11:24:53 | 16 |
| 11:25:02 | 17 |
| 11:25:05 | 18 |
| 11:25:09 | 19 |
| 11:25:12 | 20 |
| 11:25:16 | 21 |
| 11:25:19 | 22 |
| 11:25:22 | 23 |
| 11:25:24 | 24 |
| 11:25:27 | 25 |

1  know as Art.  But I think he's going to admit, at least he'll

2  admit that those guns -- that gun, the .380 was intended to be

3  for and the other gun was intended for Loretta.

4         Now, when you hear Mr. Longoria's statement, he gets

5  arrested after this raid, this search.  He's arrested on a

6  federal warrant.  He's taken down to the police station, and they

7  put him on the video and they ask him some questions.  And they

8  ask him, well, did you buy these guns from Jonathan Lee, who

9  apparently is also known as "Tater?"  So he says, well, Loretta

10  bought those guns.  He says, Loretta bought them.  I didn't buy

11  them.  Maybe he paid for them but with his money as a present for

12  her and for her protection.  I mean who knows whether he did that

13  or not, but probably he did.  And the point of it is, Loretta had

14  a gun for her protection.  Nobody has said she can't have a

15  pistol.

16         Now, Mr. Lee says he bought them, I sold them to him.

17  Maybe he's going to say he handled them, maybe he's not.  I don't

18  know.  But what Mr. Longoria said in his statement to the police

19  was -- police asked him about it and he was very cooperative with

20  the police.  And they said, well, did you handle the gun?  Yeah,

21  I handled them.  He said, would that account for your

22  fingerprints being on them?  His fingerprints weren't on the

23  guns, apparently.  But yeah.

24         So the question is going to come down to y'all -- when

25  you go out and you deliberate on this case and all the police and

11:25:31  1  Mr. Lee and the statement that you're going to see from Mr.

11:25:34  2  Longoria is, did he knowingly and intentionally possess those

11:25:38  3  firearms under the definition the Court's going to give you?

11:25:41  4       So the question becomes, if I go over here and -- I

11:25:45  5  suppose, and I pick this book up or handle this book, do I really

11:25:49  6  possess it?  Well, maybe, maybe not.  She's got the perfect right

11:25:52  7  to take it away from me and say, Steve, put my book down, what do

11:25:56  8  you think you're doing?  That's my book, bring your own.  So the

11:26:01  9  question becomes, did he -- if, in fact, he handled the guns, did

11:26:06  10  he possess them with under the meaning of the law?  And the Judge

11:26:09  11  is going to tell you what the law is on possession.

11:26:11  12       I will say this.  He's been honest enough to come in

11:26:14  13  and tell you he's got a felony conviction, didn't argue with the

11:26:19  14  government about that.  What he's arguing with the government

11:26:21  15  about is, did he knowingly and intentionally possess those

11:26:25  16  firearms?  That is, did he have the right to go out and shoot

11:26:28  17  them, do what he wanted to with them, sell them, buy and sell

11:26:30  18  them when, in fact, they belonged to Loretta?  He's not charged

11:26:34  19  with buying a gun, selling a gun, or having his girlfriend, now

11:26:40  20  wife, have a gun.  So when you go out, listen to all the

11:26:44  21  evidence, then you decide if the government has proven their case

11:26:47  22  beyond a reasonable doubt.  Thank you.

11:26:50  23       THE COURT:  You may call your first witness.

11:26:54  24       MS. DOUGLAS:  Jonathan Lee.

11:27:20  25       (Witness sworn.)

```
11:27:42   1              THE COURT:  State your full name, please, sir, and
11:27:43   2    spell your last.
11:27:44   3              THE WITNESS:  Jonathan David Lee, L-E-E.
11:27:46   4              THE COURT:  You may proceed.
11:27:47   5         JONATHAN D. LEE, called by the Government, duly sworn.
11:27:47   6                        DIRECT EXAMINATION
11:27:48   7    BY MS. DOUGLAS:
11:27:48   8    Q.   Jonathan, how old are you?
11:27:52   9    A.   Twenty-three.
11:27:53  10              THE COURT:  Counsel, that's Mr. Lee in federal court.
11:27:56  11              MS. DOUGLAS:  Yes, sir.
11:27:58  12    Q.   (BY MS. DOUGLAS) Mr. Lee, how old are you?
11:27:59  13    A.   Twenty-three.
11:28:00  14    Q.   And, Mr. Lee, where were you born?
11:28:04  15    A.   In Lubbock, Texas.
11:28:06  16    Q.   And do you presently reside -- where do you presently
11:28:08  17    reside?
11:28:08  18    A.   In Watkins, Texas.
11:28:12  19    Q.   And have you ever resided here in Austin?
11:28:14  20    A.   Yes.
11:28:16  21    Q.   And how long ago did you begin residing here in Austin?
11:28:19  22    A.   It's about almost three years ago.
11:28:21  23    Q.   Now, did you live here continuously, or can you explain to
11:28:28  24    the jury how that happened over the past three years?
11:28:30  25    A.   It was kind of off and on.  I moved to Colorado, moved back
```

| 11:28:36 | 1 | home a couple of times. I have a fiance that's from Austin, and |
|---|---|---|
| 11:28:42 | 2 | we came back to help her grandmother through her chemo for her |
| 11:28:46 | 3 | cancer. |
| 11:28:47 | 4 | Q.   Mr. Lee, have you ever been convicted of any crime? |
| 11:28:50 | 5 | A.   No. |
| 11:28:54 | 6 | Q.   Do you know an individual by the name of Art? |
| 11:28:57 | 7 | A.   Yes, I do. |
| 11:28:58 | 8 | Q.   Okay.  And how did you come to be in contact with Art? |
| 11:29:03 | 9 | A.   I met him through a mutual friend when I first moved here. |
| 11:29:07 | 10 | Q.   Okay.  And was that the three years ago that you're talking |
| 11:29:10 | 11 | about? |
| 11:29:10 | 12 | A.   Around that, yeah. |
| 11:29:12 | 13 | Q.   And at the time that you met him, did he have a girlfriend |
| 11:29:15 | 14 | or a wife? |
| 11:29:16 | 15 | A.   Yes.  A girlfriend. |
| 11:29:17 | 16 | Q.   And who was that? |
| 11:29:18 | 17 | A.   Loretta.  I'm not for sure the last name. |
| 11:29:24 | 18 | Q.   And the girlfriend, Loretta, did she continue to be his |
| 11:29:27 | 19 | girlfriend during the period of time that you've known him? |
| 11:29:29 | 20 | A.   Yes. |
| 11:29:31 | 21 | Q.   Do you have a nickname? |
| 11:29:35 | 22 | A.   Yes. |
| 11:29:35 | 23 | Q.   And what is that? |
| 11:29:36 | 24 | A.   It's "Tater." |
| 11:29:40 | 25 | Q.   Now, when you met Art and Loretta, can you tell the jury, |

| | | |
|---|---|---|
| 11:29:46 | 1 | were you all friends?  Or what was your relationship? |
| 11:29:49 | 2 | A.    When I met them? |
| 11:29:51 | 3 | Q.    Yes, sir. |
| 11:29:53 | 4 | A.    I guess just kind of friends.  Yeah. |
| 11:29:55 | 5 | Q.    Did you all hang out at each other's homes?  Or what kind of |
| 11:29:59 | 6 | friendship was it? |
| 11:30:00 | 7 | A.    I used to just go hang out over there. |
| 11:30:02 | 8 | Q.    And has Art lived in a number of different residences since |
| 11:30:06 | 9 | you've known him during the three years? |
| 11:30:07 | 10 | A.    Yes. |
| 11:30:08 | 11 | Q.    Did you ever know him to live off of a residence off of |
| 11:30:12 | 12 | Howellwood Way? |
| 11:30:13 | 13 | A.    Yes. |
| 11:30:14 | 14 | Q.    Was that the last residence that you knew where he lived? |
| 11:30:17 | 15 | A.    Yes. |
| 11:30:19 | 16 | Q.    Did you live in that area? |
| 11:30:21 | 17 | A.    Yes.  I lived off of Rock Sand, behind the H.E.B. there. |
| 11:30:27 | 18 | Q.    And Rock Sand is in the neighborhood of this Howellwood Way? |
| 11:30:30 | 19 | A.    Uh-huh, so is my fiance's grandmother's house. |
| 11:30:34 | 20 | Q.    And how many times would you say you had been to Art's |
| 11:30:37 | 21 | residence off of Howellwood Way? |
| 11:30:40 | 22 | A.    Many times. |
| 11:30:41 | 23 | Q.    Many is what you would characterize it as? |
| 11:30:44 | 24 | A.    Yes. |
| 11:30:46 | 25 | Q.    What do you do for a living? |

| 11:30:49 | 1 | A. I'm a state inspector for a lube shop, inspect vehicles. |
| 11:30:53 | 2 | Q. Have you had other professions during the period of time |
| 11:30:56 | 3 | since you've been an adult? And what I mean by adult, since |
| 11:30:59 | 4 | you've turned 18? |
| 11:31:03 | 5 | A. Other than just working in shops, no. Just auto mechanics |
| 11:31:07 | 6 | and stuff like that. |
| 11:31:09 | 7 | Q. And during the period of time that you've lived here in |
| 11:31:14 | 8 | Austin for the last three years, off and on, as you've indicated, |
| 11:31:16 | 9 | have you possessed firearms? |
| 11:31:17 | 10 | A. Yes. |
| 11:31:18 | 11 | Q. And how many would you say that you've possessed? |
| 11:31:20 | 12 | A. I'm not for sure, but I'd say about seven or eight. |
| 11:31:24 | 13 | Q. Okay. Have you ever purchased firearms -- like, where do |
| 11:31:38 | 14 | you purchase your firearms? |
| 11:31:40 | 15 | A. I've got a few from gun shows. Some have been given to me |
| 11:31:48 | 16 | and traded, you know, stuff like that. |
| 11:31:51 | 17 | Q. And would you consider yourself to be in the business of |
| 11:31:54 | 18 | buying firearms just to resell them to others? |
| 11:31:57 | 19 | A. No, not at all. |
| 11:32:02 | 20 | Q. Mr. Lee, do you think you're a good financial manager? |
| 11:32:07 | 21 | A. No. |
| 11:32:07 | 22 | Q. Okay. And why do you laugh when I ask you that question? |
| 11:32:11 | 23 | A. It's just moving here was all new for me, you know, it's |
| 11:32:16 | 24 | just a learning experience, I guess, as it goes on. It's my |
| 11:32:20 | 25 | first time to really be on my own, have my own bills, have my own |

| | | |
|---|---|---|
| 11:32:25 | 1 | place, stuff like that. |
| 11:32:26 | 2 | Q.   Okay.  So when you were living here, were you responsible |
| 11:32:28 | 3 | for your rent? |
| 11:32:30 | 4 | A.   Yes. |
| 11:32:30 | 5 | Q.   Were you responsible for whether or not you ate? |
| 11:32:33 | 6 | A.   Yes. |
| 11:32:33 | 7 | Q.   Okay.  So you had all those responsibilities? |
| 11:32:36 | 8 | A.   Yes, ma'am. |
| 11:32:36 | 9 | Q.   All right.  As it relates to why we're here with Arthur |
| 11:32:41 | 10 | Longoria, did there come a time where you purchased a Hi-Point |
| 11:32:44 | 11 | pistol and a .410 shotgun? |
| 11:32:46 | 12 | A.   Yes.  Not at the same time, but yes. |
| 11:32:49 | 13 | Q.   Okay.  So was it two separate transactions? |
| 11:32:51 | 14 | A.   Two separate transactions, yes. |
| 11:32:53 | 15 | Q.   All right.  And at the time that you purchased it, did you |
| 11:32:57 | 16 | -- what was your belief about your financial situation? |
| 11:33:00 | 17 | A.   It was a bad purchase on my behalf.  You know, when rent |
| 11:33:08 | 18 | came time, the money wasn't there.  So it was a bad decision. |
| 11:33:12 | 19 | Just wasn't thinking about it at the time. |
| 11:33:14 | 20 | Q.   But when you purchased them, was it your intent to sell them |
| 11:33:17 | 21 | to someone? |
| 11:33:17 | 22 | A.   No. |
| 11:33:18 | 23 | Q.   So at some point you realized that you needed money for |
| 11:33:24 | 24 | rent? |
| 11:33:24 | 25 | A.   Right. |

| | | |
|---|---|---|
| 11:33:24 | 1 | Q.   When you realized you needed money for rent, what were you |
| 11:33:27 | 2 | going to do as far as an option to make money for rent? |
| 11:33:30 | 3 | A.   Just try to sell the firearms that I did buy because I |
| 11:33:33 | 4 | really had no need for them.  It was just, you know, trying to |
| 11:33:39 | 5 | collect them and made no sense to have them when I had to pay |
| 11:33:43 | 6 | rent and could risk getting kicked out of my place. |
| 11:33:46 | 7 | Q.   Okay.  Did you attempt to sell your firearms? |
| 11:33:49 | 8 | A.   Yes. |
| 11:33:50 | 9 | Q.   Who did you attempt to sell them to? |
| 11:33:51 | 10 | A.   I did sell a couple to some independent people, just |
| 11:33:57 | 11 | friends, like friends that I work with, one guy.  The other is |
| 11:34:02 | 12 | Art. |
| 11:34:03 | 13 | Q.   Okay.  Now, can you tell the jury the circumstances |
| 11:34:06 | 14 | regarding how you notified Art and you had some firearms for |
| 11:34:10 | 15 | sale?  Can you tell them how that happened? |
| 11:34:12 | 16 | A.   Just -- I just contacted him and -- |
| 11:34:15 | 17 | Q.   How did you contact him? |
| 11:34:16 | 18 | A.   Over the phone. |
| 11:34:17 | 19 | Q.   Okay.  So you called Art and you said? |
| 11:34:20 | 20 | A.   That I needed money for rent and I was short for the month, |
| 11:34:24 | 21 | and I needed to sell firearm. |
| 11:34:27 | 22 | Q.   Okay.  And when you spoke with him, did you tell him you |
| 11:34:31 | 23 | were going to be bringing two firearms over? |
| 11:34:34 | 24 | A.   Yes.  I believe so. |
| 11:34:35 | 25 | Q.   All right.  And did you all negotiate a price, or did he |

| | | |
|---|---|---|
| 11:34:39 | 1 | tell you how much he was willing to pay for it?  Or how did that |
| 11:34:42 | 2 | conversation go? |
| 11:34:43 | 3 | A.   More like what he was willing to pay for it. |
| 11:34:47 | 4 | Q.   And were you in a position to bargain at that point? |
| 11:34:50 | 5 | A.   Not really.  I was just trying to get rid of them. |
| 11:34:55 | 6 | Q.   Okay.  So Art told you how much he would pay for your |
| 11:34:57 | 7 | firearms, and that's the shotgun as well as the Hi-Point pistol? |
| 11:35:00 | 8 | A.   Uh-huh. |
| 11:35:01 | 9 | Q.   All right.  How did you go about getting him the firearm and |
| 11:35:05 | 10 | getting the money from him? |
| 11:35:07 | 11 | A.   I went to his house. |
| 11:35:08 | 12 | Q.   Okay.  And is that -- which house is that? |
| 11:35:10 | 13 | A.   The one on Howellwood. |
| 11:35:14 | 14 | Q.   And so, when you went over to the home that day, was Art |
| 11:35:17 | 15 | there? |
| 11:35:17 | 16 | A.   Yes. |
| 11:35:18 | 17 | Q.   All right.  And did you have to knock on the door, or how do |
| 11:35:22 | 18 | you get in? |
| 11:35:23 | 19 | A.   Just -- I believe I just walked in. |
| 11:35:26 | 20 | Q.   Is that standard for going over to Art's house?  Were you |
| 11:35:29 | 21 | able to just walk in and out? |
| 11:35:30 | 22 | A.   I usually called before I came over.  So he knew I was |
| 11:35:35 | 23 | coming. |
| 11:35:35 | 24 | Q.   So you walked on in and you saw Art? |
| 11:35:38 | 25 | A.   Yes. |

11:35:39  1  Q.   All right.  Did Art give you the money for the shotgun as

11:35:43  2  well as the Hi-Point pistol?

11:35:44  3  A.   Yes.

11:35:45  4  Q.   At that point, did you care what happened to the shotgun or

11:35:48  5  the pistol?

11:35:49  6  A.   No, not really.

11:35:50  7  Q.   At that point, did you have the money?

11:35:52  8  A.   Yes.

11:35:52  9  Q.   Did you leave or did you stay and hang out?

11:35:57  10  A.   Maybe stayed and hung out for a little bit but left shortly

11:36:00  11  after.

11:36:03  12  Q.   And after that, when you had provided those firearms to Art

11:36:09  13  for the money, did you continue to hang out with Art?

11:36:12  14  A.   Yes.

11:36:13  15  Q.   All right.  Did there come a point where a detective with

11:36:18  16  the Austin Police Department contacted you?

11:36:20  17  A.   Yes.

11:36:22  18  Q.   And what were the circumstances regarding that detective

11:36:25  19  contacting you?

11:36:26  20  A.   About a firearm that I had purchased that they had in their

11:36:31  21  custody.

11:36:34  22  Q.   And did you agree to meet with that detective?

11:36:36  23  A.   Yes.  After we got back from our vacation.  We went on a

11:36:41  24  vacation for Christmas.

11:36:42  25  Q.   Okay.  And so, when you met with the detective, what did you

| | | |
|---|---|---|
| 11:36:48 | 1 | all discuss or what were you asked? |
| 11:36:50 | 2 | A.   Just asked about the firearm, told them who I sold it to, |
| 11:36:58 | 3 | and that was pretty much it. |
| 11:36:59 | 4 | Q.   All right.  And who did you tell the detective that you sold |
| 11:37:02 | 5 | the firearm to? |
| 11:37:02 | 6 | A.   To Art. |
| 11:37:03 | 7 | Q.   Okay.  And at that point in time, Mr. Lee, were you shown a |
| 11:37:09 | 8 | photo lineup? |
| 11:37:10 | 9 | A.   Yes. |
| 11:37:11 | 10 | Q.   All right.  And were you able to pick out the person that |
| 11:37:14 | 11 | you sold the firearm to? |
| 11:37:15 | 12 | A.   Yes. |
| 11:37:16 | 13 | Q.   And who was the person that you picked out? |
| 11:37:18 | 14 | A.   Art. |
| 11:37:19 | 15 | Q.   All right.  And we've talked about Art, but I'd like to know |
| 11:37:23 | 16 | whether or not Art, the person that you sold the firearms to, is |
| 11:37:26 | 17 | in the courtroom today. |
| 11:37:28 | 18 | A.   Yes. |
| 11:37:28 | 19 | Q.   And can you please describe an article of clothing that he |
| 11:37:31 | 20 | has on today? |
| 11:37:33 | 21 | A.   The green shirt. |
| 11:37:34 | 22 | Q.   All right.  May the record reflect he's identified the |
| 11:37:37 | 23 | defendant, your Honor? |
| 11:37:38 | 24 |          THE COURT:  So reflects. |
| 11:37:41 | 25 | Q.   (BY MS. DOUGLAS) After you had told the detective that you |

11:37:49  1  had sold the firearms to Art and received money from him, did Art

11:37:55  2  contact you?

11:37:56  3  A.   No.  I contacted him after that.  I don't think it was the

11:38:00  4  same day but maybe a few days later.

11:38:02  5  Q.   Okay.  And what, if anything, did Art say to you?

11:38:07  6  A.   I had just told him that I had spoke with the detective and

11:38:11  7  gave him a statement.  I just told him what my statement was.

11:38:15  8  Q.   Okay.  Now, let's back up a little bit, Mr. Lee.

11:38:20  9          Were you aware when Mr. Longoria's residence was

11:38:24  10  raided, when the police went out there and searched it?

11:38:27  11  A.   Yes.  I was told about it.

11:38:29  12  Q.   Okay.  Now, were you told about it before you gave the

11:38:34  13  statement to the police officer, the detective?

11:38:36  14  A.   Yes.

11:38:36  15  Q.   And who told you that?

11:38:37  16  A.   Art.

11:38:38  17  Q.   All right.  Can you tell the jury the circumstances

11:38:40  18  regarding when Art told you about the fact that his residence had

11:38:43  19  been raided?

11:38:45  20  A.   I don't understand the question.

11:38:46  21  Q.   Okay.  When you were speaking with Art, when he informed you

11:38:50  22  that his house had been raided by the police, what did he say to

11:38:54  23  you?

11:38:55  24  A.   He had mentioned that my gun was in police custody, and I

11:39:00  25  could go pick it up.

| | | |
|---|---|---|
| 11:39:01 | 1 | Q.    Okay.  And did you find that to be unusual? |
| 11:39:05 | 2 | A.    Yes, I did. |
| 11:39:06 | 3 | Q.    And why is that? |
| 11:39:07 | 4 | A.    It didn't make sense for me to go pick up a gun that had |
| 11:39:11 | 5 | been seized in a drug raid. |
| 11:39:15 | 6 | Q.    Okay.  May I approach the witness, your Honor? |
| 11:39:27 | 7 | THE COURT:  You don't need my permission. |
| 11:39:39 | 8 | Q.    (BY MS. DOUGLAS) Was the pistol still yours after you had |
| 11:39:44 | 9 | received money from Art? |
| 11:39:47 | 10 | A.    Like? |
| 11:39:51 | 11 | Q.    Had you sold the pistol to Art? |
| 11:39:53 | 12 | A.    Yes. |
| 11:39:53 | 13 | Q.    Okay.  So unless you paid him money for the pistol, was it |
| 11:39:56 | 14 | yours? |
| 11:39:59 | 15 | A.    No, it wasn't. |
| 11:40:00 | 16 | Q.    Okay.  Did Art ever indicate that he wanted you to tell the |
| 11:40:13 | 17 | police something about those firearms or the Hi-Point pistol, |
| 11:40:16 | 18 | rather? |
| 11:40:17 | 19 | A.    Yes. |
| 11:40:17 | 20 | Q.    And what did he tell you? |
| 11:40:19 | 21 | A.    He made it seem like he wanted me to say that it was sold to |
| 11:40:24 | 22 | his wife. |
| 11:40:25 | 23 | Q.    Okay.  And on the day that you actually sold it to him, was |
| 11:40:32 | 24 | that ever mentioned that this was for his wife? |
| 11:40:34 | 25 | A.    No. |

```
11:40:37   1   Q.   So not until his home was raided did he come up with this
11:40:40   2   idea that it was for his wife?
11:40:41   3   A.   Yes.
11:40:55   4   Q.   Pass the witness, your Honor.
11:40:56   5        THE COURT:  Mr. Orr.
11:40:57   6                    CROSS-EXAMINATION
11:40:58   7   BY MR. ORR:
11:40:58   8   Q.   Mr. Lee, my name is Steve Orr.  I represent Mr. Longoria.
11:41:01   9        How are you this morning?
11:41:01  10   A.   All right.  How are you?
11:41:02  11   Q.   Okay.  Do you remember talking to Detective Skolaut, over
11:41:05  12   here?
11:41:05  13   A.   Yes, I do.
11:41:06  14   Q.   Okay.  Now, your testimony to this jury, over here, is that
11:41:09  15   there was no conversation whatsoever about -- with Art that the
11:41:15  16   gun was for his wife or girlfriend, Loretta, correct?  That's
11:41:19  17   your testimony under oath to this jury?
11:41:21  18   A.   Could you --
11:41:22  19   Q.   Okay.  Let me slow down.  I'm sorry.
11:41:24  20   A.   Yeah.
11:41:24  21   Q.   You've testified, in response to questions by Ms. Douglas,
11:41:31  22   that when you sold this pistol, according to your testimony, to
11:41:35  23   Art, there was no mention of it being for Loretta?
11:41:38  24   A.   I'm sorry.  When he had told me about the raid was when that
11:41:45  25   was brought up.  I'm sorry.  I just got mixed up.
```

11:41:50  1  Q.   Oh, okay.  Well, do you remember talking to Detective

11:41:53  2  Skolaut?

11:41:53  3  A.   I do.

11:41:54  4  Q.   And so, what your testimony to this jury is that this --

11:42:00  5  you're saying that this .380 was sold to Art for Art, not for

11:42:04  6  Loretta?

11:42:04  7  A.   No.  When I talked to the detective, I had mentioned that I

11:42:07  8  sold it to Art but that something to the effect like it was for

11:42:11  9  his wife.

11:42:13  10  Q.   Okay.  So the -- you do remember telling Detective

11:42:16  11  Skolaut -- have you seen his report?  You know what you told him?

11:42:20  12  A.   Yes, I do.

11:42:21  13  Q.   So you do admit now, Lee stated he thought the .380 Hi-Point

11:42:29  14  was for Art's wife and he thought her name was Loretta.  You

11:42:32  15  wouldn't argue with that statement you told that to this man,

11:42:34  16  sitting right here, correct?

11:42:35  17  A.   Yes.  But, I'm sorry, I meant -- I just got mixed up with

11:42:38  18  the questions.  I did say that to the detective.

11:42:42  19  Q.   And are you -- the detective pressure you to say that?

11:42:47  20  A.   No.

11:42:48  21  Q.   He just asked you what happened and you told him, I sold a

11:42:51  22  pistol to Art and it was for Loretta?

11:42:54  23  A.   At that time I didn't want to incriminate anybody.  I was --

11:42:59  24  I really didn't know too much on what was going on.  So yes.

11:43:02  25  Q.   And that was on Thursday, March 13th, when you talked to

| | | |
|---|---|---|
| 11:43:05 | 1 | Detective Skolaut, was it not, sir? |
| 11:43:07 | 2 | A.  Yes. |
| 11:43:07 | 3 | Q.  Now, so what you told this jury, a minute ago, that you |
| 11:43:12 | 4 | don't know anything at all about this being for Loretta when you |
| 11:43:17 | 5 | sold the gun to Art is -- was not correct when you told it to |
| 11:43:20 | 6 | this jury? |
| 11:43:20 | 7 | A.  When I sold it to him, there was nothing mentioned about |
| 11:43:23 | 8 | Loretta.  It wasn't until that I had found out that the gun had |
| 11:43:27 | 9 | been seized in a raid. |
| 11:43:29 | 10 | Q.  I see. |
| 11:43:30 | 11 | A.  It was for her. |
| 11:43:31 | 12 | Q.  So when you told Detective Skolaut that it was for Loretta, |
| 11:43:36 | 13 | you were lying to Detective Skolaut, correct? |
| 11:43:38 | 14 | A.  No.  I said I sold it to Art and that something to the |
| 11:43:42 | 15 | matter like it was for his wife. |
| 11:43:45 | 16 | Q.  Okay. |
| 11:43:46 | 17 | A.  I didn't say anything about selling it to Loretta or -- |
| 11:43:49 | 18 | Q.  Well, are you saying now so -- so are you saying -- you're |
| 11:43:53 | 19 | saying now it had nothing to do with Loretta when you sold it, |
| 11:43:56 | 20 | right? |
| 11:43:57 | 21 | A.  When I sold it to him, no. |
| 11:43:59 | 22 | Q.  But you admit that on March the 13th of this year, you told |
| 11:44:03 | 23 | Detective Skolaut that it was for Loretta? |
| 11:44:05 | 24 | A.  Right.  That was after I had talked to Art. |
| 11:44:08 | 25 | Q.  So were you lying when you talked to Detective Skolaut, or |

| 11:44:10 | 1 | are you lying to this jury now?  Which is it? |
| 11:44:12 | 2 | A.   I wasn't lying. |
| 11:44:14 | 3 | Q.   Well, on one occasion, you said it was for Loretta.  Now, |
| 11:44:19 | 4 | today, you're saying it wasn't for Loretta.  So one of those |
| 11:44:22 | 5 | occasions -- |
| 11:44:23 | 6 | A.   I'm saying that -- |
| 11:44:24 | 7 | Q.   Would you let me finish my question, sir? |
| 11:44:26 | 8 |      So one of those occasions has to be a lie. |
| 11:44:29 | 9 | A.   I'm not saying -- I'm having a hard time -- you're just |
| 11:44:33 | 10 | giving me -- you're getting me confused. |
| 11:44:35 | 11 |      THE COURT:  Let's talk one at a time, both of you. |
| 11:44:38 | 12 | Q.   (BY MR. ORR) Well, would you say, as a general principle in |
| 11:44:42 | 13 | life, that it's a lot easier to get or to stay unconfused when |
| 11:44:47 | 14 | you tell the truth? |
| 11:44:50 | 15 | A.   I don't understand your question. |
| 11:44:52 | 16 | Q.   Well, did your parents ever teach you that if you just tell |
| 11:44:55 | 17 | the truth, you can remember what the truth is and not lie to |
| 11:44:59 | 18 | people? |
| 11:44:59 | 19 | A.   I'm not lying. |
| 11:45:01 | 20 | Q.   Well, but would you admit -- |
| 11:45:03 | 21 | A.   The effect is that I sold him the gun. |
| 11:45:05 | 22 | Q.   Well, we're talking -- |
| 11:45:06 | 23 | A.   That's the truth. |
| 11:45:09 | 24 | Q.   Did you tell -- but you told Detective Skolaut that Lee |
| 11:45:17 | 25 | stated he only knew the roommate's first name was Art.  Lee |

11:45:21    1    stated he thought the .380 Hi-Point pistol for was for Art's

11:45:26    2    wife, and he thought her name was Loretta.  You did say that?

11:45:28    3    A.    Yes.

11:45:28    4    Q.    Okay.  So when you -- a little while ago, less than 20, 30

11:45:32    5    minutes ago, when you're talking to the jury in response to

11:45:34    6    questions from Ms. Douglas --

11:45:36    7    A.    She asked me at the time when I sold him the gun was that --

11:45:40    8    Q.    Well, what do you think it is that Detective Skolaut was

11:45:42    9    asking you about?

11:45:43    10   A.    Well, this was after Art had told me that he had been

11:45:46    11   raided, and he told me about the gun.

11:45:47    12   Q.    Well, so you told Detective Skolaut that the gun was for

11:45:52    13   Loretta, did you not, sir?

11:45:53    14   A.    Yeah, but this was after that -- after Art had told me --

11:45:56    15   Q.    What on Earth has that got to do with the truth?

11:46:00    16   A.    The truth is I sold him the pistol.

11:46:01    17   Q.    But you lied to Detective Skolaut on March the 13th, when

11:46:04    18   you said it was for Loretta, did you not, sir?

11:46:07    19   A.    I was just trying to -- I wasn't trying to get myself

11:46:11    20   involved in anything, really.

11:46:13    21   Q.    Let's move on to your lack of involvement in anything then.

11:46:16    22   You've admitted that you have bought seven or eight pistols and

11:46:21    23   resold them, correct, sir?

11:46:22    24   A.    I haven't sold them all.  Some I traded, some I gave as a

11:46:25    25   present, and a few I've sold, yes.

| | | |
|---|---|---|
| 11:46:28 | 1 | Q.   Do you have any of them left? |
| 11:46:29 | 2 | A.   I have no firearms at all. |
| 11:46:30 | 3 | Q.   So is it really only seven or eight, or might it be as many |
| 11:46:33 | 4 | as 20 or 30? |
| 11:46:34 | 5 | A.   No. |
| 11:46:35 | 6 | Q.   How about 10 or 15? |
| 11:46:37 | 7 | A.   No. |
| 11:46:38 | 8 | Q.   Well, let me ask you this:  When you go to these gun shows |
| 11:46:42 | 9 | and you buy firearms, correct, sir? |
| 11:46:43 | 10 | A.   A couple of times, yes, I have. |
| 11:46:46 | 11 | Q.   Okay.  And on this particular occasion that we're talking |
| 11:46:50 | 12 | about when you sold this .380, you were given some money in |
| 11:46:56 | 13 | advance and went to the gun show and brought it back, did you |
| 11:46:58 | 14 | not, sir? |
| 11:46:58 | 15 | A.   No. |
| 11:46:59 | 16 | Q.   You gave the gun to Loretta directly, did you not, sir? |
| 11:47:02 | 17 | A.   No, I didn't. |
| 11:47:03 | 18 | Q.   All right, sir.  So far as buying and selling guns, when you |
| 11:47:09 | 19 | go to these shows, you go and buy them from, I guess, on |
| 11:47:13 | 20 | occasion, federally licensed firearm dealers, do you not, sir? |
| 11:47:16 | 21 | A.   I guess.  I guess they are. |
| 11:47:18 | 22 | Q.   Are you aware of any regulations concerning a number of |
| 11:47:21 | 23 | weapons an unlicensed individual can buy and sell in a year? |
| 11:47:25 | 24 | A.   I'm not. |
| 11:47:26 | 25 | Q.   Okay.  Are you in any way worried about buying and selling |

```
11:47:31   1   firearms?

11:47:31   2   A.    I haven't done it since then.  I've pretty much learned my

11:47:35   3   lesson.  I made a mistake and that's all it was.

11:47:38   4   Q.    Okay.  So the police called you out of the clear blue and

11:47:46   5   started asking you about a firearm, correct, sir?

11:47:49   6   A.    Yes.

11:47:51   7   Q.    Okay.  And so, you told them, I sold it to Art and it was

11:48:08   8   for Loretta?

11:48:09   9   A.    Yes.

11:48:09  10   Q.    Correct?

11:48:10  11   A.    Yes.

11:48:10  12   Q.    And so, now what you're saying is that when -- that Loretta

11:48:15  13   had nothing to do with it, as of whatever date it was you sold

11:48:18  14   this .380.  That's your testimony, correct, sir?

11:48:20  15   A.    Yes, she did.

11:48:24  16   Q.    Okay.  But you do admit telling Detective Skolaut that?

11:48:28  17   A.    I do.

11:48:28  18   Q.    All right.  Now, and you said something about apparently Art

11:48:32  19   contacted you and tried to make it sound like that you had sold

11:48:36  20   the pistol to Loretta, correct?

11:48:39  21   A.    That he had contacted me?

11:48:40  22   Q.    Yeah.  How did that come about?  Did you go see him?

11:48:44  23   A.    Yes, I went to see him and told him that I had talked to the

11:48:47  24   detective, and at that time he kind of got upset by what I had

11:48:51  25   told the detective.
```

| | | |
|---|---|---|
| 11:48:52 | 1 | Q.   Okay.  Because, well, he was upset about it, correct -- |
| 11:48:58 | 2 | A.   Yeah. |
| 11:48:59 | 3 | Q.   -- right?  Okay.  And he could have been upset either |
| 11:49:03 | 4 | because you lied about him to the detective or for whatever |
| 11:49:08 | 5 | reason, correct? |
| 11:49:09 | 6 | MS. DOUGLAS:  Objection, your Honor.  He's requiring |
| 11:49:11 | 7 | him to speculate about why my client was upset. |
| 11:49:14 | 8 | MR. ORR:  Well -- |
| 11:49:15 | 9 | THE COURT:  It's argumentative.  Let's go on. |
| 11:49:18 | 10 | Q.   (BY MR. ORR) So far as did you ever write out a statement |
| 11:49:22 | 11 | that you had sold the gun to Loretta? |
| 11:49:27 | 12 | A.   No. |
| 11:49:28 | 13 | Q.   You never did. |
| 11:49:30 | 14 | A.   Write?  Me, personally write a statement? |
| 11:49:31 | 15 | Q.   Did you write one out? |
| 11:49:32 | 16 | A.   No. |
| 11:49:33 | 17 | Q.   Did you ever sign a statement to that effect? |
| 11:49:35 | 18 | A.   Shortly after my interview with the detective, Art came to |
| 11:49:42 | 19 | my work with the piece of paper.  I didn't read it, I didn't know |
| 11:49:45 | 20 | what it said.  I knew what it was for.  He was trying to come up |
| 11:49:49 | 21 | with a bill of sale, I guess, but he came to my work with it and |
| 11:49:54 | 22 | I was kind of, you know. |
| 11:49:58 | 23 | Q.   Do you know who Eddie Longoria is? |
| 11:50:01 | 24 | A.   No. |
| 11:50:02 | 25 | Q.   Does he prepare your taxes, or is he a notary?  Do you know |

| | | |
|---|---|---|
| 11:50:05 | 1 | where he's at? |
| 11:50:06 | 2 | A.    No. |
| 11:50:08 | 3 | Q.    Well, you did sign a statement that you'd sold the gun to |
| 11:50:12 | 4 | Loretta, did you not, sir? |
| 11:50:13 | 5 | A.    I didn't read what it said, but I signed something he had |
| 11:50:15 | 6 | brought to my work.  Yes.  And Art brought that, no one else. |
| 11:50:24 | 7 | Q.    Loretta didn't bring it? |
| 11:50:25 | 8 | A.    No.  There was no notary.  Loretta wasn't there.  It was |
| 11:50:27 | 9 | just Art. |
| 11:50:28 | 10 | Q.    Do you know how Loretta's signature would have gotten on it? |
| 11:50:31 | 11 | A.    I'm not for sure unless she had wrote it before he brought |
| 11:50:34 | 12 | it up there. |
| 11:50:35 | 13 | Q.    May I approach the witness, your Honor? |
| 11:50:37 | 14 |        I'm going to hand you what's marked Defendant's Exhibit |
| 11:50:43 | 15 | 1.  Can you tell us if you can identify that? |
| 11:50:44 | 16 | A.    That's the piece of paper he brought up to my work. |
| 11:50:47 | 17 | Q.    Did you sign that?  Is that your signature on there? |
| 11:50:49 | 18 | A.    Right there in the middle, yes. |
| 11:50:51 | 19 | Q.    Yes, sir.  Okay. |
| 11:51:07 | 20 |        MS. DOUGLAS:  Your Honor, may I take this witness on |
| 11:51:09 | 21 | voir dire?  Can I approach? |
| 11:51:13 | 22 |        THE COURT:  Yes. |
| 11:51:22 | 23 |        (At the bench, on the record.) |
| 11:51:25 | 24 |        MS. DOUGLAS:  Your Honor, I asked the witness about |
| 11:51:28 | 25 | this notary, and he said that there was no notary, that this |

| | | |
|---|---|---|
| 11:51:31 | 1 | individual forged this document as in it says it was sworn before |
| 11:51:36 | 2 | a notary, but it was not.  He came up to his employment and had |
| 11:51:39 | 3 | him sign it on the hood of the car, and Loretta's signature was |
| 11:51:42 | 4 | already there. |
| 11:51:42 | 5 | THE COURT:  He's already testified there was no notary. |
| 11:51:45 | 6 | MS. DOUGLAS:  Okay. |
| 11:51:46 | 7 | MR. ORR:  He said it's his signature.  It's very odd. |
| 11:51:48 | 8 | I don't know. |
| 11:51:50 | 9 | MS. DOUGLAS:  I'd say that this a forged document I |
| 11:51:53 | 10 | mean in the respect that it's not true what it purports to be.  I |
| 11:51:55 | 11 | mean unless you want to bring Eddie up here to show he signed off |
| 11:52:01 | 12 | on it. |
| 11:52:01 | 13 | THE COURT:  Would be a felony. |
| 11:52:04 | 14 | MR. ORR:  Well, even -- |
| 11:52:05 | 15 | THE COURT:  What is your objection? |
| 11:52:08 | 16 | MR. ORR:  He doesn't say he signed it.  This doesn't |
| 11:52:09 | 17 | say he notarized it.  It says that Loretta notarized it. |
| 11:52:13 | 18 | THE COURT:  It says a notary. |
| 11:52:15 | 19 | MR. ORR:  Yeah, but look at -- read that.  It's goofy. |
| 11:52:28 | 20 | THE COURT:  Yeah. |
| 11:52:31 | 21 | MR. ORR:  I will admit I wasn't real eager to put it |
| 11:52:34 | 22 | in. |
| 11:52:39 | 23 | THE COURT:  Well, this is sworn testimony of another |
| 11:52:41 | 24 | witness.  I sustain the objection. |
| 11:52:50 | 25 | MR. ORR:  Oh, I object to hearsay. |

| | | |
|---|---|---|
| 11:53:02 | 1 | Q.   (BY MR. ORR) All right, sir.  You did sign a statement |
| 11:53:04 | 2 | saying that you had sold -- indicating that you had sold a gun to |
| 11:53:07 | 3 | Loretta? |
| 11:53:07 | 4 | A.   I don't know what it said, but I did sign it. |
| 11:53:10 | 5 | Q.   Okay.  Now, so far as -- may I have just a second?  I may |
| 11:53:21 | 6 | not have anymore, actually.  I pass the witness. |
| 11:53:52 | 7 |        THE COURT:  Ms. Douglas, I'm going to let the jury go |
| 11:53:54 | 8 | to lunch.  I'm going to let y'all go to lunch.  Remember my |
| 11:53:59 | 9 | instructions.  I want to start at 1:20.  1:20, please.  I'm |
| 11:54:03 | 10 | advised that all of you are from Travis, Williamson and Hays |
| 11:54:08 | 11 | County.  You're all neighbors.  So that you'll know, I keep court |
| 11:54:14 | 12 | until 6:00 for two reasons:  One, that way we can move |
| 11:54:18 | 13 | efficiently.  If you need to tell me anything about it that's |
| 11:54:24 | 14 | going to inconvenience you, be sure and tell Mr. Hall during the |
| 11:54:27 | 15 | noon hour when you come back.  The other reason is that there's |
| 11:54:31 | 16 | no way to get out of town -- out of the downtown area until the |
| 11:54:36 | 17 | traffic kind of stops, and so, you'll be able to get home just |
| 11:54:41 | 18 | about the same time if you leave at 5:00. |
| 11:54:44 | 19 |        Please be ready to return to work at 1:20. |
| 11:55:14 | 20 |        (Jury not present.) |
| 11:55:16 | 21 |        THE COURT:  Mr. Lee, I want you to go out in the hall. |
| 11:55:18 | 22 | Don't go away. |
| 11:55:35 | 23 |        All right.  Counsel, where are we going to go?  Ms. |
| 11:55:38 | 24 | Douglas is going to ask him why he talked to the detective, and |
| 11:55:41 | 25 | he's going to testify that he did not want to be involved in a |

| | | |
|---|---|---|
| 11:55:44 | 1 | drug raid and get all the drugs all over him because he sold the |
| 11:55:49 | 2 | gun.  That's the reason he told the detective that he sold the |
| 11:55:54 | 3 | gun to Loretta because he didn't want to be involved in the drugs |
| 11:55:57 | 4 | that he knew was in the house.  Now, where do we go from there? |
| 11:56:06 | 5 | Something to think of through the noon hour because I |
| 11:56:11 | 6 | don't know where we are.  You've made him out -- and I'm sure |
| 11:56:15 | 7 | that's his next answer.  Got too many stomach operations and too |
| 11:56:23 | 8 | much scar tissue not to know that that's his next answer.  Tell |
| 11:56:28 | 9 | your witness to return at 1:20. |
| 11:56:30 | 10 | MS. DOUGLAS:  Yes, sir. |
| 11:56:31 | 11 | THE COURT:  All right.  We're in recess till 1:20. |
| 11:56:33 | 12 | I'll hear -- y'all be back at 1:15.  I'll hear what you want to |
| 11:56:38 | 13 | tell me, Mr. Orr. |
| 11:56:41 | 14 | MR. ORR:  Yes, your Honor. |
| 13:14:18 | 15 | (Lunch recess.) |
| 13:17:48 | 16 | THE COURT:  All right.  Counsel, where are we?  You |
| 13:17:51 | 17 | want to put Mr. Lee on and see what he's going to say?  Or you |
| 13:17:58 | 18 | want to tell him that if he's going to refer to the reason he |
| 13:18:06 | 19 | told the police officer that he didn't want anybody to know he |
| 13:18:12 | 20 | sold the defendant the gun because of the raid.  I guess we've |
| 13:18:16 | 21 | got the word "raid" in several times. |
| 13:18:28 | 22 | MS. DOUGLAS:  Your Honor, the government would be fine |
| 13:18:30 | 23 | with limiting him to that.  We've spoken to him a little bit |
| 13:18:32 | 24 | about it, but he could explain that at the time that he sold the |
| 13:18:37 | 25 | firearm, to clear it up, that nothing was mentioned about |

13:18:40  1  Loretta; but then, after the defendant asked him about it, when

13:18:43  2  he was speaking with the detective, he didn't want to get tied in

13:18:46  3  because he knew that house had been raided and he didn't want to

13:18:48  4  get tied in with it is why he told him that.

13:18:50  5       THE COURT:  Well, let's tell him don't mention any of

13:18:56  6  the other things because it was obvious that he was in the house

13:18:58  7  frequently, and he knew what was in the house.

13:19:00  8       MS. DOUGLAS:  Yes, sir.

13:19:01  9       MR. ORR:  Well, that's relative to everybody would have

13:19:04  10 to tiptoe down.  There's a little something for everybody in that

13:19:07  11 -- his knowledge about what's going on in that house.

13:19:10  12      THE COURT:  That's true.  But until somebody steps

13:19:12  13 across it, I'm going to stay --

13:19:16  14      MR. ORR:  I'm just going to ask him about the time -- I

13:19:19  15 think he testified -- I'm going to clarify.  I think he testified

13:19:22  16 that he talked to the police first and then, he talked to Art.

13:19:26  17 I may not need to ask him.

13:19:26  18      THE COURT:  He has testified.

13:19:27  19      MR. ORR:  Yeah.  I think I won't bring it up.  I'm just

13:19:30  20 going to shut up.  Well, I know you don't believe that.

13:19:34  21      THE COURT:  It's America; everybody's entitled to ask

13:19:37  22 good and foolish questions.

13:19:40  23      MR. SPARKS:  And then, your Honor, just the next couple

13:19:42  24 of witnesses, all law enforcement witnesses are all part of the

13:19:47  25 narcotics control team three.  I mean, I don't --

13:19:53  1          MR. ORR:  They're all part of the narcotics control is

13:19:58  2  they're Austin Police officers?  Thanks for bringing that up.

13:20:04  3          MR. SPARKS:  There's a lot of areas to tiptoe in.

13:20:07  4  That's what they do around narcotic search warrants, Judge.

13:20:10  5          THE COURT:  Are they also Austin Police Department

13:20:14  6  employees?

13:20:15  7          MR. SPARKS:  That's true.  We've could characterize it,

13:20:18  8  I suppose, as just executing a search warrant.

13:20:21  9          THE COURT:  That's true.

13:20:22  10          MR. ORR:  They were executing a search warrant.  I have

13:20:24  11  a suspicion the jury is going to figure it out.  But I'd rather

13:20:28  12  not have all that in there.  And this would be a whole lot

13:20:30  13  shorter trial if this would not be at all in there.

13:20:32  14          THE COURT:  Well, let's see how we proceed.  It's one

13:20:39  15  thing I don't know.  I don't know what you're going to ask, and I

13:20:41  16  don't know what the witnesses are going to say.  But at the

13:20:44  17  present time, let's limit it to the firearm.

13:20:46  18          MR. SPARKS:  I'll admonish on that, your Honor.  Thank

13:26:15  19  you.

13:26:15  20          THE COURT:  Bring the jury in.

13:26:17  21          (Jury present.)

13:27:29  22          THE COURT:  Members of the jury, during the noon hour,

13:27:31  23  did anyone attempt to talk to you about this case?

13:27:33  24          JURORS:  No.

13:27:33  25          THE COURT:  Did you talk to anybody about the case?

| | | |
|---|---|---|
| 13:27:35 | 1 | JURORS:  No. |
| 13:27:36 | 2 | THE COURT:  And did you learn anything at all about the |
| 13:27:38 | 3 | case, outside the presence of each other and this courtroom? |
| 13:27:41 | 4 | JURORS:  No. |
| 13:27:41 | 5 | THE COURT:  Show negative responses to all questions by |
| 13:27:43 | 6 | all jurors.  You may recall Mr. Lee. |
| 13:28:25 | 7 | Mr. Lee, you understand you're still under oath? |
| 13:28:29 | 8 | THE WITNESS:  Yes, sir. |
| 13:28:29 | 9 | THE COURT:  All right.  You may proceed. |
| 13:28:29 | 10 | RE-DIRECT EXAMINATION |
| 13:28:29 | 11 | BY MS. DOUGLAS: |
| 13:28:32 | 12 | Q.   Mr. Lee, I'd like to ask you for clarification. |
| 13:28:37 | 13 | When you sold the firearms, .410 shotgun and a Hi-Point |
| 13:28:43 | 14 | pistol, to Arthur Longoria, did you receive the cash from Arthur |
| 13:28:48 | 15 | Longoria? |
| 13:28:48 | 16 | A.   Yes. |
| 13:28:49 | 17 | Q.   At that day, did he ever mention that he was purchasing |
| 13:28:53 | 18 | these firearms for his wife? |
| 13:28:54 | 19 | A.   No, he didn't. |
| 13:28:55 | 20 | Q.   Defense counsel questioned you on the fact that you told |
| 13:29:00 | 21 | Detective Skolaut that you thought it might have been for |
| 13:29:04 | 22 | Loretta.  What was the reason why you told Detective Skolaut |
| 13:29:08 | 23 | that? |
| 13:29:08 | 24 | A.   The reason being is I didn't want to, I guess, be in trouble |
| 13:29:13 | 25 | on both sides.  I guess just scared.  It wasn't -- the detective |

13:29:27  1  contacted me before we met up, and this was, I don't know, maybe

13:29:33  2  a few weeks apart from each other.  After he contacted me on the

13:29:37  3  phone, the first contact was when I had mentioned something to

13:29:42  4  Art, and at that time is when he had said something, you know, to

13:29:46  5  the fact where it was for Loretta.  And then, when -- later on,

13:29:52  6  when the detective interviewed me is when I made that statement.

13:29:57  7  Q.   And so, at the point when Art told you to say it was for

13:30:01  8  Loretta, that was after his home had been raided?

13:30:04  9  A.   Yes.

13:30:04  10  Q.   Pass the witness, your Honor.

13:30:07  11                    RE-CROSS EXAMINATION

13:30:07  12  BY MR. ORR:

13:30:15  13  Q.   Do you know when Loretta's birthday is?

13:30:17  14  A.   No, I don't.

13:30:18  15  Q.   Pass the witness.

13:30:20  16           MS. DOUGLAS:  Nothing further of this witness.  May he

13:30:24  17  be released, your Honor?

13:30:25  18           THE COURT:  Any objection?

13:30:26  19           MR. ORR:  No, your Honor.

13:30:27  20           THE COURT:  You may be excused, sir.  You may call your

13:30:29  21  next witness.

13:30:35  22           MS. DOUGLAS:  Robbie Volk.

13:31:16  23           (Witness sworn.)

13:31:38  24           THE COURT:  Tell us, please, sir, your full name and

13:31:40  25  spell your last.

| | | |
|---|---|---|
| 13:31:40 | 1 | THE WITNESS: My full name is Robbie Michael Volk. |
| 13:31:43 | 2 | Last name is spelled, V-O-L-K. |
| 13:31:45 | 3 | ROBBIE M. VOLK, called by the Government, duly sworn. |
| 13:31:45 | 4 | DIRECT EXAMINATION |
| 13:31:45 | 5 | BY MS. DOUGLAS: |
| 13:31:49 | 6 | Q. Sir, how are you employed? |
| 13:31:50 | 7 | A. I'm a detective with the city of Austin. |
| 13:31:53 | 8 | Q. And how long have you been with the city of Austin? |
| 13:31:55 | 9 | A. A little over 12 years. |
| 13:31:56 | 10 | Q. And did you receive training in order to become an officer |
| 13:32:00 | 11 | with the city of Austin? |
| 13:32:01 | 12 | A. Yes, ma'am, I did. |
| 13:32:02 | 13 | Q. And is that training that continues throughout the 12 years |
| 13:32:05 | 14 | that you've been with the Austin Police Department? |
| 13:32:07 | 15 | A. That is correct. |
| 13:32:09 | 16 | Q. And can you tell the jury a little bit about your training |
| 13:32:13 | 17 | and experience? |
| 13:32:14 | 18 | A. I went through a almost seven-month police academy, and |
| 13:32:20 | 19 | we're mandated to go through 80 hours of continuous training, I |
| 13:32:23 | 20 | think, every two years, plus elected courses, and so, it's a work |
| 13:32:29 | 21 | in more specialized units. We go through some more tactical base |
| 13:32:32 | 22 | training than the average cop would go through. |
| 13:32:35 | 23 | Q. And you have different assignments that you've done |
| 13:32:43 | 24 | throughout the years; is that correct? |
| 13:32:44 | 25 | A. That is correct. |

13:32:45  1  Q.   All right.  And as it relates to the case that we're here

13:32:50  2  on, were you the lead detective?

13:32:51  3  A.   That is correct.

13:32:53  4  Q.   All right.  And did you receive information, as well as

13:32:56  5  complete independent investigation, regarding a home on

13:33:01  6  Howellwood Way?

13:33:03  7  A.   Yes, ma'am, I did.

13:33:04  8  Q.   And after you did your independent investigation with the

13:33:08  9  information that you had received, did you seek a search warrant?

13:33:12  10  A.   Yes, I did.

13:33:12  11  Q.   Were you given a search warrant?

13:33:14  12  A.   Yes, I was.

13:33:15  13  Q.   All right.  And can you tell me when you get ready to

13:33:19  14  execute a search warrant, what do you do with your team, like are

13:33:24  15  there certain people that are assigned to assist you as a lead

13:33:27  16  detective?

13:33:27  17  A.   There's two different routes.  If we do the entry ourselves,

13:33:30  18  then there's two tasks:  One is the lineup that we're going to

13:33:35  19  enter the residence in as well as the job that you're going to do

13:33:38  20  after the residence is secured.  Another team does entry for us,

13:33:43  21  for whatever reason, manpower, or anything like the sun, then we

13:33:47  22  just simply do the assigned task that we have.

13:33:49  23  Q.   Okay.  And what I'd like to do is direct your attention to

13:33:53  24  December 4th of year 2007.  Are you familiar with what had

13:33:57  25  transpired on that day?

| 13:33:58 | 1 | A.   Yes, ma'am. |

13:33:58  2  Q.   And was that the day that you executed a search warrant?

13:34:01  3  A.   That's correct.

13:34:02  4  Q.   All right.  On that particular day, was it a search warrant

13:34:05  5  for the Howellwood Way residence?

13:34:08  6  A.   Yes, it was.

13:34:09  7  Q.   And is that located in Austin, Travis County, Texas?

13:34:12  8  A.   Yes, it is.

13:34:13  9  Q.   All right.  You said that there are some times where you

13:34:17  10  have one team that makes entry and another team that's actually

13:34:20  11  going to search.  As it relates to the residence on Howellwood

13:34:24  12  Way, what was the assignment that day?

13:34:25  13  A.   We actually had another team do entry for us.

13:34:28  14  Q.   And which team was that?

13:34:29  15  A.   It was the Austin SWAT team.

13:34:32  16  Q.   Okay.  And so, what is SWAT's role?

13:34:37  17  A.   SWAT's primary role in that deal was to secure the residence

13:34:41  18  for not only the participants but the neighbors and for

13:34:44  19  ourselves, as well.

13:34:45  20  Q.   All right.  And once they get it secured, then what did you

13:34:49  21  make as far as assignments for the detectives that are on your

13:34:52  22  specialized team?

13:34:53  23  A.   I made -- normally we have different assignments.  You want

13:34:58  24  me to list them?

13:34:59  25  Q.   Yes, if you could, please.

| | | |
|---|---|---|
| 13:35:00 | 1 | A.    Okay.  On this date, I was the case agent.  Detective |
| 13:35:36 | 2 | Sanchez was property.  Detective Crissman was papers.  Detective |
| 13:35:41 | 3 | Jeff Haynes was diagram, but on this, he did not show up.  He was |
| 13:35:47 | 4 | not there for the actual execution.  So Detective Crissman had |
| 13:35:50 | 5 | that additional duty.  Detective Schafer was prisoner control. |
| 13:35:59 | 6 | Actually -- I'm sorry.  Let me refer to my report.  It's a little |
| 13:36:09 | 7 | -- the threat assessment was actually done prior to the raid. |
| 13:36:12 | 8 | And the assessment duty, SWAT was done after the threat |
| 13:36:17 | 9 | assessment, so it's not accurate.  I was the case agent. |
| 13:36:44 | 10 | Detective Nelson was photo.  Detective Sanchez was property. |
| 13:36:50 | 11 | Detective Crissman was diagram.  Detective Schafer was prisoner |
| 13:36:54 | 12 | control.  And Sergeant Jesse Vasquez was supervisor. |
| 13:36:58 | 13 | And then, also noticed that I also did the dual role of |
| 13:37:01 | 14 | papers, as well. |
| 13:37:02 | 15 | Q.    Okay.  And is that standard that you give everybody an |
| 13:37:09 | 16 | assignment before you enter the home? |
| 13:37:10 | 17 | A.    Yes, it is. |
| 13:37:11 | 18 | Q.    And why is that, sir? |
| 13:37:13 | 19 | A.    For more of the -- I mean the main reason is so that |
| 13:37:16 | 20 | everybody goes in knowing what they're supposed to do, what's |
| 13:37:19 | 21 | their task; and that way we don't tend to forget things that way. |
| 13:37:22 | 22 | Q.    And on this particular day when you executed the search |
| 13:37:26 | 23 | warrant on Howellwood Way, when you got into the residence after |
| 13:37:30 | 24 | SWAT had secured it, can you tell the jury what you did? |
| 13:37:33 | 25 | A.    Once the residence was secured and SWAT -- what they'll do |

13:37:38    1    is they'll do a process of secondaries.  They'll ensure that the

13:37:41    2    residence is safe, nobody's hiding in the attic or underneath the

13:37:44    3    beds, or something like that.  Once they deem it's safe to enter,

13:37:48    4    what we'll typically do is we'll come in, and that's what

13:37:51    5    happened on this case.  We'll come in and we'll start taking the

13:37:53    6    control of the people as well as the residence from them, and as

13:37:58    7    soon as we start taking over, we say we have it, then they just

13:38:01    8    -- they leave.  They'll have one person there for diagram and

13:38:05    9    they quickly leave.

13:38:07   10          On that day, I started assessing the house is what I

13:38:12   11    did before making sure everybody started their assigned jobs.

13:38:15   12    Q.   All right.  And was one of your officers -- I believe you

13:38:20   13    indicated it was Detective Schafer, he was assigned for prisoner

13:38:24   14    control.  Can you explain to the jury what that means?

13:38:25   15    A.   What prisoner control does is once we get people to ensure

13:38:29   16    their safety as well as what they're doing in and out of the

13:38:31   17    residence -- because the officers that are searching have

13:38:35   18    assigned tasks are not watching necessarily what they're doing

13:38:37   19    and what the person that's detained at the house is doing because

13:38:41   20    they're preoccupied.  So what we have somebody set on or watch

13:38:45   21    them from the time we enter the residence or from the time we

13:38:49   22    take over the residence until the time we leave.  They'll either

13:38:54   23    come with us or we take them to jail.  That time forward, that

13:38:57   24    person is in charge of them, they get them, if they need water,

13:38:59   25    if they need to check their handcuffs, or anything else, their

13:39:04  1  sole responsibility is that person in the residence that's not a

13:39:07  2  police officer.

13:39:07  3  Q.    Is the responsibility of the detective assigned to prisoner

13:39:10  4  control to read Miranda warnings?

13:39:12  5  A.    Yes, it is.

13:39:13  6  Q.    Now, you indicated that you began to go through the house,

13:39:22  7  as well as the other detectives, that day.  Did you end up in one

13:39:25  8  of the bedrooms?

13:39:26  9  A.    Yes, I did.

13:39:27  10  Q.    Okay.  And which bedroom was that?

13:39:29  11  A.    I walked through all the bedrooms, but the one that my

13:39:33  12  primary focus was on, what was labeled on the diagram as bedroom

13:39:37  13  No. 1.

13:39:38  14  Q.    And who was bedroom No. 1 attributed to?

13:39:41  15  A.    Arthur Longoria as well as, I believe, his girlfriend or

13:39:46  16  common-law wife.  I'm not sure what she's -- her title is.  And

13:39:49  17  that was Loretta Garcia.

13:39:51  18  Q.    Okay.  And once you made your way into that room, was there

13:39:55  19  an item that you observed that was of interest?

13:39:58  20  A.    Once we entered that residence -- I'm sorry, that bedroom,

13:40:02  21  yes, there was.  There was a pistol.  Once we started checking

13:40:06  22  the bed, because what we do is -- what we do when we get in a

13:40:09  23  residence, some people have a lot of stuff, some houses are very

13:40:13  24  sparsely -- they have very few things in their house.  Some of

13:40:16  25  them have an overabundance of stuff.  So customarily what we do

13:40:20   1   is we'll search the bed first, move from the bed and start

13:40:23   2   placing things on the bed so that we can make sure we don't miss

13:40:26   3   something.  While we were doing that, we searched the bed, picked

13:40:30   4   up the mattress, and then, between the mattress and the box

13:40:33   5   spring, there was actually a pistol and a couple of knives.

13:40:35   6   Q.   Okay.  And is the pistol that you're referring to the

13:40:39   7   Hi-Point pistol that he's charged with today?

13:40:41   8   A.   Yes.

13:40:49   9   Q.   At some point did you attempt to speak with Arthur Longoria?

13:40:53  10   A.   Yes, I did.

13:40:54  11   Q.   And did you confirm whether or not he had been Mirandized

13:40:58  12   prior to you speaking with him?

13:40:59  13   A.   Yes, I did.

13:41:00  14   Q.   Can you tell the jury the circumstances regarding your

13:41:02  15   confirmation that he had been Mirandized?

13:41:05  16   A.   What I do whenever I'm talking to somebody, if I'm not

13:41:09  17   actually in there when they're giving them Miranda -- in this

13:41:11  18   case I was not -- I'll pull them aside, I'll ask them if they

13:41:15  19   were read their rights.  I'll -- typically what will happen and

13:41:17  20   in this case, Steve said he read him his rights, and I pulled him

13:41:20  21   aside.  Then I'll ask him if he understood his rights before I

13:41:23  22   ever start talking to him, or she.  In this case it's a he.  And

13:41:28  23   once he tells me he did understand them, I'll continue on with

13:41:31  24   the, you know, the interview.  If he tells me he doesn't

13:41:34  25   understand them, then I'll reread him his rights.

13:41:37   1   Q.   And on that particular day, did Arthur Longoria indicate to

13:41:40   2   you that he had understood his Miranda warnings?

13:41:43   3   A.   Yes, he did.

13:41:43   4   Q.   When you spoke with him after he had been Mirandized, did

13:41:50   5   you attempt to get some information from him?

13:41:52   6   A.   Yes, I did.

13:41:53   7   Q.   And what was that information?

13:41:55   8   A.   I was asking him if there was anything illegal in his room

13:41:57   9   or residence that he would like to tell us up front, instead of

13:42:02  10   having to look for it.

13:42:02  11   Q.   Okay.  And was there a safe that you located in that

13:42:06  12   residence?

13:42:06  13   A.   Yes, there was.

13:42:07  14   Q.   Was there more than one safe?

13:42:08  15   A.   I only saw one safe.

13:42:10  16   Q.   All right.  And where was that safe located?

13:42:12  17   A.   It was in the -- I guess you could call it the northeast

13:42:16  18   corner.  If you're walking in his door, it would have been on the

13:42:19  19   right side, up against the back wall.

13:42:21  20   Q.   And what room are we referring to?

13:42:23  21   A.   Bedroom No. 1.

13:42:24  22   Q.   All right.  Your Honor, may we approach?

13:42:48  23        THE COURT:  You may.

13:42:49  24        (At the bench, on the record.)

13:42:51  25        MS. DOUGLAS:  This is in response to defense counsel

13:42:53   1  earlier saying that he did not want us talking about the safe.

13:42:57   2  There are two safes with the same combination, and that's where

13:42:58   3  I'm attempting to go.  And I want to make sure I'm not running

13:43:01   4  afoul of the Court's ruling on addressing that.  Because this is

13:43:04   5  the safe where his wallet was found as well as the shotgun.

13:43:09   6          THE COURT:  You're entitled to have the conversation

13:43:12   7  with the defendant and ask him if he knew the combination and he

13:43:18   8  gave the combination, if he opened the safe and found it, not

13:43:25   9  going to across anybody's ruling that I'm aware of.

13:43:38  10  Q.   (BY MS. DOUGLAS) Detective Volk, you've indicated that there

13:43:42  11  was a safe in the bedroom that was Arthur Longoria as long as his

13:43:45  12  -- with his common-law wife or his girlfriend.  Did you ask

13:43:49  13  Arthur Longoria about that safe?

13:43:51  14  A.   Yes, I did.

13:43:51  15  Q.   And what did you ask him?

13:43:53  16  A.   Once it was pointed out to me there was a safe in the room,

13:43:56  17  I looked at it.  I walked outside and asked him if he'd be

13:44:00  18  willing to give us the combination to the safe.

13:44:02  19  Q.   And did he give you the combination?

13:44:04  20  A.   Yes, he did.

13:44:05  21  Q.   And did the combination open the safe?

13:44:07  22  A.   Yes, it did.

13:44:07  23  Q.   What was actually located within that safe?

13:44:11  24  A.   Inside the house, it was a wallet that actually had some of

13:44:15  25  his possessions.  And then, the other -- you want me to say the

13:44:19  1  other?

13:44:19  2  Q.   Yes.

13:44:20  3  A.   There was a shotgun, as well, in that safe.

13:44:22  4  Q.   All right.  And when you say his wallet had some of his

13:44:24  5  possessions, can you be more specific what you're talking about?

13:44:27  6  A.   There was a lot of -- large amount of money.  There was

13:44:31  7  about $1,500.

13:44:31  8  Q.   Okay.  But what attributed to the wallet to Arthur Longoria?

13:44:37  9  A.   His ID.

13:44:38  10  Q.   Okay.  Thank you.

13:44:43  11       Do you see the individual in the courtroom today who

13:44:46  12  you know to be Arthur Longoria, who gave you the combination to

13:44:48  13  the safe when you executed the search warrant on the Howellwood

13:44:51  14  Way?

13:44:51  15  A.   Yes, ma'am, I do.

13:44:53  16  Q.   And can you please identify an article of clothing he's

13:44:57  17  wearing today in the courtroom?

13:44:58  18  A.   Looks like a yellowish-green stripe or kind of a shirt.  I

13:45:02  19  could see little stripes on it, it looks like.

13:45:05  20  Q.   May the record reflect he's identified the defendant, your

13:45:07  21  Honor?

13:45:07  22       THE COURT:  So reflects.

13:45:09  23  Q.   (BY MS. DOUGLAS) Detective Volk, let me show you what's been

13:46:26  24  marked for identification purposes at this time as Government's

13:46:28  25  Exhibit No. 6.  Will you take a moment to look through this and

13:46:35    1    see if you recognize what this is without saying?

13:46:37    2    A.    Yes, I do.

13:46:38    3    Q.    All right.  And is this object in -- is this the same object

13:46:48    4    that you seized from the residence when you were at Howellwood

13:46:51    5    Way in Arthur Longoria's bedroom?

13:46:53    6    A.    It's the same item that our unit seized, yes, ma'am, and

13:46:57    7    that I observed.

13:46:58    8    Q.    All right.  And is that documented through the chain of

13:47:00    9    custody that's listed on here?

13:47:01    10    A.    Yes, it is.

13:47:02    11    Q.    Government's offering into evidence Government's Exhibit No.

13:47:07    12    6.  Tender to defense counsel for any objection.

13:47:13    13        MR. ORR:  I have my same pretrial objection, your

13:47:16    14    Honor, that we presented the objection earlier.

13:47:18    15        THE COURT:  All right.  Subject to that motion, G-6 is

13:47:23    16    admitted into evidence.

13:47:26    17    Q.    (BY MS. DOUGLAS) Now, Detective Volk, what is this?

13:47:33    18    A.    That is a .380 pistol.

13:47:36    19    Q.    Okay.  And where did you observe this in Arthur Longoria's

13:47:41    20    room?

13:47:41    21    A.    It was at the foot of his bed in between the box spring and

13:47:45    22    the mattress.

13:47:45    23    Q.    And you indicated something else was found with it?

13:47:48    24    A.    Two large, like, survival knives.

13:47:51    25    Q.    Okay.  Now, Detective Volk, as it relates to the firearm

13:48:08    1    that you found in Arthur Longoria's room between, you said, the

13:48:12    2    mattress and the box spring, is one of your responsibilities to

13:48:16    3    determine whether or not it was loaded at that time?

13:48:18    4    A.    Yes.  Whoever's the property person would take possession of

13:48:22    5    that weapon, actually clear it and make it safe.

13:48:25    6    Q.    All right.  And was this weapon, in fact, loaded on that

13:48:27    7    day?

13:48:27    8    A.    Yes, it was.

13:48:28    9    Q.    All right.  And I'm going to show you what's been marked for

13:48:35    10   identification purposes at this time as Exhibit No. 6A and see if

13:48:39    11   you're familiar with what this is.

13:48:41    12   A.    Yes, ma'am.

13:48:41    13   Q.    Okay.  And is this in the same condition as when it was

13:48:47    14   seized on that day with the firearm?

13:48:50    15   A.    Yes.  Except, of course, the bullets were in the magazine

13:48:53    16   until Detective Sanchez took them out.

13:48:55    17   Q.    All right.  Government's offering into evidence Government's

13:49:03    18   Exhibit No. 6A.

13:49:06    19          MR. ORR:  Same objection, your Honor.

13:49:07    20          THE COURT:  Okay.  Same ruling.  6A will be admitted.

13:49:10    21          Members of the jury, I do not ever allow a firearm and

13:49:15    22   bullets to go to a jury.  So while the witnesses have identified,

13:49:25    23   you will find that there will be a picture of the ammunition in

13:49:30    24   6A taken, and it will be submitted along with the firearm, which

13:49:37    25   will be, if not already, disabled.

| | | |
|---|---|---|
| 13:49:42 | 1 | Q.    (BY MS. DOUGLAS) Detective Volk, what we have here is a |
| 13:49:47 | 2 | magazine; is that correct?  Or what is this? |
| 13:49:48 | 3 | A.    That is a magazine with a set of rounds. |
| 13:49:51 | 4 | Q.    And this was what was inside the pistol that we've referred |
| 13:49:53 | 5 | to as Exhibit 6 that's been offered and admitted into evidence? |
| 13:49:56 | 6 | A.    That is correct. |
| 13:49:58 | 7 | Q.    Detective Volk, if you'll take a moment to look at what's |
| 13:50:49 | 8 | been marked as Government's Exhibit No. 31, and see if you |
| 13:50:52 | 9 | recognize what this purports to be. |
| 13:50:55 | 10 | A.    I recognize it. |
| 13:50:56 | 11 | Q.    All right.  And the same question based on the chain of |
| 13:50:58 | 12 | custody:  Is this the same firearm that you seized from within |
| 13:51:00 | 13 | the safe that Mr. Longoria gave you the combination? |
| 13:51:03 | 14 | A.    Yes, it is. |
| 13:51:04 | 15 | Q.    Government's offering into evidence Government's Exhibit No. |
| 13:51:10 | 16 | 31, tender to defense counsel for any objections. |
| 13:51:23 | 17 | MR. ORR:  Same objection, your Honor. |
| 13:51:25 | 18 | THE COURT:  The same ruling.  Government's Exhibit 31 |
| 13:51:29 | 19 | is admitted. |
| 13:51:34 | 20 | Q.    (BY MS. DOUGLAS) Now, Detective Volk, after you found that |
| 13:51:43 | 21 | item within the safe as well as Arthur Longoria's wallet with |
| 13:51:46 | 22 | that large amount of money in it, what else did you do that day? |
| 13:51:50 | 23 | A.    On that particular item, while I was there with the wallet, |
| 13:51:54 | 24 | I did observe that, but actually, Detective Crissman removed the |
| 13:51:57 | 25 | shotgun from there.  But the rest of my day involved interviewing |

13:52:04  1  people in the house.  I believe there was five at the time, and a

13:52:08  2  couple of them, actually, I re-interviewed.  So that was pretty

13:52:12  3  much it.  Once we got to the point where the house was what we

13:52:16  4  considered searched, then we made sure everything was done and we

13:52:18  5  left.

13:52:19  6  Q.   And except for any other types of various court hearings,

13:52:30  7  has that ended your contact with Arthur Longoria?

13:52:32  8  A.   That is correct.

13:52:34  9  Q.   Pass the witness, your Honor.

13:52:36  10                    CROSS-EXAMINATION

13:52:36  11  BY MR. ORR:

13:52:41  12  Q.   Sir, how are you, sir?  I'm Steve Orr.  We've probably met,

13:52:46  13  haven't we?

13:52:46  14  A.   I believe so.

13:52:47  15  Q.   So you're familiar with various firearms, are you not, sir?

13:52:50  16  A.   Yes, sir, I am.

13:52:51  17  Q.   And do you know what a .410 shotgun is?

13:52:53  18  A.   Yes, sir, I do.

13:52:54  19  Q.   And how does it compare in size to a 20-gauge, or a

13:52:59  20  12-gauge, or a 10-gauge.

13:53:00  21  A.   .410 is considerably smaller than a 12-gauge.

13:53:03  22  Q.   It's the smallest kind there is, is that not correct, sir?

13:53:06  23  A.   Yes, sir, it is.

13:53:07  24  Q.   Still be a shotgun?

13:53:08  25  A.   Correct.

13:53:09   1   Q.   Okay.  And they have single-shot, break-apart .410s, do they

13:53:13   2   not, sir?

13:53:14   3   A.   They have pretty much different versions of them, yes, sir.

13:53:16   4   Q.   They have difference versions of every kind of gauge or

13:53:18   5   shotgun there is --

13:53:19   6   A.   Yes, sir.

13:53:20   7   Q.   -- right?  And so, anybody who's experienced with firearms

13:53:25   8   would know the difference between a 410-gauge and a 12-gauge,

13:53:28   9   would they not, sir?

13:53:29   10   A.   That's -- experienced, I guess that's a relative term.

13:53:37   11   Somebody that's been in policing for 12 years would probably know

13:53:39   12   better than somebody that's, you know, a novice.

13:53:42   13   Q.   Well, and somebody who went and bought a gun at the gun

13:53:46   14   show, a .410 shotgun, and sold it to somebody would know what a

13:53:49   15   .410 looked like, right?

13:53:51   16   A.   That's likely, yes.

13:53:55   17   Q.   I mean if I went and -- well, if I went to the Ford dealer

13:53:58   18   and I bought myself a Ford F150 pickup, I'd know what that Ford

13:54:03   19   F150 pickup looked like?

13:54:04   20   A.   Yes, sir.

13:54:04   21   Q.   I wouldn't confuse that with a Mercedes 500 SL, would I?

13:54:12   22   Probably not?

13:54:13   23   A.   I think things like that, would say no.

13:54:16   24   Q.   I wouldn't have confused my Ford F150 pickup truck with a

13:54:19   25   Chevrolet pickup truck, would I?

13:54:21  1   A.    No.

13:54:21  2   Q.    Okay.  So if you go and buy a .410 shotgun, you're not going

13:54:25  3   to confuse that with a 12-gauge, very likely, are you?

13:54:28  4   A.    Most people would not.

13:54:29  5   Q.    Most people would not.  Okay.  May you come over here and --

13:54:34  6           MS. DOUGLAS:  Yes, sir.

13:54:36  7           MR. ORR:  Thank you, ma'am.

13:54:40  8   Q.    (BY MR. ORR) This is a 12-gauge, is it not, sir?

13:54:42  9   A.    That is a 12-gauge.

13:54:43  10  Q.    And I've already forgotten what the -- 31.  Okay.  And it's

13:54:49  11  considerably bigger than a .410, is it not, sir?

13:54:52  12  A.    That is correct.

13:54:53  13  Q.    Okay.  This is what will be called a 12-gauge full, would it

13:54:56  14  not, sir?

13:54:56  15  A.    Yes, sir.

13:54:57  16  Q.    So there's, really, unless you just -- and some people don't

13:55:00  17  know anything about firearms.  But unless you don't know anything

13:55:04  18  about firearms, anybody -- you know, somebody, you could look at

13:55:08  19  this and if they've ever held a .410, they know this is not a

13:55:11  20  .410, right, sir?

13:55:12  21  A.    If they've had some experience with weapons, I believe

13:55:15  22  you're right.  If they're, like I said, they're novice, there

13:55:18  23  could be some confusion.

13:55:19  24  Q.    Well, we are in Texas, are we not, sir?

13:55:21  25  A.    That is true.

13:55:22  1   Q.   And high percentage of population has some experience with

13:55:25  2   firearms, correct, sir?

13:55:26  3   A.   Yes, sir.

13:55:26  4   Q.   Okay.  And you know from the time that we're young, we

13:55:31  5   frequently are exposed to firearms, one way or the other,

13:55:33  6   correct, sir?

13:55:34  7   A.   It's likely, yes.

13:55:35  8   Q.   A .410 is maybe the first shotgun you get as a young person,

13:55:39  9   correct?

13:55:40  10  A.   Yes.

13:55:41  11  Q.   Okay.  A 12-gauge is pretty big.  You go from a .410 to a --

13:55:46  12  well, gauges are kind of strange, but they go from 40 and 20

13:55:50  13  smaller, and 12's bigger and there's 10s and 8s, correct, sir?

13:55:54  14  A.   I haven't run across many 8s, but I have run across 10s.

13:55:58  15  Q.   They're mostly for goose hunting, are they not, sir?

13:56:02  16  A.   Yes, sir.

13:56:02  17  Q.   All right.  If I understand in this house, you found a .380

13:56:21  18  and a 12-gauge shotgun, correct, sir?

13:56:23  19  A.   That is correct.

13:56:24  20  Q.   Pass the witness.  Thank you, sir.

13:56:27  21          MS. DOUGLAS:  No further questions.  May he be

13:56:30  22  released, your Honor?

13:56:31  23          MR. ORR:  Fine with us, your Honor.

13:56:43  24          MS. DOUGLAS:  Stephen Schafer.

13:57:12  25          (Witness sworn.)

13:57:27  1          THE COURT:  Tell us your full name, please, sir, and

13:57:33  2  spell your last.

13:57:34  3          THE WITNESS:  Stephen L. Schafer, S-C-H-A-F-E-R.

13:57:39  4                      DIRECT EXAMINATION

13:57:39  5  BY MS. DOUGLAS:

13:57:41  6  Q.    Sir, could you please tell us where you're employed?

13:57:43  7  A.    Austin Police Department.

13:57:44  8  Q.    And what is your role?

13:57:45  9  A.    I am a detective in the Organized Crime Division.

13:57:48  10  Q.    Okay.  And how long have you been with the Austin Police

13:57:52  11  Department as an officer?

13:57:53  12  A.    About 17-and-a-half years.

13:57:56  13  Q.    And in order to become a police officer, did you receive

13:57:59  14  some type of training and experience?

13:58:00  15  A.    Yes, ma'am.

13:58:01  16  Q.    And can you tell the jury a little bit about that?

13:58:03  17  A.    The training and experience?

13:58:04  18  Q.    Yes, sir.

13:58:05  19  A.    Basically we have -- at that point in time, we had about a

13:58:08  20  six-month academy at which time you have a riding period.  You

13:58:12  21  get off that riding period, you're eligible to promote, later on

13:58:15  22  in your career.  After being on the street for nine years, I

13:58:20  23  promoted and went to the Organized Crime Division.

13:58:22  24  Q.    And that's where you've been ever since?

13:58:24  25  A.    Yes, ma'am.

13:58:24   1   Q.   And you've made it to the role of a detective?

13:58:26   2   A.   Yes, ma'am.

13:58:27   3   Q.   Detective, I'm going to draw your attention to December 4 of

13:58:37   4   the year 2007.  Is that a date which you recall?

13:58:41   5   A.   Yes, ma'am.

13:58:41   6   Q.   And prior to that date, are you familiar with the detective

13:58:44   7   by the name of Robbie Volk?

13:58:45   8   A.   Yes, ma'am.  He is a teammate on my unit.

13:58:48   9   Q.   Okay.  And prior to that date, did you receive an assignment

13:58:52   10  from him regarding you all executing a search warrant?

13:58:55   11  A.   Yes, ma'am.

13:58:55   12  Q.   Prior to the -- tell the jury a little bit about how that

13:58:59   13  goes prior to the execution of the search warrant.  Do they have

13:59:01   14  a meeting or what happens?

13:59:02   15  A.   Yes, ma'am.  Prior to the execution of the search warrant,

13:59:04   16  we'll all have assignments.  There will be a case agent who's

13:59:07   17  assigned to the specific case.  Inside, each one of us has a

13:59:11   18  detail.  On that particular date, my detail was prisoner control.

13:59:16   19  There may be somebody who seizes evidence, someone who takes

13:59:19   20  photographs, someone who makes a diagram.  That day I was the

13:59:22   21  prisoner control.

13:59:23   22  Q.   Can you tell the jury what prisoner control involves?

13:59:26   23  A.   Basically once the subjects inside the house are detained,

13:59:31   24  prisoner control, for lack of a better term, is almost like a

13:59:34   25  babysitter.  I read them, advise them of their rights, I sit with

| | | |
|---|---|---|
| 13:59:37 | 1 | them.  If there's anything that we can get them, if their |
| 13:59:39 | 2 | handcuffs are too tight, if they need anything, it's my job to |
| 13:59:41 | 3 | make sure that they're safe and in one spot. |
| 13:59:45 | 4 | Q.    Now, on December 4th, year 2007, did you participate in the |
| 13:59:49 | 5 | execution of a search warrant at a residence off of Howellwood |
| 13:59:53 | 6 | Way? |
| 13:59:53 | 7 | A.    Yes, ma'am. |
| 13:59:53 | 8 | Q.    All right.  And is that located here in Austin, Travis |
| 13:59:56 | 9 | County, Texas? |
| 13:59:57 | 10 | A.    Yes, ma'am. |
| 13:59:58 | 11 | Q.    On that day, was SWAT assisting your team? |
| 14:00:03 | 12 | A.    Yes, ma'am. |
| 14:00:03 | 13 | Q.    And what was their role? |
| 14:00:05 | 14 | A.    Their role was basically to secure the residence, at which |
| 14:00:10 | 15 | time the residence was secured and all the people inside |
| 14:00:12 | 16 | detained, then the scene would be turned over to our unit. |
| 14:00:15 | 17 | Q.    And your unit consist of you, Detective Volk, and some other |
| 14:00:18 | 18 | individuals? |
| 14:00:18 | 19 | A.    Yes, ma'am. |
| 14:00:19 | 20 | Q.    How many prisoners were you responsible for prisoner control |
| 14:00:29 | 21 | on December 4, year 2007, at Howellwood Way? |
| 14:00:32 | 22 | A.    There would be five. |
| 14:00:33 | 23 | Q.    All right.  Was one of those prisoners an individual by the |
| 14:00:36 | 24 | name of Arthur Longoria? |
| 14:00:37 | 25 | A.    Yes, ma'am. |

14:00:38  1   Q.   All right.  Can you tell the jury what you do when you're

14:00:41  2   reading Miranda rights to the individuals that are there?  Tell

14:00:44  3   them about that process.

14:00:45  4   A.   Yes, ma'am.  Basically we have a standard operating

14:00:49  5   procedure when you do it.  There's a small blue card, a Miranda

14:00:52  6   warning card, they ask five rights on that, listed on that card.

14:00:55  7   Basically what we'll do is it's a -- the way we found that it

14:00:59  8   works best is to stick with this procedure so that we don't

14:01:01  9   deviate.  Basically you'll start with right No. 1, read it to

14:01:06  10  everybody who's present, make sure they understand that right.

14:01:08  11  If they didn't understand that right, we'll go over it.  And

14:01:10  12  we'll have each person nod, say yes, make sure that they do

14:01:14  13  understand that right before proceeding on to the second right.

14:01:17  14  And basically we proceed that way till we read all five of them.

14:01:20  15  Q.   And on this day, as it relates to Arthur Longoria, did you

14:01:24  16  read him his Miranda warnings?

14:01:25  17  A.   Yes, ma'am.

14:01:26  18  Q.   Did he indicate that he understood the warnings that were

14:01:28  19  being given to him?

14:01:29  20  A.   Yes, ma'am.

14:01:30  21  Q.   I'm going to show you what's been marked for identification

14:01:39  22  purposes at this time Government's Exhibit No. 1.  Will you take

14:01:41  23  a moment to look at it and see if you recognize what that

14:01:43  24  document purports to be?

14:01:44  25  A.   Yes, ma'am.  Is the blue Miranda warning card, which was

14:01:48  1  used that day.

14:01:49  2  Q.   All right.  Is that the Miranda warning card that you

14:01:51  3  utilized with Arthur Longoria?

14:01:52  4  A.   Yes, ma'am.  And on the back, we put our name and the date

14:01:55  5  on which it was utilized.

14:02:00  6  Q.   Government offering into evidence Government's Exhibit No.

14:02:03  7  1, tender to defense counsel for any objections.

14:02:06  8         MR. ORR:  No objection, your Honor.

14:02:07  9         THE COURT:  G-1 is admitted.

14:02:11  10  Q.   (BY MS. DOUGLAS) Now, Detective Schafer, on here there's a

14:02:16  11  signature line.  Is there a signature from Arthur Longoria?

14:02:18  12  A.   No, ma'am.

14:02:19  13  Q.   And why is that?

14:02:19  14  A.   On that date, his hands were bound and there were multiple

14:02:24  15  subjects inside.  If it's a one person, one-on-one interview,

14:02:26  16  then, yes, we allow them to sign.  At this point we're using one

14:02:30  17  card to advise five subjects of their rights, at which time all

14:02:33  18  five of the individuals are being detained, and their hands are

14:02:35  19  in handcuffs.

14:02:36  20  Q.   Okay.  Permission to publish it to the jury on the Elmo,

14:02:40  21  your Honor?

14:02:42  22         THE COURT:  Yes.

14:02:51  23  Q.   (BY MS. DOUGLAS) Now, Detective Schafer, can you explain to

14:03:03  24  the jury -- and I know it's a little bit of a disadvantage.  If

14:03:04  25  you can look around.

14:03:05  1    A.    Yes, ma'am.

14:03:06  2    Q.    What are we seeing on the front side where I have the

14:03:08  3    Government's Exhibit No. 1 label?

14:03:10  4    A.    On the front side, it's going to be advisement that they

14:03:12  5    were advised of their rights.  The next line where it says in

14:03:17  6    signature, it will indicate that they were in cuffs at the time,

14:03:19  7    followed by the date, the time at which the rights were read, and

14:03:23  8    then, my information below that.

14:03:24  9    Q.    All right.  And I don't expect you to read this, but on the

14:03:30  10   back side, what's at the top, and then, what's at the bottom?

14:03:32  11   A.    It's to advise.  That it is the Miranda warning and then,

14:03:36  12   the five rights that we spoke about a little while ago.  Each one

14:03:39  13   specific in nature to that specific right, at which point on --

14:03:45  14   basically on one, if you read one and if they didn't understand

14:03:47  15   it -- or if they did understand it, we move on to two.

14:03:56  16   Q.    On December 4th, you actually gave Miranda warnings to

14:04:03  17   Arthur Longoria?

14:04:03  18   A.    Yes, ma'am.

14:04:04  19   Q.    Did you attempt to question him?

14:04:06  20   A.    No, ma'am.

14:04:06  21   Q.    Is that one of your roles and responsibilities that day?

14:04:09  22   A.    No, ma'am.

14:04:10  23   Q.    Was this simply your responsibility to do prisoner control

14:04:14  24   and to give Miranda warnings?

14:04:16  25   A.    Yes, ma'am.

14:04:16  1    Q.    Do you see the individual in the courtroom today who you

14:04:18  2    gave Miranda warnings to?

14:04:19  3    A.    Yes, ma'am.

14:04:20  4    Q.    Can you identify an article of clothing that he has on today

14:04:23  5    as Arthur Longoria?

14:04:25  6    A.    Would be a light-colored shirt, possibly a light green with

14:04:29  7    small squares.

14:04:31  8    Q.    May the record reflect he's identified the defendant, your

14:04:33  9    Honor?

14:04:34  10             THE COURT:  So reflects.

14:04:35  11             MS. DOUGLAS:  Pass the witness, your Honor.

14:04:43  12             MR. ORR:  No questions.  Thank you, sir.

14:04:45  13             MS. DOUGLAS:  May this witness be released?

14:04:46  14             THE COURT:  Any objection to his release?

14:04:48  15             MR. ORR:  None whatsoever, your Honor.

14:04:49  16             THE COURT:  You may be excused, sir.

14:04:59  17             MR. SPARKS:  Call Detective Brian Crissman, your Honor.

14:05:20  18             (Witness sworn.)

14:05:35  19             THE COURT:  Tell us your full name, please, sir, and

14:05:41  20    spell your last.

14:05:41  21             THE WITNESS:  Brian Crissman, C-R-I-S-S-M-A-N.

14:05:41  22         BRIAN CRISSMAN, called by the Government, duly sworn.

14:05:47  23

14:05:47  24                    DIRECT EXAMINATION

14:05:48  25    BY MR. SPARKS:

14:05:48   1   Q.   Thank you, your Honor.

14:05:50   2        Detective, can you tell the jury how you're employed?

14:05:52   3   A.   I'm employed by the Austin Police Department.

14:05:54   4   Q.   And how long have you been employed by the Austin Police

14:05:57   5   Department?

14:05:57   6   A.   About 10 years, almost 11.

14:05:59   7   Q.   And were you so employed on December 4 of 2007?

14:06:04   8   A.   Yes, sir, I was.

14:06:05   9   Q.   Did you participate in the execution of a search warrant on

14:06:09  10   this date?

14:06:09  11   A.   Yes, I did.

14:06:10  12   Q.   What other officers were on your search warrant execution

14:06:15  13   team?

14:06:15  14   A.   Detective Volk, Detective Nelson, Detective Sanchez,

14:06:23  15   Detective Schafer, myself.

14:06:25  16   Q.   And were you assigned a specific roll by Detective Volk

14:06:30  17   prior to the execution of that search warrant?

14:06:31  18   A.   I was, sir.

14:06:32  19   Q.   What was your role to be?

14:06:33  20   A.   To conduct a diagram of the residence.

14:06:36  21   Q.   Did you have any secondary duties or responsibilities?

14:06:41  22   A.   To assist in the search.

14:06:42  23   Q.   Did anyone other than those detectives you just listed

14:06:46  24   participate in the execution of the search warrant that date?

14:06:49  25   A.   Not that I recall.

| 14:06:51 | 1 | Q. Okay. Did the SWAT team assist? |
| 14:06:53 | 2 | A. Yes, sir. The SWAT team made entry into the residence on |
| 14:06:57 | 3 | our behalf. |
| 14:06:58 | 4 | Q. Okay. And once they were done, is that when you and your |
| 14:07:01 | 5 | team of detectives entered the residence? |
| 14:07:04 | 6 | A. Yes, sir. |
| 14:07:04 | 7 | Q. Okay. And was that -- was the residence at 2602 Howellwood |
| 14:07:12 | 8 | Way? |
| 14:07:12 | 9 | A. Yes, sir. |
| 14:07:12 | 10 | Q. And that's in Travis County? |
| 14:07:13 | 11 | A. Yes, sir. |
| 14:07:14 | 12 | Q. Within the Western District of Texas? |
| 14:07:15 | 13 | A. Yes, sir. |
| 14:07:19 | 14 | Q. Let me show you what's been marked as Government's Exhibit |
| 14:07:22 | 15 | No. 7. Do you recognize Government's Exhibit No. 7? |
| 14:07:25 | 16 | A. I do. |
| 14:07:25 | 17 | Q. And did you create Government's Exhibit No. 7? |
| 14:07:28 | 18 | A. I did. |
| 14:07:29 | 19 | Q. Did you create Government's Exhibit No. 7 subsequent to the |
| 14:07:34 | 20 | execution of the search warrant on December the 4th of 2007? |
| 14:07:38 | 21 | A. I did. |
| 14:07:39 | 22 | Q. And does Government's 7 -- is it a fair and accurate |
| 14:07:44 | 23 | depiction of the residence as you observed it to be on that date? |
| 14:07:48 | 24 | A. It is. |
| 14:07:49 | 25 | Q. Is Government's Exhibit No. 7 drawn to scale? |

14:07:54  1    A.    It is not.

14:07:54  2    Q.    Okay.  Has what you're looking at, Government's Exhibit No.

14:07:59  3    7, been tampered with or altered in any way?  Take a close look

14:08:03  4    and see if there's been any noticeable changes on the face of

14:08:09  5    Government's Exhibit No. 7.

14:08:10  6    A.    It has not.

14:08:11  7    Q.    At this time I offer -- sort of generically, what is

14:08:19  8    Government's Exhibit No. 7?

14:08:20  9    A.    It's a diagram of the residence.  It's not drawn to scale

14:08:24  10   but it's -- shows the doors, roughly, the different rooms and

14:08:28  11   some basic furniture in the house.

14:08:30  12   Q.    Okay.  At this time I offer Government's Exhibit No. 7,

14:08:33  13   previously tendered in discovery.

14:08:34  14          MR. ORR:  No objection, your Honor.

14:08:35  15          THE COURT:  Seven is received.

14:08:51  16   Q.    (BY MR. SPARKS) Can you see that clearly, Detective?  If you

14:09:03  17   need to scoot around or even step down, you can.

14:09:06  18   A.    Thank you.

14:09:12  19   Q.    So, Detective Crissman, in your assisting with the search,

14:09:18  20   can you tell me where you focused most of your attention in the

14:09:23  21   execution of the search warrant?

14:09:25  22   A.    In the master bedroom.

14:09:26  23   Q.    Okay.  On Government's Exhibit 7, that's indicated by BR No.

14:09:31  24   1 on Government's 7?

14:09:32  25   A.    Yes, sir.

14:09:33   1   Q.   Okay.  And can you describe sort of generically what you've

14:09:42   2   drawn on Government's Exhibit No. 7, particularly in BR 1?

14:09:47   3   A.   Yes, sir.  You have a door leading into the master bedroom,

14:09:54   4   a closet.  This is the bed.  Here you have, like, a dresser and

14:10:00   5   shelving units.  There's a refrigerator over here and a bathroom,

14:10:07   6   toilet, sink and bathtub.

14:10:09   7   Q.   Okay.  I may not have been clear.  Where exactly was the

14:10:14   8   shelving in relation to the refrigerator?

14:10:16   9   A.   The shelving, the refrigerator sits right in here and the

14:10:20  10   shelving on this side and shelving over here, as well.

14:10:25  11   Q.   And what type of refrigerator was that?

14:10:27  12   A.   It's one of those kinds you use in a college dorm

14:10:31  13   refrigerator, like a mini fridge.

14:10:33  14   Q.   Okay.  So not a full size refrigerator?

14:10:36  15   A.   Correct.

14:10:36  16   Q.   Was there also a safe in bedroom No. 1?

14:10:38  17   A.   Yes, there was.

14:10:39  18   Q.   Where was it located?

14:10:40  19   A.   A gun safe was sitting on top of the refrigerator.

14:10:44  20   Q.   Okay.  And if -- can you give the jury an idea of -- it

14:10:51  21   appears on bedroom 1 that the bed is going long ways, I guess,

14:10:56  22   from east to west; is that correct?

14:10:58  23   A.   Yes, sir.

14:10:58  24   Q.   So can you indicate on there, just for the jury's

14:11:01  25   indulgence, where the head and foot of the bed is in your

14:11:04  1  opinion?

14:11:04  2  A.    In my opinion, the head of the bed would be up here, the

14:11:07  3  foot of the bed down here, and there's about three feet in

14:11:13  4  between all this stuff.  Just enough room to walk through.

14:11:18  5  Q.    So you mentioned that the drawing's not to scale?

14:11:21  6  A.    That is correct.

14:11:21  7  Q.    In your opinion, could you reach from the bed all the way,

14:11:26  8  literally, and touch the refrigerator?

14:11:27  9  A.    Yes.

14:11:27  10  Q.    Could you touch any of the shelving?

14:11:29  11  A.    Yes, you could.

14:11:30  12  Q.    How about the safe?

14:11:33  13  A.    Yes.  Yeah, you could reach it.

14:11:36  14  Q.    Okay.  Did you observe a handgun, a .38 caliber handgun?

14:11:46  15  A.    Yes, I did.

14:11:47  16  Q.    And indicate on Government's Exhibit No. 7 where you

14:11:51  17  observed that.

14:11:52  18  A.    Down here.

14:11:53  19  Q.    Okay.  And where?

14:11:54  20  A.    In the general area.

14:11:57  21  Q.    It was on the top?

14:11:58  22  A.    It was between the mattress and the box springs there was a

14:12:01  23  handgun and, I think, a couple of knives.

14:12:09  24  Q.    Were you -- Detective Crissman, were you provided a

14:12:13  25  combination to the safe in bedroom No. 1?

| | | |
|---|---|---|
| 14:12:16 | 1 | A.    I was. |
| 14:12:17 | 2 | Q.    Were you provided a combination to a safe in any other |
| 14:12:19 | 3 | bedrooms? |
| 14:12:20 | 4 | A.    No, sir. |
| 14:12:20 | 5 | Q.    Did you observe any other safes in bedroom No. 1? |
| 14:12:24 | 6 | A.    No, sir. |
| 14:12:25 | 7 | Q.    Did you observe any other safes in any of the bedrooms? |
| 14:12:30 | 8 | A.    No, sir. |
| 14:12:31 | 9 | Q.    After you were provided -- and who provided you with the |
| 14:12:34 | 10 | combination? |
| 14:12:34 | 11 | A.    Detective Volk. |
| 14:12:36 | 12 | Q.    And did you try that combination on the safe? |
| 14:12:39 | 13 | A.    I did. |
| 14:12:40 | 14 | Q.    Was -- I'll back up.  Was the safe locked prior to you |
| 14:12:43 | 15 | trying to open the safe? |
| 14:12:44 | 16 | A.    It was.  The safe was locked. |
| 14:12:46 | 17 | Q.    What did you find when you opened the safe? |
| 14:12:51 | 18 | A.    When I opened the safe, there was a wallet on the top shelf |
| 14:12:54 | 19 | of the safe and a shotgun. |
| 14:12:59 | 20 | Q.    Did you retrieve each of those items? |
| 14:13:01 | 21 | A.    I did. |
| 14:13:02 | 22 | Q.    Okay.  Was the shotgun loaded? |
| 14:13:06 | 23 | A.    The shotgun was loaded. |
| 14:13:07 | 24 | Q.    Now, showing you what's marked as -- did you locate any |
| 14:13:27 | 25 | ammunition for a .380, semiautomatic pistol? |

| | | |
|---|---|---|
| 14:13:34 | 1 | A.    I did. |
| 14:13:34 | 2 | Q.    And where did you locate that? |
| 14:13:35 | 3 | A.    I located it on the shelving next to the refrigerator and |
| 14:13:40 | 4 | the gun safe.  It was along this wall here. |
| 14:13:43 | 5 | Q.    Okay.  And now you can take the witness stand. |
| 14:13:54 | 6 | Describe to the jury how you found that.  Was the |
| 14:14:00 | 7 | ammunition for the .380 loose, packaged? |
| 14:14:05 | 8 | A.    It was in a box that they -- ammunition when you buy it, |
| 14:14:11 | 9 | usually comes in, like, a 50-round cartridge box and it will -- |
| 14:14:15 | 10 | oftentimes those boxes are made out of Styrofoam, or sometimes |
| 14:14:18 | 11 | they could be, like, a hard plastic, and the rounds actually sit |
| 14:14:22 | 12 | in there and they're stacked up nicely.  This was a Styrofoam |
| 14:14:26 | 13 | version of the box that was broke in half and there was no -- the |
| 14:14:30 | 14 | cardboard around the outside or anything.  It was just a |
| 14:14:33 | 15 | Styrofoam box with the cartridges, the bullets actually sitting |
| 14:14:38 | 16 | inside of it. |
| 14:14:38 | 17 | Q.    Detective, I'm now showing you what's been previously marked |
| 14:14:42 | 18 | as Government's Exhibit No. 31A and Government's Exhibit 32.  Do |
| 14:14:49 | 19 | you recognize each of those exhibits? |
| 14:14:52 | 20 | A.    These are the shells from the shotgun that was inside the |
| 14:14:56 | 21 | safe.  And Exhibit, I guess, 32, this is the box of ammunition |
| 14:15:07 | 22 | that I found on the shelving. |
| 14:15:08 | 23 | Q.    Okay. |
| 14:15:09 | 24 | A.    In the safe. |
| 14:15:10 | 25 | Q.    On the shelving but not in the safe.  And just to be clear |

14:15:13  1  for record purposes, when you said these that were found in the

14:15:16  2  shotgun, you're referring to Government's Exhibit No. 31A?

14:15:18  3  A.   Yes, sir.

14:15:19  4  Q.   Okay.  At this time, I offer Government's Exhibits 31A and

14:15:25  5  32, your Honor.

14:15:35  6           MR. ORR:  I have my same pretrial objection, your

14:15:39  7  Honor.

14:15:39  8           THE COURT:  31A and 32 are admitted.

14:16:14  9  Q.   (BY MR. SPARKS) So, Detective Crissman, I'm now showing you,

14:16:17  10  again, Government's Exhibit No. 32.  It appears that in that

14:16:23  11  case, some of the bullets are missing.  How many were missing

14:16:28  12  from the case that you found?

14:16:34  13  A.   According to that, looks like six.

14:16:36  14  Q.   Okay.  And did you find Government's Exhibit No. 32 -- is

14:16:41  15  that exactly how you found it or did you break -- did you break

14:16:45  16  the piece of that?

14:16:48  17  A.   No.  It is exactly the way I found it.  Yes, sir.

14:16:50  18  Q.   Okay.  And there were no -- those other six were not found

14:16:54  19  or misplaced by you.  They were missing when you recovered them

14:17:00  20  on December 4 of 2007?

14:17:02  21  A.   Yes, sir.

14:17:02  22  Q.   Did you recover or did you see or observe any other half or

14:17:12  23  any other similar boxes containing .380 ammunition?

14:17:17  24  A.   Not containing .380 ammunition.

14:17:19  25  Q.   Okay.  But you did find three rounds, three shotgun --

14:17:27  1  excuse me, four shotgun rounds and the shotgun that was in the

14:17:30  2  safe?

14:17:30  3  A.   Yes, sir.

14:17:31  4  Q.   And that was, again, Government's Exhibit 31A?

14:17:33  5  A.   Yes, sir.

14:17:39  6  Q.   Pass the witness.

14:18:06  7                      CROSS-EXAMINATION

14:18:06  8  BY MR. ORR:

14:18:11  9  Q.   How are you doing, sir?

14:18:11  10  A.   Fine, sir.  Thank you.

14:18:13  11  Q.   The shotgun was in a gun safe; is that what it was?

14:18:18  12  A.   Yes, sir.

14:18:18  13  Q.   So just a regular, ol' ordinary gun safe, right?

14:18:22  14  A.   Yes, sir.

14:18:22  15  Q.   I pass the witness.  Thank you, sir.

14:18:28  16       MR. SPARKS:  Nothing further, your Honor.  May this

14:18:30  17  witness be excused?

14:18:31  18       THE COURT:  May this witness be excused, Mr. Orr?

14:18:33  19       MR. ORR:  Yes, your Honor.

14:18:34  20       THE COURT:  You may be excused.

14:18:39  21       MR. SPARKS:  Call Detective Anthony Nelson.

14:19:05  22       (Witness sworn.)

14:19:20  23       THE COURT:  Tell us, please, sir, your full name and

14:19:26  24  spell your last.

14:19:27  25       THE WITNESS:  My name is Anthony Carasco Nelson.  And

14:19:32  1  my -- I'm sorry, sir.

14:19:33  2          THE COURT:  Just back up a little bit on that

14:19:35  3  microphone.  It will pick up.  Just relax.  And N-E-L-S-O-N?

14:19:42  4          THE WITNESS:  N-E-L-S-O-N.

14:19:42  5          THE COURT:  You may proceed.

14:19:44  6      ANTHONY C. NELSON, called by the Government, duly sworn.

14:19:44  7                      DIRECT EXAMINATION

14:19:46  8  BY MR. SPARKS:

14:19:46  9  Q.    Thank you, your Honor.

14:19:51  10          Detective, how are you employed?

14:19:54  11  A.    I'm employed with the Austin Police Department.

14:19:56  12  Q.    And how long have you been employed at the Austin Police

14:19:58  13  Department?

14:19:58  14  A.    Approximately 10 years.

14:20:00  15  Q.    Were you so employed on December the 4th of 2007?

14:20:04  16  A.    Yes, I was.

14:20:05  17  Q.    Did you participate in execution of a search warrant?

14:20:07  18  A.    Yes, I did.

14:20:08  19  Q.    Was that search warrant executed at 2602 Howellwood Way?

14:20:12  20  A.    Yes, it was.

14:20:13  21  Q.    And what -- prior to your participation and execution of

14:20:17  22  that search warrant, were you given a particular assignment?

14:20:20  23  A.    I was.

14:20:21  24  Q.    And what was that?

14:20:23  25  A.    My assignment was to photograph evidence taken.

14:20:27   1    Q.    Okay.  And just to give the jury an idea of how that works,

14:20:33   2    do you just decide what to take pictures of?  Or do one of your

14:20:39   3    fellow officers direct your attention to particular locations or

14:20:43   4    items before you take a photo?

14:20:45   5    A.    Pretty much what happens is if something of evidentiary

14:20:48   6    value is found, someone will call photo and that's, I guess, my

14:20:54   7    middle name at that point, and I go and they direct me in what

14:20:58   8    needs to be photographed, and I take it as is, take the

14:21:02   9    photograph.  I'm sorry.  Also within that, my job is to take a

14:21:14  10    photograph of everybody that's there.  So you take a picture of

14:21:17  11    them and what they were wearing at the time.

14:21:20  12    Q.    Okay.  And just one second.

14:21:36  13          Detective Nelson, I'm showing you what's been marked as

14:21:39  14    Government's Exhibits No. 14, 15, 23, 24, 25, 26 and 27.  Can you

14:21:52  15    just look through those and tell me if you recognize those --

14:21:55  16    A.    Yes, I can.

14:21:56  17    Q.    -- exhibits?

14:21:59  18    A.    I do recognize 14.  I do recognize 15, 23, 24, 25, 26 and

14:22:16  19    27.

14:22:17  20    Q.    Okay.  And the exhibits you just listed, are those each

14:22:24  21    photographs that you took on December the 4th of 2007?

14:22:27  22    A.    They are copies of the photographs.  That's correct.

14:22:29  23    Q.    Do they fairly and accurately depict either the persons or

14:22:37  24    the items that you photographed on that day?

14:22:38  25    A.    That is correct, sir.

| | | |
|---|---|---|
| 14:22:39 | 1 | Q.   Have they been tampered with or altered in any way since the |
| 14:22:43 | 2 | date that you took those photographs? |
| 14:22:44 | 3 | A.   No, they have not. |
| 14:22:45 | 4 | Q.   Okay.  I'm going to recollect those just briefly from you, |
| 14:22:49 | 5 | Detective.  Offer at this time Government's 14, 15, 23, 24, 25, |
| 14:22:58 | 6 | 26 and 27, your Honor. |
| 14:23:24 | 7 | MR. ORR:  Have my same pretrial objection, your Honor. |
| 14:23:26 | 8 | THE COURT:  Fourteen, 15, 23, 24, 25, 26, 27 are |
| 14:23:29 | 9 | admitted over the objection. |
| 14:23:32 | 10 | MR. SPARKS:  Yes, your Honor. |
| 14:23:34 | 11 | Q.   (BY MR. SPARKS) Detective, I'm now showing you in the |
| 14:23:51 | 12 | courtroom Government's Exhibit No. 14.  What does Government's |
| 14:23:54 | 13 | No. 14 depict?  And actually, I think I've got it -- |
| 14:23:58 | 14 | A.   Yes, you do. |
| 14:23:59 | 15 | Q.   -- upside down. |
| 14:24:00 | 16 | A.   Those are two knives and a pistol that were located |
| 14:24:03 | 17 | underneath the mattress and a box spring. |
| 14:24:08 | 18 | Q.   Okay. |
| 14:24:09 | 19 | A.   That looks like another knife.  I can't -- am I correct? |
| 14:24:15 | 20 | Q.   Can't testify for you. |
| 14:24:17 | 21 | A.   I'm sorry, can I see it closer?  Yes. |
| 14:24:25 | 22 | Q.   I'm now handing you Government's Exhibit No. 14. |
| 14:24:27 | 23 | A.   Okay.  Those are two knives and sheathes is what it appears |
| 14:24:31 | 24 | to me, and that's a pistol. |
| 14:24:33 | 25 | Q.   Okay.  I was previously showing you this on an in-court |

14:24:37    1    projector and it's a little bit bright, but I've just taken that

14:24:44    2    out of your hands.

14:24:45    3            Can you tell whether or not when you took the

14:24:48    4    photograph, are the two knives and the pistol -- were they

14:24:52    5    sitting on top of box springs or mattress?

14:24:54    6    A.    They were sitting on top of the box springs.  It looks as

14:24:59    7    I'm looking at that picture, I could see it on top of a box

14:25:01    8    spring and a mattress was lifted up.

14:25:05    9    Q.    Okay.  And is that -- do you recall the mattress being

14:25:10   10    lifted up?

14:25:11   11    A.    That's correct.

14:25:11   12    Q.    When you were executing the search warrant?

14:25:13   13    A.    I recall when they said photo, I walk in there and they're

14:25:18   14    lifting up the mattress, and I take a picture.

14:25:20   15    Q.    Okay.  Now showing you what's been marked as Government's

14:25:24   16    Exhibit No. 15.  What does Government's Exhibit No. 15 depict?

14:25:29   17    A.    That looks look a refrigerator, sir.

14:25:31   18    Q.    And how close in proximity was the refrigerator depicted in

14:25:36   19    Government's 15 to the gun on Government's -- depicted on

14:25:41   20    Government's 14?

14:25:42   21    A.    You want to give me -- I mean I could approximately say it

14:25:45   22    was a few feet.

14:25:47   23    Q.    Okay.  You didn't measure it?

14:25:48   24    A.    I didn't measure it.  No, I did not, sir.

14:25:50   25    Q.    Okay.  And now showing you Government's Exhibit No. 23.  Do

14:25:58  1  you remember taking Government's Exhibit No. 23?

14:25:59  2  A.   I do.

14:26:00  3  Q.   Was that person present?

14:26:01  4  A.   Yes, he was.

14:26:02  5  Q.   Did you later find out who that person was?

14:26:04  6  A.   Yes.

14:26:04  7  Q.   And who was that person?

14:26:05  8  A.   Arthur Longoria.

14:26:06  9  Q.   Okay.  And is that person -- is that person sitting in the

14:26:10  10  courtroom today?

14:26:10  11  A.   Yes, he is.

14:26:11  12  Q.   And now showing you Government's Exhibit No. 24, was that

14:26:17  13  person also present during the execution of the search warrant?

14:26:19  14  A.   She was.

14:26:20  15  Q.   Did you ever figure out what her identity was?

14:26:22  16  A.   No.  I don't know what her name is.

14:26:24  17  Q.   Okay.  Government's Exhibit No. 26, did you photograph that

14:26:28  18  person?

14:26:29  19  A.   I didn't.

14:26:30  20  Q.   Okay.  Now showing you Government's Exhibit No. 25.  I'll

14:26:37  21  take them out of order a little bit.  Did you photograph that

14:26:39  22  person on that day?

14:26:40  23  A.   I did.

14:26:40  24  Q.   On the execution of the search warrant?

14:26:42  25  A.   Correct.

| | | |
|---|---|---|
| 14:26:42 | 1 | Q.   And now showing you Government's Exhibit No. 27.  Did you |
| 14:26:47 | 2 | photograph that person, as well? |
| 14:26:48 | 3 | A.   I did. |
| 14:26:48 | 4 | Q.   And were there any other non-law enforcement persons when |
| 14:26:54 | 5 | you were assisting with the execution of the search warrant? |
| 14:26:57 | 6 | A.   Non-law enforcement, no, sir. |
| 14:26:59 | 7 | Q.   Okay.  Did anyone come in the house, or was there anyone |
| 14:27:02 | 8 | outside that you noticed or were asked to photograph? |
| 14:27:05 | 9 | A.   That I was asked to photograph, no, sir. |
| 14:27:08 | 10 | Q.   And you didn't take any pictures of anything unless somebody |
| 14:27:11 | 11 | asked you, correct? |
| 14:27:11 | 12 | A.   Unless somebody asked me. |
| 14:27:13 | 13 | Q.   Pass the witness. |
| 14:27:20 | 14 |         MR. ORR:  No questions, your Honor. |
| 14:27:23 | 15 |         THE COURT:  May the witness be excused? |
| 14:27:24 | 16 |         MR. ORR:  Fine with us, your Honor. |
| 14:27:26 | 17 |         MR. SPARKS:  Yes, your Honor. |
| 14:27:27 | 18 |         THE COURT:  You may be excused. |
| 14:27:29 | 19 |         THE WITNESS:  Thank you, your Honor. |
| 14:27:33 | 20 |         THE COURT:  Call your next witness. |
| 14:27:36 | 21 |         MR. SPARKS:  Detective Armando Balderama. |
| 14:27:40 | 22 |         THE COURT:  This is going to take Mr. Balderama a |
| 14:27:44 | 23 | little bit of time. |
| 14:27:46 | 24 |         MS. DOUGLAS:  It is, your Honor. |
| 14:27:47 | 25 |         THE COURT:  So I'll give you a little break.  You'll |

14:27:50  1  have time to go to the restroom, stretch, go outside, make sure

14:27:55  2  it's 100 degrees, then we'll be ready to come back in.

14:28:30  3        (Jury not present.)

14:28:32  4        THE COURT:  Counsel, I noticed in the motion, the

14:28:34  5  suppress hearing, there was a CD which took time to review last

14:28:37  6  Friday.  Has that been redacted to eliminate all of the materials

14:28:45  7  that I have kept under advisement on the in limine?

14:28:52  8        MS. DOUGLAS:  Your Honor, when I spoke with defense

14:28:54  9  counsel last week, we had come to an agreement regarding a

14:28:57  10  portion of the videotape that should be allowed in and his

14:29:00  11  objection, and I'll tell you the numbers that it related to was

14:29:06  12  when the detective began saying, I understand the police were out

14:29:09  13  there regarding some guns, some counterfeit money, and some

14:29:14  14  drugs.  And we've redacted the portion that talks about the

14:29:17  15  counterfeit money and the drugs.  And so, we've got it here, your

14:29:21  16  Honor, for the Court to review -- go ahead.  For the Court to

14:29:25  17  review to determine if that's acceptable because that's what the

14:29:28  18  defense attorney indicated was what he wanted out.

14:29:31  19        THE COURT:  Well, you've got talk in there about the

14:29:36  20  girlfriend, telling him how to make money or --

14:29:41  21        MS. DOUGLAS:  No.  That's not included in here, your

14:29:43  22  Honor.  It starts from when he's Mirandized at 1700, it goes to

14:29:47  23  1943, when the officer says, they were also out there on

14:29:50  24  counterfeit money and drugs.  And then, for that period of time,

14:29:54  25  it cut out from 1943 to 1955, and then, it goes to 3344, before

14:30:00  1  they began talking about the girlfriend making the counterfeit

14:30:03  2  money and all the other things.

14:30:06  3          THE COURT:  Well, I didn't memorize it.  Just taxed my

14:30:13  4  ability just to get anything on the screen.  I had to use a law

14:30:17  5  clerk to do it.  Other than at least ten minutes of just seeing

14:30:25  6  Mr. Longoria sitting there, I don't remember anything other than

14:30:30  7  when I reviewed it, one of the detectives came in, I wondered how

14:30:34  8  you were going to redact it.

14:30:37  9          MR. ORR:  Yes, sir.  We had a conversation about it.  I

14:30:39  10  complained, and I wasn't sure what they were going to take out

14:30:42  11  because I was complaining about what the detective said because

14:30:44  12  that I don't think is admissible for various reasons.  Last I

14:30:50  13  heard, she was going to leave that in there.  I haven't seen the

14:30:52  14  redacted version because we were having our conversation.  I

14:30:54  15  don't know, maybe it was Thursday.  Thursday or Friday about all

14:30:57  16  of that.

14:30:58  17          MS. DOUGLAS:  And on Friday --

14:30:59  18          MR. ORR:  I'm hoping that everything's out of there

14:31:01  19  that is --

14:31:02  20          MS. DOUGLAS:  It's 16 minutes long, your Honor.  We can

14:31:04  21  sit here, and he can look through and confirm that I've taken out

14:31:07  22  what he's wanted.  He had also indicated he was going to use his

14:31:11  23  souped-up machine to come in with a redacted copy, as well.

14:31:14  24          MR. ORR:  Well, I have this fancy new software.

14:31:16  25          THE COURT:  I don't want to hear it.

| | | |
|---|---|---|
| 14:31:17 | 1 | MR. ORR:  It didn't work.  I couldn't do it. |
| 14:31:19 | 2 | THE COURT:  If you would show -- go quickly to the |
| 14:31:24 | 3 | restroom, come back, and let's look at it and see if there's a |
| 14:31:28 | 4 | problem. |
| 14:54:18 | 5 | (Recess.) |
| 14:54:25 | 6 | THE COURT:  Okay.  Where are we on the disc? |
| 14:54:29 | 7 | MR. ORR:  Your Honor, the only thing on there and I |
| 14:54:31 | 8 | think it's -- it will never -- is he mentions one -- the officer |
| 14:54:36 | 9 | mentions something about something over there that's pending, but |
| 14:54:40 | 10 | I guess we'll -- when he's starting the interview, doesn't ask |
| 14:54:45 | 11 | him about it. |
| 14:54:51 | 12 | THE COURT:  So you've seen it.  Do you have an |
| 14:54:52 | 13 | objection to it? |
| 14:54:53 | 14 | MR. ORR:  No.  I don't think it's -- I mean we'll be |
| 14:54:55 | 15 | here for days arguing with every little -- and I think there's -- |
| 14:54:59 | 16 | THE COURT:  We've got plenty of time. |
| 14:55:00 | 17 | MR. ORR:  No.  I don't think it matters. |
| 14:55:02 | 18 | THE COURT:  All right.  Bring them in. |
| 14:55:08 | 19 | (Jury present.) |
| 14:56:02 | 20 | THE COURT:  You may call your next witness. |
| 14:56:04 | 21 | MS. DOUGLAS:  Armando Balderama. |
| 14:56:22 | 22 | THE COURT:  Counsel, if y'all will come forward. |
| 14:56:24 | 23 | (At the bench, on the record.) |
| 14:56:28 | 24 | THE COURT:  Balderama is not on this list, so he wasn't |
| 14:56:39 | 25 | voir dired on it.  So let me find out if anybody on the jury |

14:56:44  1  knows him.

14:56:45  2          MS. DOUGLAS:  Yes, sir.

14:56:53  3          THE COURT:  Members of the jury panel, I do not

14:56:55  4  remember myself, because I'm going to be 69 next month, of the

14:57:02  5  names of the witnesses who were identified.  But does anybody

14:57:06  6  know Mr. Balderama?

14:57:08  7          All right.  If you'll be sworn, please.

14:57:10  8          (Witness sworn.)

14:57:27  9          THE COURT:  If you'll tell us, please, sir, your full

14:57:30  10  name and spell your last.

14:57:31  11          THE WITNESS:  Yes, sir.  It's Armando Alberto

14:57:37  12  Balderama, B-A-L-D-E-R-A-M-A.

14:57:40  13     ARMANDO A. BALDERAMA, called by the Government, duly sworn.

14:57:40  14                      DIRECT EXAMINATION

14:57:40  15  BY MS. DOUGLAS:

14:57:43  16  Q.    Sir, how are you employed?

14:57:44  17  A.    I'm employed with the Austin Police Department as a

14:57:47  18  detective.

14:57:48  19  Q.    And how long have you been with the Austin Police

14:57:50  20  Department?

14:57:50  21  A.    For 23 years, ma'am.

14:57:52  22  Q.    And do you have a current assignment?

14:57:54  23  A.    Yes, ma'am.  I'm currently assigned in a Career Criminal

14:57:57  24  Unit, Fugitive Apprehension Division.

14:58:00  25  Q.    And what does the Fugitive Apprehension Unit do?

14:58:03  1   A.   We track felons, convicted felons that are on parole,

14:58:08  2   probation, wanted fugitives.

14:58:11  3   Q.   And did you receive information that one of the people who

14:58:19  4   you had an arrest warrant for was Arthur Longoria?

14:58:22  5   A.   Yes, ma'am.

14:58:22  6   Q.   All right.  And once you received that information, what was

14:58:24  7   your role or responsibility?

14:58:27  8   A.   It was assigned to one of the officers in our unit to try to

14:58:30  9   locate Mr. Longoria.  The warrant had been issued back in April,

14:58:35  10  and at the point that it was issued, we received information

14:58:38  11  regarding efforts were made to try to locate where he was

14:58:42  12  actually staying at, residing, where it was that we could arrest

14:58:45  13  him.

14:58:46  14  Q.   And through your investigative resources, were you able to

14:58:50  15  determine where Arthur Longoria was staying at at that point?

14:58:52  16  A.   Yes, ma'am, we were.  We were able to determine that he was

14:58:54  17  in an apartment complex out on 2504 Huntwick and that he was --

14:59:01  18  actually was determined that he was inside Apartment 505.

14:59:06  19  Q.   And what day did you attempt to go arrest Arthur Longoria on

14:59:09  20  this arrest warrant?

14:59:10  21  A.   That was May 2nd, 2008.

14:59:13  22  Q.   All right.  Can you please tell the jury, once you got to

14:59:17  23  that apartment, what steps you took in order to secure the arrest

14:59:21  24  of Arthur Longoria?

14:59:22  25  A.   There were a team of officers that went to the front door

14:59:26    1    basically to arrest him.  We had devised a plan to have one of

14:59:30    2    our officers knock on the door, ask for a particular person that

14:59:34    3    would allow us to have persons come to the front door that we

14:59:37    4    might be able to identify or allow us, more or less, to get a

14:59:41    5    foot in.  Myself and another officer went to the rear, thinking

14:59:45    6    that there may be a rear exit to the apartment.  The officers in

14:59:49    7    front did knock on the front door.  Mr. Longoria answered the

14:59:52    8    front door and was taken into custody at that time.

14:59:55    9         Myself and the other officer who were at the back then

14:59:59    10   came up front to the front of the -- front of the apartment

15:00:02    11   complex.

15:00:04    12   Q.   And when you returned to the front of the apartment complex

15:00:07    13   and saw that Arthur Longoria was the person who was taken into

15:00:10    14   custody, what was the next step that you took?

15:00:12    15   A.   Next step that I took was I actually talked to Mr. Longoria.

15:00:18    16   I advised him of his Miranda rights.  I had introduced myself,

15:00:21    17   explained who I was, explained to him that he did have an arrest

15:00:26    18   warrant; and at that point, I asked him if he didn't mind coming

15:00:32    19   with me to talk about why it was that the arrest warrant had been

15:00:37    20   issued.  And eventually, he was transported back to our unit, our

15:00:41    21   offices to be interviewed.

15:00:43    22   Q.   And once you got down to your offices and where are those

15:00:47    23   located?

15:00:48    24   A.   On Rutherford Lane now.

15:00:50    25   Q.   And once you got back to your offices off of Rutherford

| | | |
|---|---|---|
| 15:00:53 | 1 | Lane, what steps did you take to get him into an interview room? |
| 15:00:57 | 2 | A.    There were a couple of our officers that had actually |
| 15:01:01 | 3 | transported him.  I went before they did and a room was prepared. |
| 15:01:07 | 4 | We have designated interview rooms that are set up for videotape, |
| 15:01:12 | 5 | and so, that was done before they actually had arrived. |
| 15:01:18 | 6 | Q.    And once they arrived with Arthur Longoria, what did you do? |
| 15:01:22 | 7 | A.    I went into the interview room, along with another detective |
| 15:01:25 | 8 | who had advised that I was about to conduct an interview.  I |
| 15:01:29 | 9 | asked him to step in with me.  We usually have two detectives |
| 15:01:33 | 10 | that conduct interviews.  It's good to have two minds in place so |
| 15:01:38 | 11 | that one person misses something, the other one might be able to |
| 15:01:41 | 12 | catch it; or also, one can be taking notes while the other one is |
| 15:01:46 | 13 | actually engaged in conversation. |
| 15:01:47 | 14 | Q.    And in your training and experience, during the number of |
| 15:01:49 | 15 | years you've been with the Austin Police Department, have you |
| 15:01:51 | 16 | found that technique to be effective where one person actually |
| 15:01:54 | 17 | maintains eye contact and speaks with the subject, and the other |
| 15:01:57 | 18 | person makes notes about what needs to be talked about? |
| 15:01:59 | 19 | A.    Yes, ma'am. |
| 15:02:02 | 20 | Q.    And the detective who participated in the interview with |
| 15:02:09 | 21 | you, what is that detective's name? |
| 15:02:11 | 22 | A.    Detective Michael Masthia (phonetic). |
| 15:02:14 | 23 | Q.    And are you aware of where he is in relation to today and |
| 15:02:17 | 24 | tomorrow? |
| 15:02:17 | 25 | A.    Yes, ma'am.  He is currently on an approved vacation from |

15:02:22  1    our unit.  He is studying for a promotional exam that will take

15:02:25  2    place tomorrow morning.  So it's his last day to really hit the

15:02:29  3    books.

15:02:32  4    Q.    And once you took the defendant, Arthur Longoria, into the

15:02:35  5    interrogation room, the room that would be videotaped of his

15:02:39  6    discussion with you, were you present when he was read his

15:02:42  7    Miranda warnings?

15:02:43  8    A.    Yes, ma'am, I was.

15:02:44  9    Q.    Okay.  And prior to coming here today, did you review the CD

15:02:52  10   that contains the interrogation as it relates to where you were

15:02:56  11   present and Detective Masthia and Arthur Longoria?

15:02:59  12   A.    Yes, ma'am.

15:03:00  13   Q.    And was that on a device that's capable of accurately

15:03:04  14   recording the events that it's attempting to depict?

15:03:07  15   A.    Yes, ma'am.

15:03:08  16   Q.    And other than any alterations or deletions per the Court's

15:03:12  17   instructions, is it as it was on that day?

15:03:15  18   A.    Yes, ma'am.  Should be.

15:03:22  19   Q.    Can you take a moment and look at Government's Exhibit No. 2

15:03:25  20   and see if you recognize what that purports to be.

15:03:36  21   A.    This is --

15:03:39  22   Q.    Without going into detail, are you familiar with what that

15:03:41  23   document is?

15:03:41  24   A.    Yes, ma'am.

15:03:42  25   Q.    And is it in an accurate -- is it true and accurate as it

15:03:45  1  was on the day that it was presented?

15:03:46  2  A.    Yes, ma'am, it is.

15:03:47  3  Q.    All right.  And there's no alterations or deletions?

15:03:49  4  A.    No, ma'am.

15:03:50  5  Q.    Government's offering into evidence Government's Exhibit No.

15:03:54  6  2, tender to defense counsel for any objections.

15:03:57  7         MR. ORR:  No objection, your Honor.

15:03:58  8         THE COURT:  G-2 is admitted.

15:04:03  9  Q.    (BY MS. DOUGLAS) Detective, can you explain to the jury what

15:04:05  10  Government's Exhibit No. 2 is?

15:04:06  11  A.    Yes, ma'am.  Government's Exhibit No. 2 is the Miranda

15:04:12  12  warning card that was actually used to read the Miranda rights to

15:04:18  13  Mr. Longoria.  Was actually presented it to him to review, to

15:04:24  14  initial each of the individual rights, and was actually signed on

15:04:28  15  the back, indicating his waiver of his Miranda rights and

15:04:33  16  agreeing to speak with us, along with the signature of Detective

15:04:37  17  Masthia, verifying the fact that the Miranda warning had been

15:04:42  18  read to Mr. Longoria.

15:04:44  19  Q.    In Government's Exhibit No. 4, which is the CD that we've

15:04:50  20  referred to of the defendant, yourself, and the other detective,

15:04:54  21  this is a CD that you reviewed, prior to coming in to court to

15:04:57  22  testify?

15:05:01  23  A.    Yes, ma'am.

15:05:02  24  Q.    All right.  And other than what we've spoken about as far as

15:05:04  25  any alterations or deletions, this is a true and correct copy?

| | | |
|---|---|---|
| 15:05:07 | 1 | A.    Yes, ma'am. |
| 15:05:12 | 2 | Q.    Offering into evidence Government's Exhibit No. 4 that's |
| 15:05:14 | 3 | been previously tendered to defense counsel for any objection. |
| 15:05:18 | 4 | MR. ORR:  I guess my pretrial objection, your Honor. |
| 15:05:21 | 5 | THE COURT:  Okay.  That objection's overruled.  G-4 is |
| 15:05:24 | 6 | admitted. |
| 15:05:30 | 7 | Q.    (BY MS. DOUGLAS) Detective, do you see Arthur Longoria in |
| 15:05:33 | 8 | the courtroom today? |
| 15:05:34 | 9 | A.    Yes, ma'am, I do. |
| 15:05:36 | 10 | Q.    Okay.  Can you please describe an article of clothing that |
| 15:05:39 | 11 | he's wearing today? |
| 15:05:39 | 12 | A.    Yes, ma'am.  He's the gentleman that's sitting to your left, |
| 15:05:44 | 13 | at the table.  He's got a mustache and the open collar shirt, |
| 15:05:51 | 14 | button shirt with the green checks -- green and white checks. |
| 15:05:55 | 15 | Q.    May the record reflect he's identified the defendant, your |
| 15:05:58 | 16 | Honor? |
| 15:05:58 | 17 | THE COURT:  The record also should show that Mr. |
| 15:06:03 | 18 | Longoria's the only one without a coat and tie, sitting within |
| 15:06:08 | 19 | the chamber. |
| 15:06:10 | 20 | MS. DOUGLAS:  Your Honor, permission to publish the |
| 15:06:11 | 21 | videotape? |
| 15:06:12 | 22 | THE COURT:  You may. |
| 15:06:22 | 23 | (Video file played.) |
| 15:23:30 | 24 | Q.    (BY MS. DOUGLAS) And, Detective, except for as it relates to |
| 15:23:33 | 25 | any pending court hearings we have, did that contact happen with |

15:23:38   1   Arthur Longoria?

15:23:38   2   A.   That right there at the end or just -- as far as that

15:23:41   3   interview?

15:23:42   4   Q.   Yes, sir.

15:23:42   5   A.   Yes, ma'am.

15:23:43   6   Q.   All right.  And you've had no further contact with him

15:23:45   7   except as it relates to this case?

15:23:46   8   A.   That's correct.

15:23:47   9   Q.   Pass the witness, your Honor.

15:23:50  10                    CROSS-EXAMINATION

15:23:50  11   BY MR. ORR:

15:23:52  12   Q.   How are you doing, sir?

15:23:53  13   A.   All right, sir.  How about you?

15:23:54  14   Q.   Fine.  Good to see you.

15:23:56  15        Did you ever talk to Jonathan Lee?

15:23:59  16   A.   I was present when Detective Skolaut was talking to Jonathan

15:24:04  17   Lee.  I did not directly speak with Jonathan Lee.

15:24:07  18   Q.   Then you know what day -- this interview with Mr. Longoria

15:24:11  19   was May the?

15:24:14  20   A.   May the 2nd, sir.

15:24:16  21   Q.   May the 2nd.  Excuse me.

15:24:18  22   A.   Yes.

15:24:18  23   Q.   So Jonathan Lee was interviewed on March the 13th?

15:24:23  24   A.   I don't know exactly, sir.  I was there a second time, not

15:24:27  25   when Mr. Lee was interviewed.  I should correct that.  I was

15:24:30  1  there when the subpoena was served on him as far as appearing in

15:24:35  2  court.  That's what I'm referring to.

15:24:36  3  Q.  So he got to talk about -- did you and Detective Skolaut

15:24:40  4  talk about -- to him about his testimony at that time?

15:24:42  5  A.  The only thing Detective Skolaut was telling him was that he

15:24:45  6  just needed to know that he needed to appear in court to tell the

15:24:48  7  truth.

15:24:49  8  Q.  Okay.  Do you know whether or not -- okay.  So you weren't

15:24:53  9  present.  You don't know anything about the conversation

15:24:55  10  Detective Skolaut would have had with Mr. Lee?

15:24:56  11  A.  No, sir.

15:24:57  12  Q.  Or when it was?

15:24:58  13  A.  No, sir, that I don't.  I should correct that.  That was my

15:25:04  14  bet.

15:25:04  15  Q.  I pass the witness.  Thank you, sir.

15:25:06  16      MS. DOUGLAS:  Nothing further of this witness.  May he

15:25:08  17  be released, your Honor?

15:25:10  18      MR. ORR:  Certainly, your Honor.

15:25:12  19      THE COURT:  You may be excused.

15:25:14  20      THE WITNESS:  Thank you, sir.  Appreciate it.

15:25:20  21      MR. SPARKS:  Call David Berryhill, your Honor.

15:25:58  22      (Witness sworn.)

15:26:17  23      THE COURT:  State your full name, please, sir, and

15:26:26  24  spell your last.

15:26:26  25      THE WITNESS:  My name is David Berryhill.  It's

15:26:30   1   B-E-R-R-Y-H-I-L-L.

15:26:33   2         DAVID BERRYHILL, called by the Government, duly sworn.

15:26:33   3                   DIRECT EXAMINATION

15:26:33   4   BY MR. SPARKS:

15:26:35   5   Q.   And, Officer Berryhill, where are you employed?

15:26:37   6   A.   I work for the Austin Police Department Crime Lab in the

15:26:41   7   Firearms and Tool Mark Unit.

15:26:43   8   Q.   And what are your duties and responsibilities in that unit?

15:26:48   9   A.   My duties are to perform examinations of firearms evidence,

15:26:54   10   test-fire firearms, enter the fired cartridge cases in the NIBIN

15:27:01   11   database, which is a national database of firearms evidence.   In

15:27:06   12   addition, I also do fingerprint and DNA processing of firearms

15:27:12   13   evidence.

15:27:12   14   Q.   Okay.   In terms of a title, you're not just a firearms guy.

15:27:17   15   Do you have a title within the police department?

15:27:19   16   A.   Yes.   It's IBIS NIBIN technician.

15:27:22   17   Q.   IBIS NIBIN technician.   A couple of acronyms.   What does

15:27:26   18   IBIS stand for?

15:27:26   19   A.   Integrated Ballistic Identification System.   NIBIN is the

15:27:32   20   National Integrated Ballistic Information Network.   Those are the

15:27:42   21   -- that is the database that is different crime labs around the

15:27:48   22   country have specialized computer workstations where they can

15:27:53   23   take digital images of bullets and fired cartridge casings.   That

15:27:59   24   workstation is called IBIS, the computer workstation itself.

15:28:03   25   Those images go into a national database, which is called NIBIN,

15:28:08    1    the database.  So they're all interconnected, and the terms

15:28:11    2    "IBIS" and "NIBIN" are sometimes used interchangeably.

15:28:14    3    Essentially it's a national evidence database where they can --

15:28:22    4    the firearms evidence can possibly link to other cartridge cases

15:28:30    5    and both -- in evidence, both locally and around the country.

15:28:34    6    Q.    Okay.  Officer, you used each of these systems, IBIS and

15:28:37    7    NIBIN, within the regular course of your duties and

15:28:41    8    responsibilities within the Austin Police Department?

15:28:41    9    A.    That's correct.

15:28:42   10    Q.    That's why they've integrated IBIS specialist in your title?

15:28:45   11    A.    Correct.

15:28:45   12    Q.    Now, have you attended specialized training or coursework

15:28:49   13    related to the origin or, let me ask you, to the functionality of

15:28:53   14    firearms?

15:28:53   15    A.    Yes, I have.

15:28:54   16    Q.    On few or many occasions?

15:28:56   17    A.    Many occasions.

15:28:56   18    Q.    And would you say more than five?

15:28:59   19    A.    Yes.

15:29:00   20    Q.    More than --

15:29:02   21    A.    More than 20 plus a one-year, full-time program where I

15:29:07   22    actually earned a degree in gunsmithing.

15:29:09   23    Q.    Okay.  And let me -- I'm going to ask you about that.  Can

15:29:13   24    you tell us or tell the jury the difference between gunsmithing,

15:29:18   25    if there is one -- and I noticed on your CV or your resume that

15:29:25  1  you attended a number of armorers school or courses.  Is there a

15:29:30  2  difference between gunsmithing and an armorer school?

15:29:33  3  A.    Sometimes an armorer and a gunsmith are used

15:29:39  4  interchangeably.  Generally gunsmithing is a little bit more

15:29:41  5  advanced repairs, where an armorer, a lot of times, will just

15:29:47  6  replace broken parts.  But the core concepts of understanding the

15:29:53  7  design and function of the firearm, diagnosing a problem,

15:29:57  8  repairing the problem are generally the same.  It's just how

15:30:00  9  advanced the repairs you learn to do.

15:30:04  10  Q.    Okay.  So, for example, if there were an armor school for a

15:30:09  11  Glock, or a Sig Sauer pistol, or a Beretta, or some other

15:30:13  12  firearm, that would include the checking, diagnosing the firearm

15:30:19  13  and then, actually repairing the firearm, if your diagnosis led

15:30:24  14  you to believe it might need some repair?

15:30:25  15  A.    Yes.  You would learn the design of the firearm, how it's

15:30:29  16  supposed to function when it's working properly.  You generally

15:30:34  17  learn how to completely disassemble it, replace all the parts,

15:30:39  18  diagnose common problems, repair those problems and wind up with

15:30:43  19  a working, functioning firearm again.

15:30:45  20  Q.    And where have you received your formal education, both

15:30:48  21  undergraduate and any other degree programs?

15:30:51  22  A.    I earned a degree, a bachelor's degree in business from USC,

15:30:57  23  University of Southern California, in 1982 and, also, a Associate

15:31:03  24  of Science Degree in Gunsmithing from Yavapai College in Arizona

15:31:08  25  in 1998.

15:31:09  1    Q.    Okay.  And then, that course in gunsmithing, is that

15:31:13  2    something where you're physically at that institution?

15:31:17  3    A.    Yes.

15:31:18  4    Q.    Okay.

15:31:18  5    A.    That was a full-time, one-year program, eight hours a day

15:31:23  6    plus.

15:31:26  7    Q.    Okay.  Backing up, so your duties within the Firearms and

15:31:31  8    Tool Mark Section within APD, that involves the investigation and

15:31:35  9    supervision of firearms-related crimes?

15:31:39  10   A.    Yes.

15:31:39  11   Q.    Prior to your employment with APD, were you employed with

15:31:43  12   law enforcement agencies, and if so, did you work closely with

15:31:46  13   firearms in any of those capacities?

15:31:49  14   A.    Yes, I have in several agencies.  I've worked in the city of

15:31:57  15   -- or in the Los Angeles area for a couple of different police

15:32:01  16   agencies.  In addition to my duties as a patrol officer, training

15:32:07  17   officer, some vice and gang enforcement, I was also a member of

15:32:11  18   the SWAT team.  I was one of the firearms instructors and one of

15:32:15  19   the department armorers.  One of my job was to inspect, repair

15:32:19  20   and maintain some of the department firearms.

15:32:22  21   Q.    Now fast-forward.  Can you tell the jury what a firearm is,

15:32:25  22   please?

15:32:26  23   A.    A firearm is any weapon that will or is designed to, or can

15:32:32  24   be readily converted to expel a projectile by means of an

15:32:37  25   explosive.

15:32:40  1    Q.   Showing you now, Officer, what's been admitted as

15:32:48  2    Government's Exhibit No. 6.  Do you recognize Government's

15:32:55  3    Exhibit No. 6?  If you need to handle it, you can.

15:33:03  4    A.   Yes, I recognize that.

15:33:05  5    Q.   Okay.  And is Government's Exhibit No. 6 -- did you conduct

15:33:10  6    an examination of Government's Exhibit 6 on March the 28th of

15:33:16  7    2008?

15:33:17  8    A.   Yes, I did.

15:33:18  9         THE COURT:  Counsel, are you tendering this witness as

15:33:21  10   an expert?

15:33:22  11        MR. SPARKS:  I would like to tender this witness as an

15:33:23  12   expert at this time, your Honor.

15:33:24  13        THE COURT:  Do you have any voir dire questions?

15:33:27  14        MR. ORR:  No, your Honor.  Thank you.

15:33:29  15        THE COURT:  Ladies and gentlemen of the jury, the

15:33:33  16   witness has been qualified as an expert.  That means in federal

15:33:37  17   court that the witness may give opinions.  Non-experts, people

15:33:41  18   who have not received specialized education, training, or

15:33:45  19   experienced in areas, are not allowed to give opinions such as

15:33:49  20   probably you and me.  But the federal laws of evidence say that a

15:33:55  21   specialized person who has the appropriate education, experience

15:34:04  22   can give opinions.  You are to evaluate this witness as any

15:34:08  23   other.

15:34:11  24        MR. SPARKS:  Thank you, your Honor.

15:34:12  25   Q.   (BY MR. SPARKS) Officer Berryhill, what did your examination

15:34:17  1   consist of and what was its purpose related, obviously, to

15:34:21  2   Government's Exhibit No. 6?

15:34:23  3   A.   My examination consisted of a thorough visual examination

15:34:30  4   noting the design and safety features, the various parts of the

15:34:37  5   firearm.  It included test-firing it four times, and when I was

15:34:45  6   completed -- when I completed my test-firing, then I also input

15:34:49  7   the cartridge cases that -- from my test-firing into the NIBIN

15:34:55  8   database that I explained earlier.

15:34:58  9   Q.   Okay.  And when you -- I was looking at my notes.  But when

15:35:04  10  you test-fire that, do you use laboratory ammunition, or how does

15:35:08  11  that work?

15:35:09  12  A.   Yes.  In this case, I used four rounds of our laboratory

15:35:13  13  ammunition and used the firearm and the magazine that was

15:35:18  14  included with the firearm evidence.

15:35:20  15  Q.   And did the -- did Government's 6 -- did it function

15:35:25  16  normally during the test?

15:35:25  17  A.   Yes, it did function normally.

15:35:27  18  Q.   Do you have an opinion as to whether or not Government's

15:35:29  19  Exhibit No. 6 is, in fact, a firearm?

15:35:33  20  A.   Yes.  By both my visual examination and my test-fire, both

15:35:40  21  led me to the conclusion that it was a firearm.

15:35:45  22  Q.   I'm, again, handing you back Government's No. 6.  Did you --

15:35:49  23  as part of your examination, did you confirm what type -- what

15:35:57  24  make and model the Government's 6 was?

15:35:59  25  A.   Yes, I did.

```
15:36:00   1   Q.   And what is Government's 6?
15:36:04   2   A.   It is a Hi-Point, Model CF380.  It's a .380 auto caliber,
15:36:12   3   semiauto pistol.
15:36:13   4   Q.   Okay.  Is there a serial number on Government's Exhibit No.
15:36:17   5   6?
15:36:17   6   A.   Yes, there is.  It is P870065.
15:36:24   7   Q.   And then, did you also process this exam -- or process and
15:36:31   8   examine this firearm for fingerprints?
15:36:33   9   A.   Yes, I did.
15:36:34  10   Q.   Were you able to pull any latent fingerprints off the
15:36:37  11   firearm?
15:36:38  12   A.   No, I was not able to recover any latent prints.
15:36:41  13   Q.   Okay.  As part of your duties and responsibilities within
15:36:45  14   the Firearms and Tool Mark Section, is it one of your duties to
15:36:51  15   try to recover latent prints from firearms?
15:36:57  16   A.   On occasion, yes.
15:37:01  17   Q.   In your experience, is it common or uncommon to be able to
15:37:05  18   pull fingerprints from firearms?
15:37:07  19   A.   It's fairly uncommon to find fingerprints.  Generally
15:37:13  20   firearms have textured grips and painted surfaces and things that
15:37:19  21   are designed to enhance your grip so that you can hold onto the
15:37:23  22   firearm better, and these types of services often don't lend
15:37:28  23   themselves towards good services to find fingerprints on.
15:37:33  24   Q.   And what did you do to test Government's 6 to see if you
15:37:38  25   could pull off a latent print?
```

15:37:40  1  A.    Well, we have a standard protocol that we follow on

15:37:46  2  nonporous evidence, and that's the protocol that I followed, if

15:37:52  3  you'd like me to explain it.

15:37:53  4  Q.    If you could do it and in as much a layman's term as

15:37:58  5  possible, just summarize what you did to test the firearm.

15:38:02  6  A.    Sure.  First, I examine it under a bright visible light to

15:38:05  7  see if there were any visible prints that could be photographed

15:38:09  8  or recovered, and I did not find any.  Then I used what is called

15:38:16  9  a forensic light source, which is a fancy name for a colored

15:38:20 10  light, which allows you to change the color of the frequency of

15:38:24 11  the light.  Sometimes sweat, oil, other substances will glow

15:38:32 12  under other color or frequency of lights not necessarily visible

15:38:37 13  under white light.  And I did not find any fingerprints.

15:38:43 14        The next step was cyanoacrylate ester fuming, or it's

15:38:50 15  sometimes called superglue fuming.  It's a process where a

15:38:54 16  chemical that is used in making a superglue is placed in a tank,

15:39:01 17  and it fumes or smokes, fills the tank, and it actually coats

15:39:07 18  with a light white coating.  And it really likes moisture and

15:39:14 19  skin oils, and things like that, and a lot of times, it will

15:39:17 20  attach itself to those skin oils and make those invisible

15:39:22 21  fingerprints visible.  And I did not find any after that process.

15:39:30 22        Next step is to use a color dye that you squirt on it

15:39:35 23  that essentially takes this white or gray residue from the

15:39:40 24  cyanoacrylate fuming, and it dyes it a bright orange or other

15:39:45 25  color.  When you look at this under the forensic light source or

| | | |
|---|---|---|
| 15:39:50 | 1 | the colored light source, it will -- the particles that have been |
| 15:39:56 | 2 | dyed will glow or fluoresce under the lights to help you see them |
| 15:40:02 | 3 | better, and I did not find any at that point. |
| 15:40:05 | 4 | The last step was just using common black fingerprint |
| 15:40:11 | 5 | powder, which I processed it with, and did not find any visible |
| 15:40:15 | 6 | prints after that process. |
| 15:40:16 | 7 | Q.   Okay.  Just to be clear, not only did you not find any |
| 15:40:19 | 8 | prints of the defendant, Arthur Longoria, you didn't find |
| 15:40:25 | 9 | anyone's, any person's usable prints, or animals, or any sort of |
| 15:40:30 | 10 | prints that are fingerprints? |
| 15:40:31 | 11 | A.   That's correct.  I didn't find any ridge or fingerprint |
| 15:40:34 | 12 | detail at all. |
| 15:40:35 | 13 | Q.   Pass the witness, your Honor. |
| 15:40:39 | 14 | CROSS-EXAMINATION |
| 15:40:39 | 15 | BY MR. ORR: |
| 15:40:40 | 16 | Q.   How are you? |
| 15:40:40 | 17 | A.   Good morning.  Good afternoon. |
| 15:40:44 | 18 | Q.   Well, whatever it is. |
| 15:40:45 | 19 | And did you find -- you didn't find any fingerprints of |
| 15:40:48 | 20 | any kind on the .380, correct? |
| 15:40:51 | 21 | A.   No, sir. |
| 15:40:51 | 22 | Q.   Did you fingerprint any shotguns in this case? |
| 15:40:55 | 23 | A.   Yes, I did. |
| 15:40:56 | 24 | Q.   No fingerprints.  You just didn't find anything? |
| 15:40:58 | 25 | A.   That's correct. |

15:40:58   1   Q.   Of anybody?

15:40:59   2   A.   That's correct.

15:41:00   3   Q.   And that's, again, sometimes you find prints on guns and

15:41:03   4   frequently you don't.

15:41:04   5   A.   Yes.  That's correct.

15:41:04   6   Q.   And it is possible, however, in some instances, to recover

15:41:08   7   DNA from firearms, is it not, sir?

15:41:10   8   A.   Yes.

15:41:11   9   Q.   And that's -- was any DNA testing done in these -- on the

15:41:16   10   .380 or anything?

15:41:18   11   A.   I don't believe so.

15:41:20   12   Q.   Okay.

15:41:20   13   A.   I did not process it for DNA.

15:41:22   14   Q.   That's something that somebody has to ask to be done and

15:41:25   15   there is -- in the APD DNA lab, correct?

15:41:28   16   A.   Yes.  That's correct.

15:41:30   17   Q.   Okay.  Pass the witness.  Thank you.

15:41:32   18        MR. SPARKS:  Nothing further, your Honor.  May this

15:41:35   19   witness be excused?

15:41:35   20        THE COURT:  May this witness be excused, Mr. Orr?

15:41:38   21        MR. ORR:  Yes, sir.

15:41:39   22        THE COURT:  You may be excused.  You may call your next

15:42:03   23   witness.

15:42:04   24        MR. SPARKS:  Thank you, your Honor.  Call Detective

15:42:27   25   Doug Skolaut, your Honor.

| | | |
|---|---|---|
| 15:42:40 | 1 | (Witness sworn.) |
| 15:42:56 | 2 | THE COURT:  If you'll tell us, please, sir, your full |
| 15:42:59 | 3 | name and spell your last. |
| 15:43:00 | 4 | THE WITNESS:  My name is Douglas Allen Skolaut, |
| 15:43:05 | 5 | S-K-O-L-A-U-T. |
| 15:43:06 | 6 | DOUGLAS A. SKOLAUT, called by the Government, duly sworn. |
| 15:43:06 | 7 | DIRECT EXAMINATION |
| 15:43:06 | 8 | BY MR. SPARKS: |
| 15:43:08 | 9 | Q.   Thank you, your Honor. |
| 15:43:09 | 10 | And how are you employed, Detective Skolaut? |
| 15:43:12 | 11 | A.   I'm a detective with the Austin Police Department. |
| 15:43:14 | 12 | Q.   And what are your current duties and responsibilities within |
| 15:43:18 | 13 | the Austin Police Department? |
| 15:43:20 | 14 | A.   I am currently assigned to the Firearms Review Unit. |
| 15:43:23 | 15 | Q.   Okay.  Do you liaison with the United States Attorney's |
| 15:43:27 | 16 | Office here in the Western District of Texas? |
| 15:43:28 | 17 | A.   Yes, sir. |
| 15:43:31 | 18 | Q.   Do you refer cases for federal prosecution from the Austin |
| 15:43:37 | 19 | Police Department? |
| 15:43:37 | 20 | A.   Yes, sir. |
| 15:43:38 | 21 | Q.   How long have you been with the Austin Police Department? |
| 15:43:40 | 22 | A.   Twenty-one years. |
| 15:43:41 | 23 | Q.   And can you explain to the jury how you came to be familiar |
| 15:43:48 | 24 | with Arthur Longoria? |
| 15:43:50 | 25 | A.   I received this case -- I'd actually worked in a different |

15:43:54   1    unit, and I got assigned to the Organized Crime Unit, Firearms

15:43:59   2    Unit.  When I came to the unit, I received cases from the

15:44:03   3    detective that had that position that I was taking, and this was

15:44:07   4    one of the cases that I picked up from him.

15:44:09   5    Q.   Okay.  Once you receive a firearms case, do you do any

15:44:12   6    checking to try to determine who the original purchaser of the

15:44:17   7    firearm at issue was?

15:44:20   8    A.   That is what we do.  Yes.

15:44:21   9    Q.   Okay.  At this time I'll offer Government's Exhibit No. 5 as

15:44:33  10    a public record under 803(8), your Honor.

15:45:03  11         MR. ORR:  No objection, your Honor.

15:45:04  12         THE COURT:  All right.  G-5 is admitted.

15:45:07  13    Q.   (BY MR. SPARKS) After you ran a check to try to determine

15:45:12  14    who the original purchaser of the firearm was, did you have a

15:45:15  15    conversation with Jonathan David Lee?

15:45:18  16    A.   I did.

15:45:18  17    Q.   And when and where did you speak with Jonathan David Lee?

15:45:23  18    A.   It was actually on Thursday, March the 13th of 2008.  He was

15:45:29  19    working at a Shell oil change place at Bilbrook and Slaughter.

15:45:34  20    Q.   When you met with him, did you show him a -- did you show

15:45:38  21    him a group of photographs related to this case?

15:45:41  22    A.   I had prepared a photo lineup with Mr. Longoria in the photo

15:45:45  23    lineup, and yes, I did.

15:45:46  24    Q.   And can you tell the jury how you go about preparing a photo

15:45:51  25    lineup?

15:45:52  1  A.   We go into our identification section, there's actually a

15:45:56  2  spot where we have booking photos, and you put in age range,

15:46:05  3  certain descriptors, because you want people that are similar in

15:46:09  4  size and some features as your suspect.  And you basically pull

15:46:16  5  up anywhere from 300 to up to a thousand different photos, and

15:46:21  6  you'll place the suspect's photo in one of the picture frames,

15:46:27  7  and then, you basically scroll through and try to get other

15:46:30  8  photos that are similar with the similar features to your

15:46:35  9  suspect.  And then, you place him and the other five picture

15:46:38  10  frames.

15:46:39  11  Q.   Okay.  And so, what features -- when you're preparing this

15:46:42  12  photo lineup related to this case, what features did you try to

15:46:48  13  use to create that?

15:46:49  14  A.   We were looking for Hispanic males of his age range with the

15:46:55  15  mustache.  That's what we used in this one.

15:46:59  16  Q.   Okay.  Prior to showing this photo lineup to Jonathan David

15:47:05  17  Lee, did you tell him anything about it, or how you created it,

15:47:09  18  or anything of that nature?

15:47:10  19  A.   No, sir.

15:47:11  20  Q.   Okay.  Had he seen any of the photos before?

15:47:15  21  A.   No, sir.  I'd never met Jonathan Lee until that day.

15:47:20  22  Q.   Did at any time -- did you ever suggest to Jonathan David

15:47:24  23  Lee which photo he should pick of the six you said?

15:47:29  24  A.   No, sir.  I did not.

15:47:33  25  Q.   Did Jonathan David Lee recognize the person -- did he

| | | |
|---|---|---|
| 15:47:37 | 1 | indicate someone that he recognized on the photo lineup? |
| 15:47:39 | 2 | A.   He did. |
| 15:47:40 | 3 | Q.   And did he verbalize this to you?  Did he tell you this? |
| 15:47:43 | 4 | A.   He pointed to the slot No. 5 and indicated that was the |
| 15:47:47 | 5 | person he knew as Art. |
| 15:47:49 | 6 | Q.   Is the person -- is that the same person that's -- |
| 15:47:54 | 7 | A.   The person in the picture frame No. 5 on the photo lineup is |
| 15:47:58 | 8 | Arthur Longoria. |
| 15:47:59 | 9 | Q.   Okay.  Is that person in the courtroom today? |
| 15:48:03 | 10 | A.   Yes, sir. |
| 15:48:03 | 11 | Q.   Sort of begs the obvious, but it's a question that I have to |
| 15:48:05 | 12 | ask. |
| 15:48:06 | 13 | A.   Yes, sir. |
| 15:48:07 | 14 | Q.   And just for record purposes, can you identify what he's |
| 15:48:11 | 15 | wearing? |
| 15:48:11 | 16 | A.   Gentleman with the open collar shirt, green in color. |
| 15:48:14 | 17 | Q.   No jacket? |
| 15:48:15 | 18 | A.   No jacket. |
| 15:48:16 | 19 | Q.   Your Honor, may the record reflect that the witness |
| 15:48:20 | 20 | identified the defendant? |
| 15:48:21 | 21 | THE COURT:  So does. |
| 15:48:22 | 22 | Q.   (BY MR. SPARKS) Show you what's been marked now, Detective |
| 15:48:26 | 23 | Skolaut, as Government's Exhibit No. 3. |
| 15:48:43 | 24 | MR. ORR:  No objection. |
| 15:48:59 | 25 | Q.   (BY MR. SPARKS) Do you recognize Government's Exhibit No. 3? |

15:49:02    1    A.    Yes, sir.    This is photo lineup that I prepared and showed

15:49:06    2    to witness Jonathan Lee.

15:49:08    3    Q.    Okay.    Do you recognized each of the six photographs that

15:49:12    4    are -- that are depicted on Government's Exhibit No. 3?

15:49:18    5    A.    These are the ones that I picked for the photo lineup, yes.

15:49:21    6    Q.    They're in the same condition as when you showed them to

15:49:23    7    Jonathan David Lee?

15:49:24    8    A.    Yes, sir.

15:49:29    9    Q.    Did Jonathan David Lee indicate in writing or did you

15:49:35    10    indicate on writing anywhere after he selected the person that --

15:49:40    11    tell us what Jonathan David Lee did.

15:49:43    12    A.    What I did is --

15:49:45    13    Q.    Or what Jonathan David Lee did.

15:49:47    14    A.    What he did was he actually pointed to No. 5 and identified

15:49:51    15    that as the person as Art.    He then initialed directly underneath

15:49:58    16    that photo, and then, he put the date that he was shown this

15:50:01    17    photo.

15:50:02    18    Q.    Okay.    And then, just tell the jury what specific questions

15:50:05    19    you asked Jonathan David Lee.

15:50:09    20    A.    About the photo lineup or about --

15:50:13    21    Q.    About the case in general.

15:50:14    22    A.    The case in general.

15:50:15    23    Q.    Just tell them what you asked.

15:50:16    24    A.    I had to ask him basically to tell me -- I told him I was

15:50:21    25    there to talk about the guns that he had purchased from the Loves

15:50:28  1  Gun Company.  I asked him basically to tell any -- had he bought

15:50:32  2  the guns, if he had, what kind they were, which he did.  He

15:50:36  3  couldn't remember the serial numbers or the exact date that he

15:50:39  4  bought them.  But he described the weapons.  And then, I asked

15:50:44  5  him what he had done with the weapons.  He'd indicated that he

15:50:48  6  had sold them to a person by the name of Art and that he had sold

15:50:52  7  them for $200.  He was short on rent money, and that's the reason

15:50:57  8  that he sold the guns to him.

15:50:59  9  Q.    Offer Government's Exhibit No. 3 at this time, your Honor.

15:51:11  10  Did I not offer this?

15:51:12  11        THE COURT:  You haven't offered it, but he had no

15:51:14  12  objection.  Three is in.

15:51:16  13        MR. ORR:  I'm sorry.

15:51:28  14  Q.    (BY MR. SPARKS) Detective Skolaut, I'm showing you on the

15:51:31  15  overhead projector Government's Exhibit No. 3.  Can you describe

15:51:34  16  to the jury which photo of the six that appear on Government's 3

15:51:38  17  that Jonathan David Lee indicated to you when you met with him?

15:51:42  18  A.    No. 5, the bottom center.

15:51:44  19  Q.    Okay.  And it's dated?

15:51:47  20  A.    That was his initial and then, he put the date, also.

15:51:50  21  Q.    He put that date on there?

15:51:51  22  A.    He did.

15:51:51  23  Q.    Pass the witness, your Honor.

15:52:00  24                    CROSS-EXAMINATION

15:52:00  25  BY MR. ORR:

15:52:07  1   Q.   So how many times have you talked to Jonathan David Lee?

15:52:11  2   A.   The date I showed the photo lineup and then, the date that

15:52:16  3   we served him the subpoena.

15:52:17  4   Q.   That's the two times?

15:52:19  5   A.   Yes, sir.

15:52:20  6   Q.   And in your report, is it not correct that on the date you

15:52:23  7   showed him the lineup, he did say the words we were talking about

15:52:29  8   this morning that the firearms were purchased for Loretta,

15:52:35  9   correct?

15:52:35  10  A.   He indicated he thought the .380 Hi-Point pistol was for his

15:52:43  11  wife, and that's her, Loretta, he told me.

15:52:46  12  Q.   And when you went to this service place, you had in there

15:52:49  13  these photographs, including the picture of Arthur Longoria,

15:52:55  14  correct?

15:52:55  15  A.   That's correct.

15:52:56  16  Q.   Did you have any other stacks of photographs with you?

15:52:59  17  A.   No, sir.  Just those.

15:53:01  18  Q.   Okay.  So this is the first time you're talking to Mr. Lee,

15:53:08  19  correct?

15:53:09  20  A.   That's correct.  I spoke to him briefly on the phone, make

15:53:12  21  sure he was going to be there.  But yes, that was first time.

15:53:16  22  Q.   What did he tell you on the phone?  What did y'all talk

15:53:18  23  about on the telephone, anything?

15:53:19  24  A.   I indicated who I was, detective with the Austin Police

15:53:23  25  Department.  I told him that I was assigned to work a firearms

| | | |
|---|---|---|
| 15:53:26 | 1 | case and that I had a photo lineup that I wanted to show him. |
| 15:53:30 | 2 | Q.   Okay.  And so, you didn't mention any names, or anything |
| 15:53:34 | 3 | like that, on that phone call? |
| 15:53:35 | 4 | A.   No, sir.  I did not. |
| 15:53:36 | 5 | Q.   So he wouldn't -- and he wouldn't necessarily know what |
| 15:53:42 | 6 | firearms case you were talking about, would he? |
| 15:53:46 | 7 | A.   I didn't indicate what firearms case I was talking about.  I |
| 15:53:48 | 8 | told him I was working a firearms case. |
| 15:53:50 | 9 | Q.   Okay.  Well, and you heard some -- the testimony from him |
| 15:53:54 | 10 | that he admits to buying and selling seven to eight firearms, |
| 15:53:59 | 11 | correct? |
| 15:53:59 | 12 | A.   That was his testimony this morning, yes. |
| 15:54:02 | 13 | Q.   Well, let me ask you this:  When these firearms traces -- |
| 15:54:05 | 14 | can you put in the name of the individual or, say, can you put in |
| 15:54:08 | 15 | a name of a person, then run a search and see how many firearms |
| 15:54:12 | 16 | they bought in the last two years? |
| 15:54:16 | 17 | A.   I don't know if you can do it with just the name.  That |
| 15:54:19 | 18 | would be something ATF could answer.  We do it through eTrace, |
| 15:54:23 | 19 | which is a system that's provided to the police department |
| 15:54:26 | 20 | through ATF.  I've never done one by the name.  Basically those |
| 15:54:32 | 21 | things are as good as the information you could put in there. |
| 15:54:36 | 22 | What they really try to search is the serial numbers on the |
| 15:54:39 | 23 | firearms and only for firearms were it sold through a licensed |
| 15:54:45 | 24 | dealer. |
| 15:54:46 | 25 | Q.   Okay.  So basically you didn't know -- you don't know if you |

15:54:52  1  can do this, but you certainly didn't do any kind of trace to see

15:54:54  2  how many firearms, in fact, Mr. Lee has purchased?

15:54:58  3  A.    No, sir.  It was strictly for Mr. Longoria.

15:55:02  4  Q.    Okay.  So in other words, when you went to see Mr. Lee, you

15:55:11  5  already had a -- these shots and these individuals, including Mr.

15:55:20  6  Longoria, and you were already wanting to see what you could find

15:55:28  7  out about Mr. Longoria about buying a pistol, correct?

15:55:32  8  A.    That's what this case was about.  Yes, sir.

15:55:34  9  Q.    Okay.  All right.  Now, so you didn't -- you had already --

15:55:38  10  the time you're talking to Mr. Lee, you're focused on Mr.

15:55:41  11  Longoria?

15:55:41  12  A.    Yes, sir.

15:55:46  13  Q.    And so, you've got these people and you found an old picture

15:55:53  14  of Mr. Longoria, and you mix it in with some other people, some

15:55:56  15  of whom, I suppose, looked at -- they're Hispanic males with

15:56:00  16  mustaches, correct?

15:56:01  17  A.    Yes, sir.

15:56:02  18  Q.    And then, you called -- because you had a firearms trace

15:56:05  19  showing this pistol was sold to Mr. Lee, you went out and found

15:56:11  20  Mr. Lee, and he says, yeah, I know this guy and that's who I sold

15:56:13  21  the pistol to, correct?

15:56:14  22  A.    He said he knew a person by the name of Art, yes, sir.

15:56:17  23  Q.    Then he brought up the name of Loretta Garcia or Loretta?

15:56:22  24  A.    He said that he believed her name was Loretta.

15:56:25  25  Q.    Okay.  Did Mr. Lee appear to be nervous?

| | | |
|---|---|---|
| 15:56:32 | 1 | A.    I don't recall him being extremely nervous, no. |
| 15:56:37 | 2 | Q.    Was he extremely calm? |
| 15:56:40 | 3 | A.    We spoke.  There's a recording of our conversation.  He |
| 15:56:45 | 4 | didn't -- his voice didn't tremble.  He wasn't scared. |
| 15:56:48 | 5 | Q.    Okay.  Now, there's a -- do you know the difference between |
| 15:56:56 | 6 | a .410 shotgun and a 12-gauge shotgun? |
| 15:56:58 | 7 | A.    Yes, sir.  I do. |
| 15:56:59 | 8 | Q.    And over here, without me messing with it, there's a |
| 15:57:04 | 9 | 12-gauge shotgun over there, right? |
| 15:57:05 | 10 | A.    Yes, sir, there is. |
| 15:57:06 | 11 | Q.    And did Mr. Lee kind of indicate to you that the shotgun |
| 15:57:09 | 12 | that he had purchased and allegedly sold to Mr. Longoria was a |
| 15:57:14 | 13 | .410 shotgun? |
| 15:57:14 | 14 | A.    He told me it was a .410 shotgun.  Yes, sir. |
| 15:57:17 | 15 | Q.    And furthermore, he told you it was a break-apart, |
| 15:57:20 | 16 | single-shot, .410 shotgun, did he not? |
| 15:57:22 | 17 | A.    I believe, actually, what he said was a single-shot, which |
| 15:57:25 | 18 | more than likely was either a bolt action or break open. |
| 15:57:27 | 19 | Q.    Well, I'd suggest if you'd listen to your tape again, you'll |
| 15:57:30 | 20 | find that he says crack open. |
| 15:57:32 | 21 | A.    He may have. |
| 15:57:33 | 22 | Q.    Yeah.  And -- but anyway, in any event, a single-shot? |
| 15:57:37 | 23 | A.    Okay. |
| 15:57:37 | 24 | Q.    Certainly not a 12-gauge pump, correct, sir? |
| 15:57:40 | 25 | A.    He didn't mention a 12-gauge pump.  No. |

15:57:42  1  Q.  Okay.  Now, you've watched this -- the video interview of

15:57:50  2  Mr. Longoria, along with the rest of us, have you not, sir?

15:57:52  3  A.  I did.

15:57:53  4  Q.  And on -- on there, Officer -- or, excuse me, Detective

15:57:58  5  Balderama asked him about the shotgun, correct?

15:58:01  6  A.  Yes, sir.

15:58:02  7  Q.  And never identifies it as a .410 or 12-gauge, or a what,

15:58:06  8  does it?

15:58:07  9  A.  Not that I recall.  No, sir.

15:58:08  10  Q.  So you would agree with me that there is some sort of

15:58:11  11  discrepancy here between this .410 as to what Mr. Lee says he

15:58:17  12  sold and this 12-gauge that's found about which Mr. Longoria

15:58:23  13  either never asked or if he was asked, it's not very clear?

15:58:27  14          MR. SPARKS:  Your Honor, I believe that calls for

15:58:28  15  speculation or providing a legal conclusion, one of the two.

15:58:34  16          THE COURT:  Rephrase your question.

15:58:36  17          MR. ORR:  I guess it was too long.  Sure.

15:58:38  18  Q.  (BY MR. ORR) Okay.  So basically -- well, let me just kind

15:58:43  19  of change the topic a little bit.  Might be better.

15:58:45  20          So this 12-gauge here is nothing that was like what was

15:58:50  21  identified by Mr. Lee, correct?

15:58:52  22  A.  Correct.

15:58:53  23  Q.  And on the video, nobody even asked, well, it's not clear --

15:58:58  24  would you agree with me or disagree with me that it's not clear

15:59:00  25  on the video interview of Mr. Longoria what shotgun we're talking

| | | |
|--|--|--|
| 15:59:07 | 1 | about? |
| 15:59:07 | 2 | A.   I don't recall them describing what kind of -- no, I don't. |
| 15:59:12 | 3 | Q.   Well, they talk about a shotgun -- |
| 15:59:14 | 4 | A.   They talk about a shotgun, yes. |
| 15:59:16 | 5 | Q.   They sort of talk about a Jonathan Lee shotgun, if I could |
| 15:59:19 | 6 | phrase it like that, correct? |
| 15:59:21 | 7 | A.   I don't recall him saying exactly the word "shotgun" came |
| 15:59:28 | 8 | from. |
| 15:59:28 | 9 | Q.   Okay.  Well, they certainly don't describe it as 12-gauge or |
| 15:59:37 | 10 | a .410? |
| 15:59:38 | 11 | A.   I don't recall hearing that on the interview.  No. |
| 15:59:40 | 12 | Q.   Okay.  I pass the witness.  Thank you, sir. |
| 15:59:43 | 13 | A.   Yes, sir. |
| 15:59:46 | 14 | MR. SPARKS:  No further witnesses -- no further |
| 15:59:50 | 15 | evidence.  We have one more witness, your Honor.  No further |
| 15:59:52 | 16 | questions of this witness. |
| 15:59:53 | 17 | THE COURT:  Okay.  Let's slow down.  No further |
| 15:59:55 | 18 | questions here? |
| 15:59:56 | 19 | MR. SPARKS:  That's correct, your Honor. |
| 15:59:57 | 20 | THE COURT:  All right.  You may step down. |
| 15:59:59 | 21 | THE WITNESS:  Thank you, your Honor. |
| 15:59:59 | 22 | THE COURT:  You may call your next witness. |
| 16:00:01 | 23 | MR. SPARKS:  Thank you. |
| 16:00:03 | 24 | MS. DOUGLAS:  Daniel Jones. |
| 16:00:34 | 25 | (Witness sworn.) |

16:00:46  1          THE COURT:  State your full name, please, sir, and

16:00:58  2   spell your last.

16:00:59  3          THE WITNESS:  My full name is Daniel Leonard Jones,

16:01:03  4   J-O-N-E-S.

16:01:04  5      DANIEL L. JONES, called by the Government, duly sworn.

16:01:04  6                      DIRECT EXAMINATION

16:01:04  7   BY MS. DOUGLAS:

16:01:06  8   Q.   Sir, how are you employed?

16:01:07  9   A.   I'm a Special Agent with the Bureau of Alcohol, Tobacco

16:01:11  10  Firearms and Explosives, most commonly known as ATF.

16:01:14  11  Q.   And how long have you been with ATF?

16:01:17  12  A.   I've been an ATF agent for 18 years in July.  So just over

16:01:22  13  18 years.

16:01:23  14  Q.   And in order to become an agent with the ATF, did you have

16:01:27  15  to complete some type of training?

16:01:29  16  A.   Yes.  That's correct.  After graduating from college, I was

16:01:36  17  hired by ATF, about a year afterwards, and I went through basic

16:01:41  18  criminal investigator school at the Federal Law Enforcement

16:01:43  19  Training Center.  And I also went to the ATF Academy at the

16:01:47  20  Federal Law Enforcement Center, and that's in Georgia.

16:01:51  21  Q.   And can you explain to the jury a little bit about ATF's

16:01:56  22  roles and responsibilities are?

16:01:57  23  A.   Sure.  What I do primarily for ATF is I work on violations

16:02:03  24  of the federal firearms laws.  Most of the cases that I'm

16:02:05  25  involved in on a daily basis involve firearms violations, but we

16:02:10    1  also are involved in investigations involving explosives and

16:02:14    2  arson.  And periodically, we get involved in cases involving

16:02:18    3  alcohol and tobacco, but that's pretty rare.  That goes back to

16:02:21    4  some of the old days.  But for the most part, I work on gun

16:02:24    5  cases, gun-trafficking, possession of weapons by prohibited

16:02:28    6  persons, possession of unregistered machine guns, possession of

16:02:31    7  firearms by persons that are involved in drug-trafficking, that

16:02:35    8  type of thing.

16:02:35    9  Q.   And, Agent Jones, do you have some specialized training as

16:02:39   10  it relates to firearms, where they're manufactured, and things of

16:02:43   11  that nature?

16:02:43   12  A.   Yes.  That's correct.  I'm what we refer to as a nexus

16:02:48   13  expert and I am -- I have a background that's specific to

16:02:53   14  firearms and extra training to learn as to identify a firearm,

16:02:58   15  when and where it was made, sort of the place of birth and date

16:03:02   16  of birth of firearms.  I've had quite a bit of training in that

16:03:05   17  area.

16:03:05   18  Q.   And have you been qualified as an expert in federal district

16:03:08   19  court?

16:03:09   20  A.   Yes.  I've testified as an expert on the identification of

16:03:13   21  firearms in federal court in Detroit, which is where I started my

16:03:18   22  career.  Also, in Atlanta, Georgia and Corpus Christi, Texas, as

16:03:23   23  well as having testified as an expert here in Austin, in front in

16:03:27   24  federal court before Judge Sparks and Judge Yeakel.

16:03:30   25  Q.   Tendering Agent Jones at this time as an expert in this

16:03:33  1   area, your Honor.

16:03:35  2           THE COURT:  Counsel, do you have any questions?

16:03:36  3           MR. ORR:  Oh, no, your Honor.

16:03:37  4           THE COURT:  All right.  I accept the witness as an

16:03:41  5   expert.

16:03:42  6           Members of the jury, as I've already indicated to you,

16:03:44  7   you are to construe Mr. Jones' testimony as you would any other

16:03:51  8   witness who comes before you.

16:03:53  9   Q.   (BY MS. DOUGLAS) Now, Agent Jones, you've indicated that one

16:03:58  10  of your responsibilities is to inspect firearms to determine

16:04:02  11  place of manufacture or, as you've indicated, date of birth,

16:04:05  12  place of birth, and things of that nature.

16:04:06  13  A.   Correct.

16:04:06  14  Q.   Did you become involved in this case as it relates to an

16:04:10  15  individual by the name of Arthur Longoria?

16:04:12  16  A.   Yes.

16:04:12  17  Q.   And can you tell the jury the circumstances on how you

16:04:15  18  became aware that your services were going to be needed?

16:04:17  19  A.   Sure.  ATF works a lot with APD, Austin Police Department,

16:04:24  20  on firearms cases.  And APD, when they take a case, what we call

16:04:29  21  direct file with the U.S. Attorney's Office, they still need

16:04:32  22  someone who's an expert in firearms identification to, number

16:04:35  23  one, make sure they have a firearm and to make sure that that

16:04:38  24  firearm in some point in the history of the firearm has had an

16:04:42  25  effect on interstate or foreign commerce.

16:04:43  1          So I was requested by the original APD detective,

16:04:46  2   Detective Howard Staha, to give a determination on one of the

16:04:49  3   firearms involved in this investigation.

16:04:52  4   Q.   And did you, in fact, use your skills and your experience

16:04:58  5   and your training to investigate the firearm that you were --

16:05:00  6   that you were notified about?

16:05:01  7   A.   That's correct.

16:05:02  8   Q.   And what was that firearm?

16:05:03  9   A.   The firearm was a Hi-Point.  It's a Model CF380.  It's a

16:05:08  10  .380 caliber, semiautomatic pistol, and it's made by Beemiller,

16:05:12  11  Incorporated in Mansfield, Ohio.

16:05:20  12  Q.   And, Agent Jones, I'm going to show you what's been marked

16:05:31  13  for identification purposes as Government's Exhibit No. 6, and

16:05:34  14  I've taken it out of the bag, but this is the bag that it's come

16:05:37  15  out of.  If you will take a moment to examine that firearm.

16:05:39  16  A.   Yes.

16:05:40  17  Q.   And is this the firearm information that you were given in

16:05:45  18  order to make an expert opinion on whether or not it was

16:05:47  19  manufactured in the state of Texas?

16:05:48  20  A.   That's correct.  I actually examined this firearm, and if

16:05:52  21  you look on the bag you can see my initials on here, DLJ, for

16:05:56  22  Daniel Leonard Jones, ATF 3069, which is my badge number.  And I

16:06:02  23  claimed this gun on June 20th, 2008.  And I also recognize the

16:06:05  24  serial number on the firearm is consistent with the serial number

16:06:10  25  on my report.  And this is the same firearm that I examined in

16:06:13  1  reference to this investigation.

16:06:31  2  Q.    Now, Agent Jones, I don't know if you could see from your

16:06:33  3  vantage point, but at the bottom of the bag, is that what you

16:06:36  4  were referring to?

16:06:36  5  A.    Yeah.  That's my handwriting with a black Sharpie with the

16:06:40  6  evidence tape has been cut there, DLJ -- D.L. Jones, excuse me,

16:06:45  7  Daniel Leonard Jones, ATF, and then, 306 and the 9 is probably

16:06:50  8  cut off there.  That's my badge number.  There you go.

16:07:01  9  Q.    Can you see the information that you would need off of here

16:07:06  10  to kind of show the jury where you're getting that information?

16:07:10  11  A.    Sure.  All firearms are required to have certain information

16:07:15  12  on them.  That information includes the name and the

16:07:20  13  manufacturer, the model of the firearm, the caliber, and the

16:07:24  14  place of manufacture, or place of origin.  And if the gun is

16:07:28  15  actually from outside of the United States, it must also have the

16:07:31  16  name of the importer.

16:07:32  17        This particular firearm, you could see the triangle,

16:07:36  18  which is a trademark symbol for Hi-Point.  And then, it's a

16:07:40  19  little bit blurry there, but it says Beemiller, Mansfield, Ohio,

16:07:44  20  Model CF380, a .380 ACP, that's the caliber.  The serial number

16:07:50  21  on this particular gun is actually on a plate that's on the

16:07:52  22  bottom side of the frame.  This is a -- serial numbers starts

16:07:56  23  with a letter P because it's a polymer frame; it's actually made

16:08:01  24  out of plastic.  And you could see where the letter P prefix,

16:08:07  25  prior to the numbers there.  So 870065 with a P prefix.  The full

16:08:15  1  serial number is P870065.  And this particular firearm is pretty

16:08:21  2  recently manufactured.  The gun was made in 2007, which was just

16:08:25  3  last year, and it was made in the state of Ohio by Beemiller,

16:08:29  4  Incorporated.  They're a fairly large company, make about 100,000

16:08:32  5  guns a year.

16:08:41  6  Q.   Now, Agent Jones, I believe you indicated that one of your

16:08:44  7  roles is making a nexus determination.  I believe you explained

16:08:47  8  to the jury what that was.  But now that you've testified about

16:08:49  9  your opinion as it relates to this firearm, can you put it into

16:08:53  10  terms that they would understand about it manufactured and being

16:08:57  11  found here in the state of Texas?

16:08:58  12  A.   Yeah.  One of the things that I'm trying to establish when I

16:09:03  13  examine a firearm is at any point in the history of that gun's

16:09:08  14  life, did it have an effect on interstate and/or foreign

16:09:13  15  commerce.  Not necessarily transported by the person that's

16:09:16  16  caught with it or being charged with it but at any point in the

16:09:18  17  history of that gun.  This particular firearm, as I stated

16:09:22  18  earlier, it was made in Ohio by a company called Beemiller,

16:09:26  19  Incorporated.  Their trademark is Hi-Point, and they actually

16:09:30  20  have a distributor out of Dayton, Ohio, where they send all their

16:09:33  21  guns, and then, those guns go to retail level to gun shops.

16:09:37  22          In order for this gun to have arrived here in Texas, it

16:09:41  23  had to, at some point in its life, cross state lines because it

16:09:45  24  was made in Ohio.  There's no other way it could have gotten here

16:09:48  25  without crossing state lines.

16:09:51   1   Q.   Agent Jones, I have just a few more questions for you.

16:09:53   2        In your training and experience and your role with ATF,

16:09:59   3   are there companies that are licensed to sell firearms?

16:10:05   4   A.   Yes.  Every company is licensed to manufacture, sell, import

16:10:15   5   firearms.  They have to be licensed by ATF.  We're the ones that

16:10:18   6   give them the license.  We're the ones that regulate them.  We're

16:10:21   7   the ones that inspect them.  We're the ones that monitor them.

16:10:25   8   So Hi-Point, since 1993, they have had a license in Ohio to

16:10:30   9   manufacture these firearms.  They've never been licensed in

16:10:33  10   anywhere other than in the state of Ohio.

16:10:36  11   Q.   And is it -- could a person who's a convicted felon go in

16:10:42  12   the Academy -- is that one of the licensed providers?

16:10:44  13   A.   Yeah.  Academy's probably one of the bigger retail stores in

16:10:48  14   the area for firearms.

16:10:50  15   Q.   Could a convicted felon walk in the Academy and purchase a

16:10:53  16   firearm?

16:10:53  17   A.   No.  What would happen is if a subject went into the Academy

16:10:59  18   store and let's say they saw this gun in the show case, and they

16:11:02  19   said to the guy behind the counter, I would like to buy that

16:11:06  20   Hi-Point pistol, the person working in the Academy -- and

16:11:11  21   Academy's licensed by us.  They are required to ask that person

16:11:15  22   for a valid government-issued ID.  It's got to be, like, a

16:11:19  23   driver's license or state ID card.  It can't be, like, a

16:11:22  24   University of Texas ID card, or a Dell computer card, or

16:11:25  25   something.  Then that person is required to fill out a form:

16:11:28    1    It's called a Firearms Transaction Records, ATF Form 4473.  And

16:11:33    2    on that form, they're required to give their full name, their

16:11:37    3    date of birth.  They're required to give their address, their

16:11:40    4    place of birth.  Social Security number is optional, but usually

16:11:44    5    people put that on there, and they have to answer several

16:11:46    6    questions.  The questions include things such as:  Are you a

16:11:51    7    fugitive from justice?  Are you a convicted felon?  Have you ever

16:11:54    8    been convicted of a misdemeanor crime of domestic violence?  Are

16:11:58    9    you the current subject of a restraining order?  There's about

16:12:01    10   ten categories of people that are not allowed to have firearms.

16:12:04    11          So the person would have to answer all those questions.

16:12:07    12   They'd have to answer them "No" as far as all the questions about

16:12:11    13   whether or not you're a prohibited person.  And there's -- last

16:12:13    14   question is, are you the actual purchaser?  So if someone was

16:12:16    15   trying to get someone else to buy the gun for them, they have to

16:12:18    16   answer that question, as well.

16:12:19    17          Then the person who's in the store takes the ID, not

16:12:23    18   the information written on the form, but they take the actual ID

16:12:27    19   card, and they call a 1-800 number, which is the National Instant

16:12:32    20   Criminal Background Check System -- it's called NICS -- and they

16:12:36    21   call the FBI, and they look at the ID, look at the person in the

16:12:41    22   store, make sure it's the same person, and they would have the

16:12:42    23   background check conducted on that subject.  And if the person's

16:12:46    24   a convicted felon, that's going to come up in the background

16:12:49    25   check, and that sale is going to be turned down; it's going to be

16:12:53  1  denied.

16:12:53  2       There's also a place on the form where I said before,

16:12:55  3  they ask the person, are you a convicted felon?  If that person

16:12:58  4  puts "No" and the answer's "Yes," that's actually an additional

16:13:01  5  crime; that would be a felony to falsify that document in the

16:13:04  6  acquisition or the attempted acquisition of the firearm.  So

16:13:08  7  since November 30th, which happens to be my birthday, in 1998,

16:13:12  8  they started doing the NICS background checks, so now anybody

16:13:16  9  that goes into a licensed premises, whether it's McBride's, or

16:13:19  10  Academy, or even Wal-Mart sells guns -- they don't sell handguns,

16:13:23  11  but they sell rifles.  If they go into any one of these stores

16:13:26  12  and they want to buy a gun and they're a convicted felon, most

16:13:28  13  likely, they're going -- it's going to be found out.  I mean it's

16:13:32  14  going to happen.  They're going to be -- it's going to be found

16:13:35  15  out that they're a convicted felon.  The sale is going to be

16:13:37  16  denied, and the person's going to be kicked to the curb, and

16:13:40  17  we're probably going to get notified, as well.

16:13:42  18  Q.  And, Agent Jones, finally, could a convicted felon go into

16:13:46  19  that place and indicate they're buying it as a present for their

16:13:48  20  wife and be allowed to purchase it?

16:13:50  21  A.  No.  No way.  I mean if that person's prohibited, they could

16:13:53  22  say it's a present for the Judge, they're not going to get it.

16:13:57  23  If they're a convicted felon, they can't pass the background

16:14:00  24  check, they're not getting the gun.  And if the store thinks that

16:14:03  25  there's someone else there trying to fill out the paperwork for

16:14:05  1   them and they know the gun's really for that person, called a

16:14:08  2   straw purchase, they're going to kick them to the curb.

16:14:11  3        So as far as a convicted felon going into a store

16:14:14  4   that's a licensed firearms dealer and getting a gun, since

16:14:16  5   November 30th, 1998, that's become a lot, lot harder.

16:14:20  6   Q.   Pass the witness, your Honor.

16:14:23  7                    CROSS-EXAMINATION

16:14:23  8   BY MR. ORR:

16:14:29  9   Q.   Have you ever talked to Jonathan Lee?

16:14:31  10  A.   No, sir.

16:14:32  11  Q.   Don't know who he is?

16:14:33  12  A.   No, sir.

16:14:33  13  Q.   Is it possible that when you run a firearms trace to put in

16:14:38  14  an individual's name and see how many firearms they purchased?

16:14:41  15  A.   No, sir.

16:14:42  16  Q.   Can't do that?

16:14:43  17  A.   No, sir.  I can explain that.  But no, sir, you can't.

16:14:45  18  Q.   No.  I'll take your word.

16:14:47  19  A.   Okay.  Thank you.

16:14:47  20  Q.   I believe you.  It's a little late in the afternoon to have

16:14:52  21  any database in computers explained to me, anyway.

16:14:55  22        All right.  So now, you've indicated that this .380 is

16:15:02  23  interstate commerce, right, sir?

16:15:03  24  A.   It had an effect an interstate commerce.  Absolutely.

16:15:07  25  Q.   So it was manufactured in Ohio and shipped here, whatever

16:15:11   1   effect that is, right, sir?

16:15:12   2   A.    That's correct.

16:15:13   3   Q.    And other than doing that, you don't know anything at all

16:15:18   4   about this -- about the case, is that correct, more or less?

16:15:23   5   A.    My role in this particular case was to provide a nexus

16:15:27   6   statement, but I was not like one of the detectives interviewing

16:15:30   7   witnesses, and I was not on any sort of enforcement activity,

16:15:34   8   anything like that.

16:15:35   9   Q.    So that would explain why when I mentioned Jonathan Lee to

16:15:38   10  you just kind of -- obviously from expression on your face, you

16:15:41   11  didn't know him?

16:15:41   12  A.    No.  I don't know -- I don't know Jonathan Lee.

16:15:44   13  Q.    Okay.  So far as someone -- people can go to these gun shows

16:15:51   14  and purchase pistols there, correct?

16:15:53   15  A.    Yes, sir.

16:15:54   16  Q.    And so far as purchasing -- or someone who's a convicted

16:15:58   17  felon purchasing a pistol from someone who's not a licensed

16:16:01   18  firearm dealer, they can buy and nobody's going to run the check?

16:16:04   19  A.    That can happen.

16:16:05   20  Q.    In other words, you can -- there are people at these gun

16:16:09   21  shows who sell firearms?

16:16:10   22  A.    Yes, sir.

16:16:10   23  Q.    Who are not licensed firearm dealers?

16:16:13   24  A.    That is correct.

16:16:14   25  Q.    And that's kind of one of those little gray areas.  Is that

16:16:18  1  a fair way to put it or not?

16:16:19  2  A.   I think sometimes people refer to it as loophole.  But that

16:16:23  3  is a gray area.

16:16:24  4  Q.   Are you casting aspersions on lawyers now?

16:16:27  5  A.   It's just what people call them.

16:16:29  6  Q.   Mentioning and using loopholes?

16:16:31  7  A.   I guess it's called the gun show loophole.

16:16:36  8  Q.   Okay.  Well, in other words, if the government wants to

16:16:38  9  correct that, they could get the law passed through Congress to

16:16:41  10  change that, correct?

16:16:42  11  A.   It would require something to that effect.

16:16:45  12  Q.   Yeah, but it's not up to you or me --

16:16:47  13  A.   No, sir.

16:16:48  14  Q.   -- to fix that.  It's just a convicted felon can go to a gun

16:16:52  15  show, and they can look around and find somebody who's not a

16:16:54  16  licensed firearm dealer and legally, at least, buy guns from that

16:16:58  17  person except -- hang on.  Let me finish.  He can't possess the

16:17:02  18  firearm, right?

16:17:04  19  A.   Can't possess it, transfer it, or anything to that effect.

16:17:06  20  No.

16:17:06  21  Q.   That person would still be violating the law to possess a

16:17:11  22  firearm?

16:17:12  23  A.   Yeah.  If a convicted felon went to a gun show, found

16:17:15  24  someone that was not a licensed dealer and bought a gun from

16:17:18  25  them, that convicted felon is still committing a crime.

16:17:20   1   Q.   If he's walking out, if he's actually in possession of it?

16:17:25   2   A.   Correct.  If he possesses it.

16:17:27   3   Q.   Okay.  All right.  So but if they want to do it, that's what

16:17:36   4   they can go do?

16:17:37   5   A.   Unfortunately, if a convicted felon really wants a gun and

16:17:41   6   they went to the gun show, chances are they could leave the gun

16:17:43   7   show with a gun.

16:17:45   8   Q.   Now, so far as this .380 -- let me ask you this:  Do you

16:17:48   9   know anything about fingerprints on guns?

16:17:50  10   A.   Me?

16:17:50  11   Q.   Yeah.

16:17:51  12   A.   Not me personally.  No.

16:17:52  13   Q.   You don't do fingerprints on guns?

16:17:54  14   A.   No, sir.

16:17:54  15   Q.   That's, again, not your area of expert -- I thought maybe

16:17:57  16   you might have -- you probably have more than one, but I just

16:18:00  17   didn't want to -- correct?

16:18:01  18   A.   I have a lot of experience with having guns checked for

16:18:03  19   fingerprints, but I've never been the one that actually tries to

16:18:06  20   lift the fingerprints.

16:18:07  21   Q.   Let me ask you this:  So far as this exception for people

16:18:11  22   selling guns without having a license, are there any number of

16:18:14  23   firearms in a year they can sell?  Is there some upper limit?  Is

16:18:18  24   there some requirement as to when they have to get a license?

16:18:21  25   A.   There is no magic number.  There is no law that says if you

| | | |
|---|---|---|
| 16:18:25 | 1 | sell 12 or more guns a year, you have to have a license.  The |
| 16:18:30 | 2 | statute that refers to that, without getting too lawyer-ish, is |
| 16:18:34 | 3 | 18 U.S.C., Section 922(a)(1)(A).  It's engaged in the business of |
| 16:18:39 | 4 | dealing in firearms without a license, and that statute doesn't |
| 16:18:41 | 5 | define a specific number, but it does state the person's doing |
| 16:18:44 | 6 | this for profit and it's part of their livelihood, that they |
| 16:18:48 | 7 | cannot be doing this without a license. |
| 16:18:51 | 8 | Q.   Okay.  Well, and you would agree, I suppose, that if there's |
| 16:18:57 | 9 | someone in the house who's a convicted felon, that the other |
| 16:19:01 | 10 | person, anybody else that's there, there's no -- if you live with |
| 16:19:04 | 11 | a convicted felon, that doesn't -- there's nothing in the statute |
| 16:19:07 | 12 | that says you can't have a firearm, correct? |
| 16:19:08 | 13 | MS. DOUGLAS:  Your Honor, I'd object.  He's asking him |
| 16:19:10 | 14 | for a legal conclusion. |
| 16:19:11 | 15 | THE COURT:  And I sustain the objection. |
| 16:19:13 | 16 | MR. ORR:  I pass the witness.  Thank you. |
| 16:19:17 | 17 | MS. DOUGLAS:  Nothing further of this witness, your |
| 16:19:19 | 18 | Honor.  May he be released? |
| 16:19:22 | 19 | MR. ORR:  Sure. |
| 16:19:23 | 20 | THE COURT:  Yes, sir. |
| 16:19:25 | 21 | THE WITNESS:  Thank you. |
| 16:19:30 | 22 | MS. DOUGLAS:  Your Honor, that's the last government |
| 16:19:32 | 23 | witness.  Government rests. |
| 16:19:34 | 24 | THE COURT:  Okay. |
| 16:19:35 | 25 | MR. ORR:  We're ready to proceed, your Honor.  If we |

16:19:37  1    could have a moment with the jury out so we can get ready.  Short

16:19:43  2    break.

16:19:46  3            THE COURT:  Y'all have a break.  Please remember the

16:19:47  4    instructions.

16:20:15  5            (Jury not present.)

16:20:17  6            MR. ORR:  Your Honor, we move for judgment of acquittal

16:20:19  7    pursuant to Federal Rule of Criminal Procedure 29, based on the

16:20:24  8    insufficiency of the evidence to sustain a finding of guilty

16:20:27  9    against Mr. Longoria.

16:20:28  10           THE COURT:  That motion's overruled.  You need a minute

16:20:33  11   to --

16:20:34  12           MR. ORR:  Yes, sir.

16:21:01  13           (Recess.)

16:28:28  14           THE COURT:  Bring them in.

16:28:31  15           (Jury present.)

16:29:42  16           THE COURT:  Mr. Orr, you wish to call any witnesses?

16:29:45  17           MR. ORR:  Belinda Olivo.

16:29:49  18           THE COURT:  Come forward.

16:30:03  19           (Witness sworn.)

16:30:12  20           THE COURT:  If you'll tell us your full name, please,

16:30:14  21   and spell your last name.

16:30:15  22           THE WITNESS:  Belinda Diane Olivo.  Last name,

16:30:20  23   O-L-I-V-O.

16:30:20  24           THE COURT:  You may proceed.

16:30:21  25       BELINDA D. OLIVO, called by the Defendant, duly sworn.

DIRECT EXAMINATION

16:30:21  1

16:30:21  2  BY MR. ORR:

16:30:21  3  Q.   Where do you live?

16:30:23  4  A.   6809 West Gate Boulevard, Apartment 210.

16:30:26  5  Q.   That's here?

16:30:27  6  A.   Austin, Texas 78745.

16:30:30  7  Q.   Okay.  Do you know Loretta Garcia?

16:30:32  8  A.   Yes.

16:30:32  9  Q.   And do you know Arthur Longoria?

16:30:33  10  A.   Yes.

16:30:34  11  Q.   And how do you know them?

16:30:35  12  A.   Loretta's my cousin and Arthur I met through my boyfriend

16:30:40  13  that worked with him at Mazda.  They both work at Mazda South.

16:30:44  14  Q.   Oh, okay.  All right.  And have you lived in Austin all your

16:30:50  15  life?

16:30:51  16  A.   No.  I was born in Ohio.  Pretty much raised in Ohio.  Been

16:30:55  17  living in Austin for about 13 years now.

16:30:58  18  Q.   Okay.  And have you ever been to Lubbock?

16:31:01  19  A.   Yes.

16:31:01  20  Q.   Do you -- who lives in Lubbock?

16:31:03  21  A.   I have a lot of family that lives in Lubbock.  Loretta's

16:31:07  22  mother still lives there and my grandmother -- I have a lot of

16:31:12  23  aunts and uncles.

16:31:13  24  Q.   Have you ever -- do you know a guy named Jonathan Lee, also

16:31:17  25  known as "Tater"?

| | | |
|---|---|---|
| 16:31:18 | 1 | A.   Yes, I do. |
| 16:31:19 | 2 | Q.   And where did you meet him? |
| 16:31:21 | 3 | A.   I met him at Arthur and Loretta's. |
| 16:31:24 | 4 | Q.   Okay.  And how many times have you seen him there? |
| 16:31:26 | 5 | A.   A lot.  I would say probably 30 or so times. |
| 16:31:35 | 6 | Q.   Okay. |
| 16:31:35 | 7 | A.   Several different apartments. |
| 16:31:39 | 8 | Q.   Let me ask you this:  Does -- were Loretta and Mr. Lee, |
| 16:31:46 | 9 | "Tater," that is, were they friends? |
| 16:31:47 | 10 | A.   Yes. |
| 16:31:47 | 11 | Q.   How long had they been friends? |
| 16:31:49 | 12 | A.   At least two or more years. |
| 16:31:52 | 13 | Q.   Okay.  And had they -- were you -- have you ever had dinner |
| 16:31:57 | 14 | with "Tater"? |
| 16:31:57 | 15 | A.   Yes. |
| 16:31:58 | 16 | Q.   Excuse me, Mr. Lee? |
| 16:31:59 | 17 | A.   Yes. |
| 16:31:59 | 18 | Q.   And where was that at? |
| 16:32:01 | 19 | A.   At Loretta's. |
| 16:32:01 | 20 | Q.   Here in Austin? |
| 16:32:02 | 21 | A.   Yes. |
| 16:32:03 | 22 | Q.   Have you ever had dinner with him in Lubbock? |
| 16:32:06 | 23 | A.   I wasn't there for the Thanksgiving dinner. |
| 16:32:09 | 24 | Q.   Okay.  So let me you ask you this:  Have you ever heard Mr. |
| 16:32:12 | 25 | Lee brag about buying and selling firearms? |

| | | |
|---|---|---|
| 16:32:16 | 1 | A.   I did hear him discuss or shoot off -- shoot his mouth off |
| 16:32:21 | 2 | about buying guns at a gun show and how him and his father would |
| 16:32:25 | 3 | collect guns and -- |
| 16:32:27 | 4 | MS. DOUGLAS:  Your Honor, excuse me, I'm going to have |
| 16:32:28 | 5 | to object.  I believe this is hearsay what she's telling -- |
| 16:32:31 | 6 | THE COURT:  It is hearsay.  I sustain the objection. |
| 16:32:34 | 7 | MR. ORR:  Offering for purposes of impeachment, not for |
| 16:32:36 | 8 | the purpose of truth, because he was minimizing his role as gun |
| 16:32:40 | 9 | dealer, your Honor, or gun seller. |
| 16:32:42 | 10 | THE COURT:  It's hearsay and I instruct the jury not to |
| 16:32:45 | 11 | consider it for any purpose. |
| 16:32:46 | 12 | Q.   (BY MR. ORR) Okay.  Did you ever see any guns at the |
| 16:32:57 | 13 | apartment there of Loretta's or Loretta and/or Arthur's? |
| 16:33:03 | 14 | A.   No, sir. |
| 16:33:05 | 15 | Q.   I pass the witness. |
| 16:33:19 | 16 | THE COURT:  Members of the jury, I'm going to let you |
| 16:33:21 | 17 | go home.  If you are quick, you might get out by 5:00.  If I keep |
| 16:33:32 | 18 | you any more, there's no point in letting you all go home till |
| 16:33:36 | 19 | 6:00.  But I could see that we're going to have some evidence |
| 16:33:38 | 20 | tomorrow, anyway.  So please remember the instructions.  I'd like |
| 16:33:42 | 21 | for you to be back at 9:00, ready to go to work at 9:00.  Anybody |
| 16:33:49 | 22 | have any questions?  All right.  You're discharged. |
| 16:34:24 | 23 | (Jury not present.) |
| 16:34:26 | 24 | THE COURT:  Ms. Olivo, I'm going to ask you to step out |
| 16:34:28 | 25 | in the hall for just a second. |

| 16:34:30 | 1 | THE WITNESS:  Okay. |

16:34:30    1            THE WITNESS:  Okay.

16:34:50    2            THE COURT:  What does the government intend to ask this

16:34:52    3    witness?

16:34:54    4            MS. DOUGLAS:  We're waiting on the confirmation on her

16:34:56    5    criminal history.  Our initial determination is that she has a

16:34:59    6    theft by check.  We're trying to confirm the status of it, your

16:35:02    7    Honor.  And we might have --

16:35:04    8            THE COURT:  Well, theft by check is nothing.  I'm not

16:35:06    9    concerned about that.  Counsel asked if she's ever seen guns in

16:35:12   10    the home.  The government intends to ask what she has seen in the

16:35:20   11    home, and has she seen methamphetamine, and has she seen

16:35:25   12    marihuana, has she seen cocaine, has she seen scales, and has she

16:35:33   13    seen body armor, has she seen police scanners.

16:35:40   14            MS. DOUGLAS:  Yes, your Honor.  I think that goes to

16:35:42   15    their credibility on being truthful with the Court.

16:35:44   16            MR. ORR:  Well, your Honor, I didn't open --

16:35:45   17            THE COURT:  There's no question that they're entitled

16:35:47   18    to do that.  The next to the last question, what have you seen.

16:35:53   19    Stays clean for a while, but there's just nothing to do about it.

16:35:56   20    See y'all in the morning.  Tell the witness she must return in

16:36:00   21    the morning, ten of 9:00.

16:36:00   22            (Proceedings adjourned.)

           23

           24

           25